## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

THE ESTATE OF AARON JIMENEZ, deceased, by
and through EUGENIO S. MATHIS, personal
representative of the estate,

   Plaintiff,

vs.             No. 24-CV-00316-SCY-JMR

WEXFORD HEALTH SOURCES, INC.; ALISHA
TAFOYA LUCERO, NM SECRETARY FOR
DEPARTMENT OF CORRECTIONS, in her individual
capacity; WENCE ASONGANYI, NMCD HEALTH
SERVICES ADMINISTRATOR, in his individual
capacity; ORION STRADFORD, NMCD BUREAU
CHIEF, in his individual capacity; MICHAEL
HILDENBRANDT, WEXFORD DIRECTOR OF
OPERATIONS, in his individual capacity; JOSEPH
MONTOYA, WEXFORD HEALTH SERVICES
ADMINISTRATOR OF CNMCF, in his individual
capacity; DR. KESHAB PAUDEL, WEXFORD
REGIONAL MEDICAL DIRECTOR, in his individual
capacity; RAUL NOCHES, WEXFORD REGIONAL
MANAGER OF CNMCF, in his individual capacity;
RAJESH SHARMA, WEXFORD MEDICAL DIRECTOR
OF CNMCF, in his individual capacity; SARAH
CARTWRIGHT, WEXFORD REGIONAL DIRECTOR
OF NURSING, in her individual capacity; DAVID
WHIPPLE, WEXFORD DIRECTOR OF NURSING OF
CNMCF, in his individual capacity; DENISE JONES,
WEXFORD DIRECTOR OF NURSING OF CNMCF, in
her individual capacity; LYNNSEY VIGIL, WEXFORD
UTILIZATION MANAGEMENT COORDINATOR, in
their individual capacity; and HEATHER GARZA,
WEXFORD UTILIZATION MANAGEMENT
COORDINATOR, in her individual capacity,

   Defendants.

## NEW MEXICO CORRECTIONS DEPARTMENT'S ANSWER TO PLAINTIFF'S
## COMPLAINT AND DEMAND FOR JURY TRIAL

  COME NOW Defendants Alisha Tafoya Lucero, Wence Asonganyi, and Orion Stradford, all sued in

their individual capacities (together, NMCD Defendants), through their undersigned counsel, who hereby

submit their answer to Plaintiff's Complaint.

**RESPONSE TO PRELIMINARY STATEMENT**

1. The New Mexico Corrections Department ("NMCD") and Wexford Health Sources, Inc. ("Wexford") acting through their respective employees, staff, agents, and assign named above in their individual capacities, knew that Mr. Jimenez was at a high risk of developing sepsis (life-threatening, overwhelming infection) and endocarditis (a life-threatening inflammation of the inner lining of the heart's chambers and valves) and that he was suffering from increasing and debilitating pain that was not ameliorated over time or through pain medication. Yet, Defendants deliberately and recklessly ignored an emergent infection and Mr. Jimenez's high risk of endocarditis, which caused him to experience severe sepsis, endocarditis, and heart failure, resulting in his wrongful death.

**ANSWER: NMCD Defendants deny the allegations contained in this paragraph.**

2. Mr. Jimenez's severe sepsis, endocarditis, and heart failure—along with the accompanying prolonged pain, suffering, and death—were, in part, the result of Wexford's widespread pattern and practice of failing to provide constitutionally adequate medical care and effectively denying patients access to medical care. His injuries and suffering were also caused, in part, by NMCD's longstanding pattern and practice of responding with deliberate indifference to the failures of its medical contractors to provide constitutionally adequate medical care to NMCD prisoners.

**ANSWER:     NMCD Defendants deny the allegations contained in this paragraph.**

3. The actions and inactions of Defendants violated Mr. Jimenez's rights secured by 42 U.S.C. § 1983 under the Eighth and Fourteenth Amendments to the United States Constitution.

**ANSWER:     NMCD Defendants deny the allegations contained in this paragraph.**

**JURISDICTION AND VENUE**

4. This action arises under the Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1983 and 1988.

**ANSWER:     No response is required to this statement. If a response is required, NMCD Defendants deny.**

5. Subject matter jurisdiction in conferred by 28 U.S.C. § 1331.

**ANSWER:     This statement is a legal conclusion for which no response is required. If a response is required, NMCD Defendants deny.**

6. This Court has personal jurisdiction over each of the entity and individual Defendants because, upon information and belief, all Defendants are domiciled in the State of New Mexico and/or have substantial contacts in the State of New Mexico and purposefully availed themselves of conducting business in New Mexico.

**ANSWER:     NMCD Defendants admit as to NMCD Defendants.**

7. Venue is proper here under 28 U.S.C. § 1391(b)(2), because, upon information and belief, a majority of the Defendants reside in this judicial district and the events and omissions giving rise to Plaintiff's claims occurred in this judicial district.

**ANSWER:     This statement is a legal conclusion for which no response is required. If a response is required, NMCD Defendants deny.**

## PARTIES

8. Plaintiff Eugenio S. Mathis, personal representative of the Estate of Aaron Jimenez, deceased, is a resident of the United States presently domiciled in Las Vegas, New Mexico. At the time of his death, Mr. Jimenez was physically located in New Mexico. During all relevant times, he was in the custody of the NMCD. Until his subsequent transfer to the University of New Mexico Hospital ("UNMH") for emergency care, he was housed at Central New Mexico Correctional Facility ("CNMCF") in Los Lunas, New Mexico. CNMCF is a state-run facility managed and operated by New Mexico State agency NMCD and existing under the laws of the State of New Mexico. CNMCF is operated in accordance with NMCD rules, policies, and procedures. NMCD, through its employees,

staff, agents, and assigns, who are named in their individual capacities, is responsible for the policies, practices, supervision, implementation, and conduct of all CNMCF matters and for the appointment, training, supervision, and conduct of all CNMCF personnel, including the individual Defendants specifically named herein.

**ANSWER:   NMCD Defendants admit as to NMCD Defendants only.**

9. Defendant Wexford is a foreign corporation registered to do business in New Mexico. Wexford, by the terms of the Professional Services Contract, #20-770-1300-1200-0043 ("PSC"), was contracted by NMCD for the purposes of providing medical care to prisoners in the NMCD prison system, including Mr. Jimenez. Upon information and belief, the term of the PSC began on or about October 19, 2019 and was in effect at all times relevant to this Complaint.

**ANSWER:   NMCD Defendants admit the first two sentences of this paragraph and deny the remaining allegations in this paragraph.**

10. Under the PSC, Wexford was acting as the apparent and actual agent, servant, and contractor of NMCD and was responsible for the care, health, safety, and proper medical treatment of all prisoners in NMCD's facilities, including Mr. Jimenez. Pursuant to the PSC, NMCD adopted Wexford's policies, practices, habits, customs, procedures, training, and supervision as its own, and Wexford adopted NMCD's policies, practices, habits, customs, procedures, training, and supervision as its own. Wexford acted by and through its employees, staff, agents and assigns who are named in their individual capacities.

**ANSWER:   NMCD Defendants deny the allegations contained in this paragraph.**

11. Defendant Alisha Tafoya Lucero served as the New Mexico Secretary for the Department of Corrections at all times relevant to this Complaint. As the Secretary for the Department of Corrections, Ms. Lucero oversaw prison operations, including NMCD's nondelegable duty to provide a safe environment at its facilities, including CNMCF, and to ensure that prisoners have access to

adequate health care. She was an agent of NMCD, acting within scope of her employment at all times relevant to this lawsuit. She is sued herein in her individual capacity.

**ANSWER:** **The allegations in this paragraph contain legal conclusions for which no response is required. If a response is required, NMCD Defendants deny.**

12. Defendant Wence Asonganyi served as the Health Services Administrator ("HSA") for NMCD at all times relevant to this Complaint. As HSA for NMCD, Mr. Asonganyi maintained direct clinical oversight over independent medical contractors, and was responsible for ensuring that NMCD contractors provided adequate care to NMCD prisoners, including those at CNMCF and specifically, Mr. Jimenez. He was an agent of NMCD, acting within the scope of his employment at all times relevant to this lawsuit. He is sued herein in his individual capacity.

**ANSWER:** **The allegations in this paragraph contain legal conclusions for which no response is required. If a response is required, NMCD Defendants deny.**

13. Defendant Orion Stradford served as the NMCD Bureau Chief at all times relevant to this Complaint. As NMCD Bureau Chief, Mr. Stradford was responsible for monitoring the work of independent contractors, including Wexford, and acted as NMCD's supervisor over its independent contractors. He was an agent of NMCD, acting within the scope of his employment at all times relevant to this lawsuit. He is sued herein in his individual capacity.

**ANSWER:** **The allegations in this paragraph contain legal conclusions for which no response is required. If a response is required, NMCD Defendants deny.**

14. Defendant Michael Hildenbrandt served as Wexford's Director of Operations at all times relevant to this Complaint. As the Director of Operations, Mr. Hildenbrandt was responsible for overseeing Wexford's operations within New Mexico prisons and ensuring that Wexford met its duty to provide constitutionally adequate medical care to prisoners within the NMCD facilities in which it

operated. He was an agent of Wexford and NMCD, acting within the scope of his employment at all times relevant to this lawsuit. He is sued herein in his individual capacity.

**ANSWER:     The allegations in this paragraph do not pertain to NMCD Defendants; accordingly, no response is required. Furthermore, the allegations in this paragraph contain legal conclusions for which no response is required. If a response is required, NMCD Defendants deny.**

15. Defendant Joseph Montoya served as Wexford's Health Services Administrator of CNMCF at all times relevant to this Complaint. As the HSA, Mr. Montoya maintained direct clinical oversight of Wexford staff, agents, and independent contractors and was responsible for ensuring that all such individuals provided adequate care to NMCD prisoners, including those at CNMCF and specifically Mr. Jimenez. He was an agent of Wexford and NMCD, acting within the scope of his employment at all times relevant to this lawsuit. He is sued herein in his individual capacity.

**ANSWER:     The allegations in this paragraph do not pertain to NMCD Defendants; accordingly, no response is required. Furthermore, the allegations in this paragraph contain legal conclusions for which no response is required. If a response is required, NMCD Defendants deny.**

16. Defendant Dr. Keshab Paudel served as Wexford's Regional Medical Director for New Mexico's region at all times relevant to this Complaint. As the Regional Medical Director, Dr. Paudel was responsible for the care, health, safety and proper medical treatment of Mr. Jimenez. He was an agent of Wexford and NMCD, acting within the scope of his employment at all times relevant to this lawsuit. He is sued herein in his individual capacity.

**ANSWER:     The allegations in this paragraph do not pertain to NMCD Defendants; accordingly, no response is required. Furthermore, the allegations in this paragraph contain**

legal conclusions for which no response is required. If a response is required, NMCD Defendants deny.

17. Defendant Kathy Armijo served as Wexford's Regional Manager of CNMCF at all times relevant to this Complaint. As the Regional Manager of CNMCF, Ms. Armijo was responsible for the care, health, safety and proper medical treatment of Mr. Jimenez. She was an agent of Wexford and NMCD, acting within the scope of her employment at all times relevant to this lawsuit. She is sued herein in her individual capacity.

**ANSWER:** **The allegations in this paragraph do not pertain to NMCD Defendants; accordingly, no response is required. Furthermore, the allegations in this paragraph contain legal conclusions for which no response is required. If a response is required, NMCD Defendants deny.**

18. Defendant Rajesh Sharma served as Wexford's Medical Director of CNMCF at all times relevant to this Complaint. As Medical Director, Mr. Sharma was responsible for the care, health, safety and proper medical treatment of Mr. Jimenez. He was an agent of Wexford and NMCD, acting within the scope of his employment at all times relevant to this lawsuit. He is sued herein in his individual capacity.

**ANSWER:** **The allegations in this paragraph do not pertain to NMCD Defendants; accordingly, no response is required. Furthermore, the allegations in this paragraph contain legal conclusions for which no response is required. If a response is required, NMCD Defendants deny.**

19. Defendant Sarah Cartwright served as Wexford's Regional Director of Nursing for New Mexico's region at all times relevant to this Complaint. As the Regional Director of Nursing, Ms. Cartwright was responsible for the care, health, safety and proper medical treatment of Mr. Jimenez.

She was an agent of Wexford and NMCD, acting within the scope of her employment at all times relevant to this lawsuit. She is sued herein in her individual capacity.

**ANSWER:     The allegations in this paragraph do not pertain to NMCD Defendants; accordingly, no response is required. Furthermore, the allegations in this paragraph contain legal conclusions for which no response is required. If a response is required, NMCD Defendants deny.**

20. Defendant David Whipple served as one of Wexford's Directors of Nursing at CNMCF at all times relevant to this Complaint. As a CNMCF Director of Nursing, Mr. Whipple was responsible for the care, health, safety and proper medical treatment of Mr. Jimenez. He was an agent of Wexford and NMCD, acting within the scope of his employment at all times relevant to this lawsuit. He is sued herein in his individual capacity.

**ANSWER:     The allegations in this paragraph do not pertain to NMCD Defendants; accordingly, no response is required. Furthermore, the allegations in this paragraph contain legal conclusions for which no response is required. If a response is required, NMCD Defendants deny.**

21. Defendant Denise Jones served as one of Wexford's Directors of Nursing at CNMCF at all times relevant to this Complaint. As a CNMCF Director of Nursing, Ms. Jones was responsible for the care, health, safety and proper medical treatment of Mr. Jimenez. She was an agent of Wexford and NMCD, acting within the scope of her employment at all times relevant to this lawsuit. She is sued herein in her individual capacity.

**ANSWER:     The allegations in this paragraph do not pertain to NMCD Defendants; accordingly, no response is required. Furthermore, the allegations in this paragraph contain legal conclusions for which no response is required. If a response is required, NMCD Defendants deny.**

22. Defendants Lynnsey Vigil and Heather Garza both served as Wexford's Utilization Management Coordinator Nurses at all times relevant to this Complaint. As Utilization Management Coordinators, they participated in the utilization management process and were responsible for the care, health, safety and proper medical treatment of Mr. Jimenez. They were agents of Wexford and NMCD, acting within the scope of their employment at all times relevant to this lawsuit. They are sued herein in their individual capacities.

**ANSWER:     The allegations in this paragraph do not pertain to NMCD Defendants; accordingly, no response is required. Furthermore, the allegations in this paragraph contain legal conclusions for which no response is required. If a response is required, NMCD Defendants deny.**

23. At all times relevant to this Complaint, each of the abovenamed Defendants was an employee and/or agent of a New Mexico state-run entity or a private medical service responsible for treating State prisoners, a task which was ultimately the responsibility of the State. Accordingly, all Defendants were acting under color of state law at all relevant times.

**ANSWER: The allegations in this paragraph contain legal conclusions for which no response is required. If a response is required, NMCD Defendants deny.**

### FACTUAL BACKGROUND

### I. MR. JIMENEZ COMPLAINED OF SEVERE PAIN AND THE INABILITY TO SEE OR WALK FOR NEARLY TWO WEEKS BEFORE DEFENDANTS FINALLY TRANSFERRED HIM TO A HOSPITAL FOR EMERGENCY MEDICAL CARE.

**RESPONSE TO HEADNOTE I:   NMCD Defendants deny the claims contained in this headnote.**

24. At the time that Mr. Jimenez began complaining of his medical injuries, he was 38 years old and imprisoned by NMCD at CNMCF, where Wexford was contracted to provide medical services to prisoners.

**ANSWER:** **NMCD Defendants admit the allegations contained in this paragraph.**

25. While incarcerated at CNMCF, Mr. Jimenez had a history of intravenous drug abuse that made him susceptible to infections, including endocarditis, and this history was known to Wexford and NMCD staff, including the individual Defendants, through Mr. Jimenez's prison file and regular conversations amongst Wexford medical staff and the individual Defendants.

**ANSWER:** **NMCD Defendants deny the allegations contained in this paragraph.**

26. On March 22, 2021, Mr. Jimenez told Wexford medical staff (a term which includes nurses, medical unit assistants, and other staff who are medically-trained and/or worked within the medical areas of CNMCF) that he was not feeling well. He pleaded for Wexford medical staff to help him. He also explained: "I'm walking around all wobbly like I'm drunk. My vision is blurred, and I feel like I'm dehydrated. I can't drink enough water. My voice is even going away. . . I'm seeing two of you." He also informed Wexford medical staff that the side of his face was numb and he had been vomiting.

**ANSWER:** **NMCD Defendants deny the allegations contained in this paragraph.**

27. Despite these severe and concerning symptoms, Wexford medical staff merely gave him a one-time dose of Tylenol for his headache and discharged him back to his cell.

**ANSWER:** **NMCD Defendants deny the allegations contained in this paragraph.**

28. About three hours later the same day, Mr. Jimenez sought the help of Wexford medical staff again, informing them that he could not eat or drink because he was vomiting everything he consumed. Wexford medical staff noted that his skin was warm and dry and that he looked pale. Still, Wexford medical staff provided him with no medical care, and he was again sent back to his prison cell.

**ANSWER:** **NMCD Defendants deny the allegations contained in this paragraph.**

29. That evening, Mr. Jimenez submitted a written medical request, writing: "I think I got a ear infection cause the right side of my head has been throb[b]ing painfully for 2 days. I'm walking

like I'm drunk. The pain is from my lower right ear to my jaw and behind my ear to the whole right side of my head. Please help me."

      **ANSWER:**    **NMCD Defendants deny the allegations contained in this paragraph.**

30. Upon information and belief, Wexford medical staff did not respond to Mr. Jimenez's written medical request. They took no action to address it.

      **ANSWER:**    **NMCD Defendants deny the allegations contained in this paragraph.**

31. On March 24, 2021, Mr. Jimenez again sought out medical assistance from Wexford medical staff, complaining of an earache in his right ear. Wexford medical staff noted that his right ear was swollen. He was given ear drops used to treat infection and irritation, Keflex (an antibiotic), and Rocephin (another antibiotic).

      **ANSWER:**    **NMCD Defendants deny the allegations contained in this paragraph.**

32. On March 26, 2021, Mr. Jimenez asked Wexford medical staff to address and evaluate his ear pain and his blurry vision. He noted that his ear pain had lessened but that his blurry vision persisted. Wexford medical staff noted in his file that he needed an eye examination, but he was never provided with this examination despite repeated and persistent complaints of continuing blurry vision and loss of balance.

      **ANSWER:**    **NMCD Defendants deny the allegations contained in this paragraph.**

33. Rather than provide Mr. Jimenez with the eye examination that he needed, as was noted repeatedly in his file, Wexford medical staff merely administered a cursory evaluation of his vitals on March 31, 2021. Mr. Jimenez was "prescribed" Gatorade for his abnormal vitals. Again, nothing was done to even attempt to address his blurry vision, which Mr. Jimenez had persistently pleaded for help to address for the past 10 days.

      **ANSWER:**    **NMCD Defendants deny the allegations contained in this paragraph.**

34. On March 31, 2021, Mr. Jimenez again emphasized that he still had blurry vision that was not improving. Yet again, Wexford medical staff did nothing to attempt to determine the cause of his blurry vision—limiting their treatment to providing him with Gatorade, which is patently not medical care.

**ANSWER:** **NMCD Defendants deny the allegations contained in this paragraph.**

35. Again, rather than providing Mr. Jimenez with the eye examination that he required, Wexford medical staff conducted another vitals check on April 2, 2021. Yet again, Wexford medical staff made no attempt to diagnose or treat his complaints of persistent blurry vision.

**ANSWER:** **NMCD Defendants deny the allegations contained in this paragraph.**

36. On April 3, 2021, Mr. Jimenez was seen by Wexford medical staff due to complaints of weakness and the inability to stand. Wexford medical staff noted that he had labored breathing, pale lips, and an increased respiratory rate. He complained of heart pain, shortness of breath, vomiting, and severe right upper quadrant pain. In response, Wexford medical staff simply gave him more Gatorade and oxygen.

**ANSWER:** **NMCD Defendants deny the allegations contained in this paragraph.**

37. Approximately 90 minutes later, emergency medical services arrived at CNMCF to transport Mr. Jimenez to UNMH for emergency medical care. Mr. Jimenez was brought to the ambulance in a wheelchair. He told emergency medical staff that he could feel a lump on his side and was still suffering from blurry vision and growing, severe body pain.

**ANSWER:** **NMCD Defendants are without knowledge or information sufficient to determine the truth of the allegations contained in this paragraph; accordingly, NMCD Defendants deny the allegations contained in this paragraph.**

38. Immediately upon learning of Mr. Jimenez's symptoms, the outside emergency medical staff knew that he was likely suffering from sepsis, and he was taken to the hospital's trauma unit for

a sepsis work-up. He died a day later due to Defendants' delay in providing him with necessary medical care and waiting until his death was imminent before transferring him to a medical provider qualified to address his life-threatening condition.

**ANSWER:     NMCD Defendants are without knowledge or information sufficient to determine the truth of the allegations contained in this paragraph; accordingly, NMCD Defendants deny the allegations contained in this paragraph.**

39. Upon information and belief, Mr. Jimenez was never seen by a doctor or other medical staff member qualified to triage his infection and sepsis symptoms during the entire time that he was complaining of blurry vision, vomiting, and the inability to eat or drink without vomiting, minimally from March 22, 2021 to April 3, 2021. During this time, Mr. Jimenez was never seen by any medical provider capable of competently evaluating, diagnosing, and/or treating Mr. Jimenez's symptoms and conditions.

**ANSWER:     NMCD Defendants deny the allegations contained in this paragraph.**

40. Additionally, from at least March 22, 2021 to April 3, 2021, Mr. Jimenez was denied critical medical care despite persistent and repeated complaints of symptoms that are clear indicators of runaway infection, sepsis, and endocarditis, especially when combined with Mr. Jimenez's known risk factors for endocarditis.

**ANSWER:     NMCD Defendants deny the allegations contained in this paragraph.**

41. Rather than properly diagnose and treat Mr. Jimenez, Wexford medical staff simply took his vitals and provided Tylenol, antibiotics, and Gatorade, which had already been proven ineffective, before sending Mr. Jimenez back to his cell in an increasingly severe and debilitating state. Wexford medical staff ignored Mr. Jimenez's pain and deteriorating health even after the point at which Mr. Jimenez could not walk.

**ANSWER:     NMCD Defendants deny the allegations contained in this paragraph.**

42. Wexford medical staff overseeing CNMCF acted and failed to act with reckless disregard and deliberate indifference to Mr. Jimenez's serious medical needs, including through the following: (a) failing to obtain a diagnosis by a qualified medical doctor and instead relying on triage and diagnoses by nurses and medical staff unqualified to diagnose sepsis and endocarditis, (b) failing to refer Mr. Jimenez to an outside medical provider for proper diagnosis and treatment despite knowing that staff at CNMCF lacked the diagnostic capability concerning sepsis and endocarditis, (c) failing to develop, employ, and follow appropriate policies and procedures with regard to the assessment, treatment, and management of sepsis and endocarditis, and (d) failing to provide Mr. Jimenez with necessary and proper pain management.

**ANSWER:    NMCD Defendants deny the allegations contained in this paragraph.**

43. The Wexford Medical Director of CNMCF, Defendant Rajesh Sharma, failed to see Mr. Jimenez as his health rapidly deteriorated. Mr. Sharma showed a complete lack of interest or concern for Mr. Jimenez's health and safety despite the fact that he was displaying clear signs of sepsis and endocarditis, and both conditions are common in NMCD facilities. Mr. Sharma displayed deliberate indifference to Mr. Jimenez's critical, life-threatening infection.

**ANSWER:    NMCD Defendants deny the allegations contained in this paragraph.**

44. Additionally, upon information and belief, on-site medical personnel, including medical doctors and the Directors of Nursing, cannot make a referral to an outside medical provider without prior corporate approval through the utilization management review process, regardless of the diagnostic and/or treatment limitations that exist at any given NMCD facility, including CNMCF. Because of this policy, the referral of Mr. Jimenez for emergency care was not made until it was too late to prevent his death.

**ANSWER:    NMCD Defendants deny the allegations contained in this paragraph.**

14

45. Upon information and belief, Defendants Dr. Keshab Paudel, Lynnsey Vigil, Heather Garza, Kathy Armijo, and Rajesh Sharma determined when an NMCD prisoner at CNMCF could be transferred to an outside medical provider. Upon information and belief, in making this determination, they utilized an automated software that was modeled on insurance industry standards for approval of referrals. Nurses input data into the software and referrals could be automatically refused based upon the software's own automated process, with no regard for constitutional standards concerning prisoner medical care.

**ANSWER:     NMCD Defendants are without knowledge or information sufficient to determine the truth of the allegations contained in this paragraph; accordingly, NMCD Defendants deny the allegations contained in this paragraph.**

46. Upon information and belief, this process was used in Mr. Jimenez's case, which caused him to be denied access to constitutionally adequate medical care.

**ANSWER:     NMCD Defendants deny the allegations contained in this paragraph.**

**II. MR. JIMENEZ DIED DUE TO SEPSIS, ENDOCARDITIS, AND HEART FAILURE BECAUSE OF DEFENDANTS' DELIBERATE INDIFFERENCE TO HIS LIFE-THREATENING CONDITION.**

**RESPONSE: NMCD Defendants deny the allegations contained in this headnote.**

47. At approximately 3:30 PM on April 3, 2021, Mr. Jimenez arrived at the UNMH Emergency Room presenting noted symptoms of hypoxia (insufficient oxygen), tachycardia (an abnormally fast heartbeat), and tachypnea (rapid breathing). Hospital staff noted that he had labored breathing, pale skin, and was in distress.

**ANSWER:     NMCD Defendants are without knowledge or information sufficient to determine the truth of the allegations contained in this paragraph; accordingly, NMCD Defendants deny the allegations contained in this paragraph.**

48. At approximately 4:00 PM the same day, x-rays of Mr. Jimenez's chest revealed that he had an enlarged cardiac silhouette, diffuse hazy opacities throughout his lungs, and pleural effusions (fluid buildup in the space between the lung and the chest wall). Hospital staff suspected that he had multifocal pneumonia (a lung infection) and/or pulmonary edema (excess fluid in the lungs). He had a temperature of nearly 103 degrees Fahrenheit.

**ANSWER:     NMCD Defendants are without knowledge or information sufficient to determine the truth of the allegations contained in this paragraph; accordingly, NMCD Defendants deny the allegations contained in this paragraph.**

49. Based on Mr. Jimenez's symptoms, hospital medical staff noted concern that he had developed endocarditis.

**ANSWER:     NMCD Defendants are without knowledge or information sufficient to determine the truth of the allegations contained in this paragraph; accordingly, NMCD Defendants deny the allegations contained in this paragraph.**

50. At approximately 5:30 PM on April 3, 2021, Mr. Jimenez was diagnosed with sepsis, acute aortic regurgitation (inadequate closure of the aortic valve within the heart resulting in reverse blood flow through the valve), pulmonary edema, and endocarditis.

**ANSWER:     NMCD Defendants are without knowledge or information sufficient to determine the truth of the allegations contained in this paragraph; accordingly, NMCD Defendants deny the allegations contained in this paragraph.**

51. At approximately 6:00 PM the same day, Mr. Jimenez was further diagnosed with septic shock and presumed heart failure.

**ANSWER:** NMCD Defendants are without knowledge or information sufficient to determine the truth of the allegations contained in this paragraph; accordingly, NMCD Defendants deny the allegations contained in this paragraph.

52. On April 4, 2021, at approximately 10:00 AM, Mr. Jimenez needed to be resuscitated by hospital staff. He required mechanical assistance to maintain a pulse and to breathe.

**ANSWER:** NMCD Defendants are without knowledge or information sufficient to determine the truth of the allegations contained in this paragraph; accordingly, NMCD Defendants deny the allegations contained in this paragraph.

53. Again, approximately an hour later, hospital staff needed to resuscitate Mr. Jimenez, and chest compressions were administered.

**ANSWER:** NMCD Defendants are without knowledge or information sufficient to determine the truth of the allegations contained in this paragraph; accordingly, NMCD Defendants deny the allegations contained in this paragraph.

54. At approximately 11:30 AM the same day, Mr. Jimenez suffered from a cardiac arrest and was intubated and sedated due to hospital staff's concern that he would begin experiencing seizures.

**ANSWER:** NMCD Defendants are without knowledge or information sufficient to determine the truth of the allegations contained in this paragraph; accordingly, NMCD Defendants deny the allegations contained in this paragraph.

55. At approximately 1:00 PM that day, CT scan results confirmed that Mr. Jimenez's endocarditis was rapidly worsening. Additionally, his gallbladder was largely collapsed. He continued to deteriorate until he experienced respiratory failure and shock. Hospital staff explained to his family that Mr. Jimenez likely suffered from a stroke due to his infection embolizing to his brain.

17

**ANSWER:     NMCD Defendants are without knowledge or information sufficient to determine the truth of the allegations contained in this paragraph; accordingly, NMCD Defendants deny the allegations contained in this paragraph.**

56. When his family was informed of his repeated heart failures and continually worsening state, they agreed to permit hospital staff to let him pass away peacefully if his heart stopped again.

**ANSWER:     NMCD Defendants are without knowledge or information sufficient to determine the truth of the allegations contained in this paragraph; accordingly, NMCD Defendants deny the allegations contained in this paragraph.**

57. Mr. Jimenez passed away and was pronounced dead at 1:45 PM on April 4, 2021. His presumed cause of death was listed as infection caused by septicemia (blood poisoning caused by bacteria and/or their toxins), infective endocarditis, and aortic regurgitation.

**ANSWER:     NMCD Defendants are without knowledge or information sufficient to determine the truth of the allegations contained in this paragraph; accordingly, NMCD Defendants deny the allegations contained in this paragraph.**

58. In light of these facts, it is clear that, together, NMCD, Wexford, and their agents: Failed to properly monitor Mr. Jimenez's medical conditions; failed to perform adequate physical examinations, tests, and evaluations of test results; failed to refer Mr. Jimenez for higher/specialty care in a timely manner; and caused significant and inexcusable delay in the diagnosis of Mr. Jimenez's severe sepsis, endocarditis, and heart failure.

**ANSWER:     NMCD Defendants are without knowledge or information sufficient to determine the truth of the allegations contained in this paragraph; accordingly, NMCD Defendants deny the allegations contained in this paragraph.**

59. Overall, the medical care provided to Mr. Jimenez under Wexford's and NMCD's care was so grossly deficient as to amount to no medical care at all.

**ANSWER:    NMCD Defendants deny the allegations contained in this paragraph.**

**III.  WEXFORD DEMONSTRATED A PERSISTENT AND WIDESPREAD PATTERN AND PRACTICE OF DELIBERATE INDIFFERENCE TO THE SERIOUS MEDICAL NEEDS OF PRISONER PATIENTS UNDER ITS CARE, AND THIS PRACTICE WAS THE MOVING FORCE BEHIND MR. JIMENEZ'S DEATH.**

**RESPONSE: NMCD Defendants deny the allegations contained in this headnote.**

60. Wexford maintained various widespread patterns and practices which violated Mr. Jimenez's constitutional rights and contributed to his severe injuries, including: (1) failing to report, diagnose, and properly examine and treat prisoners with serious medical and/or mental health conditions; (2) delaying or denying patient referrals to necessary emergency or other offsite medical services; (3) severely understaffing its medical and mental health facilities; (4) failing to provide adequate medical documentation or communicate changes in patient conditions to the appropriate correctional officers and/or medical or mental health staff; and (5) failing adequately to hire, retain, and train and supervise its employees and agents on procedures necessary to protect patients' health.

**ANSWER:    NMCD Defendants deny the allegations contained in this paragraph.**

61. In essence, Wexford's medical care of NMCD prisoners effectively amounted to no medical care at all. *Kikumura v. Osagie*, 461 F.3d 1269, 1295 (10th Cir 2006) (finding sufficient deliberate indifference allegations where "the medical treatment [plaintiff] received was merely a façade . . . [and] so cursory as to amount to no treatment at all") (internal cites and quotes omitted); *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980) ("[D]eliberate indifference to inmates' health needs may be shown by . . . proving there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care.").

**ANSWER:    NMCD Defendants deny the allegations contained in this paragraph.**

A.     <u>Wexford had a pattern and practice of failing to report, diagnose, and treat warning signs of serious medical and mental health conditions, and of delaying or denying patients access to critical off-site medical services, which were contributing factors to Mr. Jimenez's injuries and resulting death.</u>

**RESPONSE: NMCD Defendants deny the allegations contained in this headnote.**

62. Wexford failed to report, diagnose, and treat the warning signs of serious conditions for many other patients in circumstances similar to those of Mr. Jimenez. These failures are reflected in the following non-exhaustive list of cases:

- In *Jessica Melendrez v. NMCD et al.*, No. D-101-CV-2022-01177 (N.M. 1st Dist. Ct.), Wexford failed to diagnose and treat a patient's emergent infection and failed to refer the patient to an outside provider in a timely manner, resulting in a long-term ear infection that caused permanent hearing loss.

- In *Vincent Martin v. Wexford et al.*, No. D-101-CV-2021-02252 (N.M. 1st Dist. Ct.), Wexford failed to diagnose and treat emergent infection and failed to refer the patient to an outside provider in a timely manner, resulting in osteomyelitis, discitis with partial vertebral collapse, and severe sepsis.

- In *Brandon Wagner v. NMCD et al.*, No. D-101-CV-2020-01058 (N.M. 1st Dist. Ct.), Wexford refused to timely report, diagnose, and treat signs of Hepatitis-C, which caused the patient substantial pain for over a year and put his life in jeopardy.

- In *Gerry Armbruster v. Wexford et al.*, No. 16-CV-00544 (S.D. Ill.), Wexford failed to timely report, diagnose, and treat signs of spinal injury, which resulted in the patient's needlessly extended suffering and diagnosis of severe spinal cord compression requiring emergency surgery.

- In *Sharon Bost v. Wexford et al.*, No. 15-CV-03278 (D. Md.), Wexford failed to timely report, diagnose, and treat signs of stroke, which resulted in the patient's death from excessive brain swelling before Wexford medical personnel were even able to arrive at the facility.

- In *Andre Mauldin v. Saleh Obaisi et al.*, No. 15-CV-02106 (N.D. Ill.), Wexford failed to timely report, diagnose, and treat signs of severe knee injury, which resulted in major structural damage to the patient's knee, including a torn ACL and other major ligament tears requiring immediate surgery.

- In *Antonio Hunter v. Ill. Dept. of Corr., et al.*, No. 21-CV-00271 (S.D. Ill.), Wexford refused to timely report, diagnose, and treat signs of renal prolapse and denied the patient's clear need for a surgery consultation, which resulted in life-threatening excessive bleeding.

- In *Patrick Pursley v. Tarry Williams, et al.*, No. 15-CV-04313 (N.D. Ill.), Wexford refused to timely report, diagnose, and treat signs of severe respiratory infection and a broken rib for

over a year, which caused the patient to heal improperly and endure over a year of severe pain and difficulty breathing.

**ANSWER:**     **NMCD Defendants deny the allegations contained in this paragraph.**

63. The preceding cases and others illustrate Wexford's persistent refusal to refer prisoner patients to third-party medical providers for the provision of a higher level of care unavailable through Wexford within NMCD's facilities.

**ANSWER:**     **NMCD Defendants deny the allegations contained in this paragraph.**

64. Upon information and belief, Wexford's widespread failure to refer prisoners for off-site medical care was, in large part, financially motivated, as Wexford was contractually relieved from paying for the hospital costs of any prisoner who was hospitalized for more than 24 hours. Evidently, this fee structure incentivized Wexford to refrain from referring prisoners for off-site care unless and until their injuries were so severe that they would likely require hospitalization lasting more than 24 hours.

**ANSWER:**     **NMCD Defendants deny the allegations contained in this paragraph.**

65. The following information, outlined in various news articles and cases, has publicly documented Wexford's widespread practices of improper reporting, diagnosing, monitoring, examining, treating, and referring prisoner patients for off-site services:

▪ In 2004, Florida's Office of Program Policy Analysis and Government Accountability ("OPPAGA") found that "Wexford kept costs down by compromising the care of its inmates," and that one of "the most pressing problems" was Wexford's "postponement of specialty clinic visits." Some of Wexford's former employees allege that NMCD's monetary savings "came at too high a cost."[1]

▪ According to the accounts of numerous prior Wexford employees in New Mexico, in 2006, Wexford repeatedly refused to grant chronically ill prisoners critical, off-site specialty care and had "systemic problems in administering prescription medicine" to prisoners. Because of these issues and others, Wexford lost its multimillion-dollar contract with New Mexico "[a]fter two troubled years of administering health care." Around this time, Wexford also lost its contracts with Wyoming and Florida for similar reasons.[2]

---

[1] https://www.sfreporter.com/news/coverstories/2006/08/09/hard-cell/
[2] https://www.sfreporter.com/2006/12/13/sfr-exclusive-wexford-under-fire/

▪ In 2006, the NMCD spokeswoman at the time admitted publicly: "Wexford has not met its contractual obligations to the Department, and that's something we can't ignore. We have to do something about it." Similarly, a former Wexford employee from Hobbs, New Mexico stated: "It is my sense that Wexford doesn't care what sort of facility they run.  Everything is run on a bare-bones budget. They're in it to make money."[3]

▪ Also around 2006, multiple former Wexford employees in New Mexico reported that "to save money, [Wexford] failed to send sick inmates off-site to hospitals expeditiously." One former Wexford nurse from New Mexico reported that other private prison medical providers gave medical staff discretion to decide when prisoners required specialized offsite medical attention, whereas Wexford "consistently denied approval." She found this practice to be "really disturbing" given that prisoners were "suffering all the time" and their lives were potentially at risk. Similarly, a former Wexford administrative assistant in New Mexico noted that their "inmates stayed in pain a lot," particularly due to the long wait times for chronically ill patients waiting for off-site medical treatment. A third former Wexford employee noted that Wexford staff "had to wait until an inmate was practically dying before [they] could send them off for X-rays."[4]

▪ Additionally, in 2006, former Wexford employees in New Mexico "reported that the mentally ill were cut off psychotropic medicine for cheaper, less effective drugs, those who needed off-site specialty care were consistently denied referrals, and some were even denied prescription medication for significant periods of time against their doctors' recommendations," and "[s]taff complained of a systemic lack of medical supplies including protective equipment for treating infectious diseases like MRSA."[5]

▪ In 2007, a New Mexico Legislative Finance Committee audit found "gaping holes" in Wexford's delivery of healthcare, and one lawmaker compared the level of care to "torture" and "murder." Additionally, it was found that diabetic patients were not receiving a drug meant to fight off infections as required by national standards for chronic illness care.[6]

▪ In 2009, Wexford was audited by Clark County, Washington and found to have "systematically failed to comply with the many complex undertakings included in its contract with the county."[7]

▪ In 2012, the Arizona Department of Corrections wrote a letter to Wexford's director titled "Written Cure Notification," detailing 20 "significant areas of non-compliance and required corrective action within 90 days pursuant to the contract." These deficiencies included, among others: (1) inappropriate discontinuation/change of medication, (2) inconsistent non-formulary medication approval process, (3) inconsistent or contradictory medication refill and/or return procedures, (4) inability to readily identify specific groups of prisoners or chronic conditions based upon medications prescribed (*e.g.,* diabetes), (5) quantitative decreases in routine institutional care consisting of a backlog of chart reviews, untimely handling of Health Needs Requests, and backlog/cancellation of outside specialty

---

[3] *Id.*

[4] https://www.sfreporter.com/news/coverstories/2006/08/09/hard-cell/

[5] https://www.acluaz.org/sites/default/files/documents/Wexford One-Pager_1.pdf

[6] https://www.pressreader.com/usa/albuquerque-journal/20070524/283330402891567

[7] https://www.acluaz.org/sites/default/files/documents/Wexford%20One-Pager_1.pdf

consultations, and (6) unresponsive approaches to corrections department inquiries on patient information and the prisoner grievance process.[8]

▪ Also in 2012, the Arizona Department of Corrections disciplined and fined Wexford for failing to provide a mentally ill prisoner with his prescribed psychotropic medication for an entire month before he hanged himself in the prison. The state noted Wexford's "significant non-compliance," and "lack of urgency" in correcting medication problems.[9]

▪ Around 2013, a dental care expert for a class of Arizona prisoner plaintiffs found that Wexford provided systemic deficiencies in the provision of dental care, including (1) insufficient dental staffing, (2) inadequate processes for triaging prisoners requiring dental treatment, (3) inappropriate treatment of pain, (4) a de facto "extraction only" policy for teeth, and (5) inadequate treatment of chewing difficulty.[10]

▪ In 2014, a prisoner spent five months begging Wexford staff for a medical diagnosis, treatment, and referral to an off-site specialist who could provide necessary care, but Wexford repeatedly failed to fulfill any of these requests, so the prisoner required emergency spinal cord surgery. This Wexford doctor "missed critical symptoms and misdiagnosed common conditions."[11]

▪ Also in 2014, Wexford continually refused to give two other prisoners necessary, standard antibiotics, which caused these prisoners to develop severe infections that had to be surgically removed because Wexford doctors simply refused to treat these patients.[12]

▪ Moreover, a 2014 court-appointed panel of medical experts published a report finding that Wexford's care of at least two prisoners was "'extremely problematic,' and involved 'egregious' lapses in care" involving failures to properly test, report, and treat that "could 'only be construed as deliberate indifference.'"[13]

▪ In 2015, Wexford agreed to pay the family of a prisoner who died in Illinois $800,000 after its doctors failed to diagnose and treat him for colon cancer, and he died as a result. Wexford failed to properly refer the prisoner for off-site diagnosis and treatment for two years even though he had lost 42 pounds, had nausea, frequent vomiting, and back pain, could not urinate or defecate, had blood in his stool, and continued to insist that he was in excruciating pain and seriously ill.[14]

---

[8] *Parsons v. Ryan*, 289 F.R.D. 513, 517 (D. Ariz. 2013) (identifying these deficiencies in all ten prisons); *see also Jensen et al. v. Shinn Et al.*, No. 12-CV-00601 (D. Ariz.).

[9] https://www.prisonlegalnews.org/news/2014/oct/2/arizona-fines-wexford-10000-neglect-hepatitis-c-exposure/

[10] *Parsons v. Ryan*, 289 F.R.D. 513, 519 (D. Ariz. 2013) (noting that three plaintiffs waited between 85 and 516 days to receive treatment for identified dental needs and one plaintiff had not had a tooth cleaning in 6.5 years); *see also Jensen et al. v. Shinn Et al.*, No. 12-CV-00601 (D. Ariz.).

[11] https://theappeal.org/why-prisoners-get-the-doctors-no-one-else-wants/

[12] *Id.*

[13] *Id.*

[14] https://www.illinoistimes.com/springfield/six-figure-settlement-in-prison%20lawsuit/Content?oid=11437278

▪ In 2017, Wexford exhibited chronic care backlogs in at least six Indiana prisons. In one of these facilities, 100 prisoners had missed their required 90-day medical appointments for chronic care services. [15]

▪ In 2018, a U.S. District Court Judge in Illinois found that Wexford's services continued to fall short of constitutional standards, stating that "it [was] clear [that] mentally ill inmates continue[d] to suffer;" the providers remained "deliberately indifferent" to the needs of mentally ill prisoners; and "[t]he Court cannot allow this to continue."[16]

▪ Also in 2018, a report from court-appointed experts found that 12 of the 33 deaths under Wexford's care that they studied were preventable, another seven might have been preventable, and no conclusions could be reached about five cases because these deaths were not adequately documented. [17]

▪ In 2019 or 2020, a former Illinois prisoner was awarded an $11 million jury verdict against Wexford after the jury found that Wexford deliberately delayed his medical tests and treatment for advanced kidney cancer. Around this time, a young mentally ill prisoner received no medical attention from Wexford after he was seen swallowing two plastic sporks, lost 54 pounds, and complained of abdominal pain. Eventually, he died due to esophageal perforation. Also around this time, a court-appointed expert reviewed death records from 2016 and 2017, while prisoners were under Wexford's care, and found that about 58% of these deaths were preventable or possibly preventable.[18]

▪ In 2020, a court-appointed monitor in Illinois found that one Wexford nurse was asked to check on a prisoner who was unresponsive and drooling, but she waited so long to do so that, when she finally arrived at his cell, he was already receiving CPR.[19]

▪ The 2020 court-appointed monitor in Illinois also found that Wexford would not allow prisoners to see off-site medical specialists unless approved by Wexford employees in Pennsylvania who discussed cases without the benefit of charts or examining patients. One prisoner's surgery to remove a mass in his shoulder was delayed for over a year, and according to the monitor, this delay could have jeopardized his life. Similarly, a reported delay in the eye surgery of another prisoner could have resulted in his permanent loss of vision. The monitor noted that delays of dental care have lasted nearly two years, and the median wait time for dentures or fillings was nine months.[20]

▪ In 2021, a prisoner committed suicide a few days after improperly being taken off suicide watch, when Wexford knew that he had expressed an intent to kill himself, and Wexford failed to take appropriate measures to report, diagnose, examine, treat, monitor, and protect him.[21]

---

[15] https://www.alreporter.com/2017/11/15/report-shows-wexford-health-services-failing-requirements-indiana/

[16] https://theappeal.org/no-shower-wearing-diapers-laying-there-for-so-long/

[17]  https://www.illinoistimes.com/springfield/prison-health-care-still-bad/Content?oid=12787400

[18] https://www.chicagobusiness.com/health-care/illinois-comes-short-another-area-prison-health-care

[19] https://www.illinoistimes.com/springfield/prison-health-care-still-bad/Content?oid=12787400

[20] *Id.*

[21] https://www.indystar.com/story/news/investigations/2021/11/30/lawsuit-mentally-ill-man-should-not-have-diedindiana-prison/8797782002/

**ANSWER:      NMCD Defendants deny the allegations contained in this paragraph.**

66. Upon information and belief, on-site Wexford medical providers are unable to refer prisoner patients for off-site diagnostic testing and services. Instead, Wexford's "utilization review" process requires Wexford corporate approval of prisoners' off-site services. Upon information and belief, Wexford has a pattern and practice of routinely denying off-site medical referrals for prisoners and, in doing, so, frequently overrides the clinical advice of its on-site medical providers.

**ANSWER:      NMCD Defendants deny the allegations contained in this paragraph.**

67. The preceding cases and articles, among others, also establish that Wexford and NMCD were on notice of these widespread unconstitutional practices prior to Mr. Jimenez's injuries and thereby knew that additional safeguards should have been put in place to address patients' signs of serious medical and mental health conditions.

**ANSWER:      NMCD Defendants deny the allegations contained in this paragraph.**

68. Accordingly, it can be readily inferred that Wexford intentionally failed to report, diagnose, and treat these serious warning signs despite the known and obvious risk to patient safety. And NMCD intentionally failed to provide proper supervision and oversight of these practices despite the risk known to it.

**ANSWER:      NMCD Defendants deny the allegations contained in this paragraph.**

69. Wexford's widespread practice of failing to report, diagnose, and treat the warning signs of serious medical and mental health conditions shares a close factual relationship with the events in Mr. Jimenez's case, and accordingly, the widespread practice was the moving force behind his injuries and near-death experiences.

**ANSWER:      NMCD Defendants deny the allegations contained in this paragraph.**

70. Significantly, Wexford personnel failed to conduct diagnostic and physical examinations multiple times in Mr. Jimenez's case alone, which establishes a pattern and practice of insufficient reporting, diagnoses, and treatment of serious medical conditions.

**ANSWER:     NMCD Defendants deny the allegations contained in this paragraph.**

71. As such, Wexford's policy and practice of failing to report, diagnose, and treat warning signs of serious medical and mental health conditions caused Mr. Jimenez's injuries.

**ANSWER:     NMCD Defendants deny the allegations contained in this paragraph.**

B. Wexford had a pattern and practice of severely understaffing its medical and mental health facilities, which was a moving force behind Mr. Jimenez's injuries and resulting death.

**RESPONSE: NMCD Defendants deny the allegations contained in this headnote.**

72. Wexford's chronic understaffing of medical positions has been continually publicized and made known to both Wexford and NMCD as early as the late 1990s.

**ANSWER:     NMCD Defendants deny the allegations contained in this paragraph.**

73. The following information, outlined in various news articles and cases, has publicly documented Wexford's widespread practice of understaffing its medical personnel, as well as the tragic consequences to prisoners due to this understaffing:

- In the late 1990s, the U.S. Justice Department investigated Wexford's medical services in Wyoming prisons and criticized Wexford's staffing levels, noting that its inadequate staffing and other inadequacies "created conditions that violated inmates' constitutional rights." Shortly after this report was published, Wexford lost its contract with Wyoming.[22]

- Similarly, in 2004, Florida's OPPAGA found that Wexford had a pattern of insufficient staffing in Florida's prisons.[23]

- In 2005, the NMCD Corrections Secretary at the time confirmed that Wexford proposed paying New Mexico approximately $35,000 "to address state concerns about a shortage of hours worked by Wexford personnel."[24]

- In 2006, the Santa Fe Reporter noted that it repeatedly published accounts from former Wexford employees focusing on the "dangerously low medical staffing levels at the nine

---

[22] https://www.sfreporter.com/news/cpverstproes2006/08/09/hard-cell/
[23] *Id.*
[24] *Id.*

correctional facilities where Wexford operate[d]" in New Mexico.[25]

▪ In 2006, one former Wexford dentist located in Hobbs, New Mexico stated that prisoners were suffering because the backlog to receive dental treatment was so massive, and the facilities were so understaffed that prisoners sometimes waited up to six weeks to receive important dental care. Some prisoners had to resort to pulling their own teeth after months of waiting, saying they just could not stand the pain any longer. The former Wexford dentist called Wexford "grossly understaffed and disorganized."[26]

▪ Also in 2006, former Wexford employees in New Mexico reported that Wexford regularly "canceled inmates' medical appointments because of staff shortages." Similarly, according to a former Wexford administrative assistant in New Mexico, "[s]taffing was so short that a Wexford administrator once authorized a lab technician to start an intravenous flow on an inmate, something he was not legally licensed to do."[27]

▪ In 2006, one former Wexford nurse from New Mexico stated that, as soon as Wexford took over medical services in New Mexico prisons, "things changed dramatically." One of the most notable changes was an approximate 50% reduction in the nursing staff, resulting in cancelled medical appointments due to staffing shortages.[28]

▪ In 2007, a New Mexico Legislative Finance Committee audit found that Wexford was very understaffed. For example, no medical staff were on duty at the Santa Fe prison when one expert visited in March 2007. The audit also found that nurses often spent time doing clerical duties because there were so few clerical workers. "A common complaint against Wexford was that it left positions vacant to save money."[29]

▪ In 2012, Arizona's "Written Cure Notification" letter to Wexford's director also identified the following significant areas of Wexford's non-compliance related to staffing: (1) inadequate staffing levels in multiple program areas at multiple locations, (2) staffing levels creating inappropriate scheduling gaps in on-site medical coverage, (3) staffing levels forcing existing staff to work excessive hours, creating fatigue risks, and (4) quantitative decrease in routine institutional care: backlog of prescription medication expiration review. [30]

▪ Also in 2012, the mental health contract monitor for Arizona corrections wrote and circulated an internal memo reporting that: "Wexford's current level of psychiatry [was] grossly insufficient to meet [its] contractual requirement. Further, this staffing level is so limited that patient safety and orderly operation of [Arizona corrections] facilities may be significantly compromised. . . . Wexford currently has 14.85 psychiatry [full-time employees] allocated to address the clinical needs of 8,891 patients who are prescribed psychotropic medications.

---

[25] https://www.sfreporter.com/2006/12/13/sfr-exclusive-wexford-under-fire/

[26] *Id.*
[27] https://www.sfreporter.com/news/coverstories/2006/08/09/hard-cell/

[28] *Id.*
[29] https://www.pressreader.com/usa/albuquerque-journal/20070524/283330402891567
[30] *Parsons v. Ryan*, 289 F.R.D. 513, 517 (D. Ariz. 2013) (identifying these deficiencies in all ten prisons); *see also Jensen et al. v. Shinn Et al.*, No. 12-CV-00601 (D. Ariz).

Wexford now employs a total of 5.95 [full-time] psychiatry providers (approximately 33% of their allocation) [leaving] 8.9 [full time employee slots]
vacant (leaving a vacancy rate of 66%)."[31]

▪ In late 2012, Wexford's own review of its services in Arizona prisons concluded that "of 762 budgeted full time employee positions, only 567 positions had been filled. It also revealed that, for higher-level providers, such as physicians, psychiatrists, dentists, nurse practitioners, and management-level health care staff, the overall vacancy rate across ADC
facilities exceeded 50%." Around the same time, a survey of the quality of healthcare in Arizona prisons concluded that insufficient coverage was "reaching a critical state for both routine visits and chronic care follow-ups." [32]

▪ In 2017, records obtained concerning Wexford's services in Indiana prisons revealed that Wexford failed to meet "required staffing levels, particularly in the area of mental and behavioral health." Such shortfalls led to "backlogs in providing care, especially with regard to prisoners with chronic medical conditions including diabetes and HIV." [33]

▪ In 2018, a U.S. District Court Judge in Illinois found that Wexford had "systemic and gross deficiencies in the staffing of mental health providers." [34]

▪ In 2020, a court-appointed monitor in Illinois found that Wexford was drastically understaffing its prison medical facilities, and that 357 new positions, mostly for nurses, were needed to comply with a consent decree meant to ensure constitutionally adequate medical care in Illinois prisons. [35]

74. Upon information and belief, Mr. Jimenez was unable to receive adequate medical treatment due, in part, to the severe shortage of healthcare providers at the prison. Numerous important health protocols were violated, and critical assessments and evaluations foregone. It was this lack of medical care and contract oversight that exacerbated Mr. Jimenez's medical issues and eventually caused his injuries and resulting death.

**ANSWER:**   NMCD Defendants deny the allegations contained in this paragraph.

---

[31]*Parsons v. Ryan*, 289 F.R.D. 513, 519 (D. Ariz. 2013); *see also Jensen et al. v. Shinn Et al.*, No. 12-CV-00601 (D. Ariz).

[32] *Parsons v. Ryan*, 289 F.R.D. 513, 519 (D. Ariz. 2013); *see also Jensen et al. v. Shinn Et al.*, No. 12-CV-00601 (D. Ariz).

[33]  https://www.alreporter.com/2017/11/15/report-shows-wexford-health-services-failing-requirements-indiana/

[34] https://theappeal.org/no-shower-wearing-diapers-laying-there-for-so-long/

[35] https://www.illinoistimes.com/springfield/prison-health-care-still-bad/Content?oid=12787400

75. Simply put, Mr. Jimenez received little to no healthcare services largely because there were very few healthcare providers working in NMCD prisons in the months leading up to his injuries.

**ANSWER:    NMCD Defendants deny the allegations contained in this paragraph.**

76. Through Wexford's well-documented history of understaffing, and the investigative reporting published on the dangerous consequences of Wexford's staffing shortages, Wexford and NMCD were put on notice that this severe understaffing was substantially certain to cause constitutional violations regarding patients' medical treatment, yet they both chose to disregard that risk and, for decades, continued to display a pattern and practice of severe shortages in medical staff and mental healthcare providers.

**ANSWER:    NMCD Defendants deny the allegations contained in this paragraph.**

77. In this way, Wexford and NMCD acted with deliberate indifference to prisoners' healthcare needs. *See, e.g., Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980) (finding deliberate indifference to prisoners' healthcare needs where "gross deficiencies in staffing" and procedures cause the prisoner population to be "effectively denied access to adequate medical care").

**ANSWER:    NMCD Defendants deny the allegations contained in this paragraph.**

C. Wexford also had a pattern and practice of failing to provide adequate medical documentation and failing to communicate changes in patient conditions, both of which contributed to Mr. Jimenez's injuries and resulting death.

**RESPONSE: NMCD Defendants deny the allegations contained in this headnote.**

78. Wexford failed to provide adequate medical documentation and failed to communicate changes in patient conditions for many other patients in circumstances similar to those of Mr. Jimenez.

**ANSWER:    NMCD Defendants deny the allegations contained in this paragraph.**

79. The following information, outlined in various news articles and cases, has publicly documented Wexford's widespread practice of providing inadequate medical documentation and failing to communicate changes in patient conditions:

▪ In 2004, Florida's OPPAGA found that Wexford's pattern of insufficient record keeping was one of "the most pressing problems" of its non-compliance with its contract in Florida prisons.[36]

▪ In 2005, Wexford's regional medical director for New Mexico's prisons found that Wexford nurses repeatedly failed to accurately document test results or to communicate those results. According to this director, these repeated failures could constitute a "falsification of [ ] testing." When the director notified Wexford, it "never fully addressed

her concerns and placed her on leave when she pressed the matter." According to the Santa Fe Reporter, this account is similar to the accounts of five other former Wexford employees interviewed by the Reporter.[37]

▪ In 2006, a former Wexford nurse from New Mexico reported that "she observed Wexford administrators at Central [prison in New Mexico] altering inmates' medical records." According to her, "[t]hey were hiding mistakes they'd made." A former Wexford administrative assistance from Hobbs, New Mexico voiced these same concerns.[38]

▪ Also in 2006, another former Wexford nurse from New Mexico reported that "Wexford's record keeping was so desultory, it was difficult to keep track of which inmate was getting which medicine." When this nurse repeatedly informed Wexford's chief health services administrator in New Mexico, the nurse was "roundly ignored."[39]

▪ Similarly, in 2006, a third former Wexford nurse from New Mexico stated that Wexford had "glaring errors" in how it kept medical charts, so that prisoners received the wrong medicine and even the wrong dosages. This nurse quit his employment with Wexford after one month as Wexford's director of nursing, ending his 24-year career as a prison nurse because, among other things, he was concerned about losing his license due to the inadequate medical care that Wexford was providing its patients in New Mexico prisons.[40]

▪ In 2007, Wexford failed to issue timely reports on 14 prisoner deaths in New Mexico correctional facilities.[41]

▪ In 2012, Arizona's "Written Cure Notification" letter to Wexford's director also identified \the following significant areas of Wexford's non-compliance related to improper documentation and communication of prisoners' conditions: (1) incorrect and incomplete pharmacy prescriptions, (2) inadequate pharmacy reports, (3) inconsistent documentation of Medication Administration Records, (4) inadequate/untimely communication between field staff, corporate staff, and the corrections department, and (5) lack of responsiveness and/or lack of awareness of incident urgency and reporting requirements.[42]

---

[36] https://www.sfreporter.com/news/coverstories/2006/08/09/hard-cell/
[37] https://www.sfreporter.com/news/coverstories/2006/08/09/hard-cell/
[39] *Id.*
[40] *Id.*
[38] *Id.*
[39] *Id.*
[40] *Id.*
[41] https://www.pressreader.com/usa/albuquerque-journal/20070524/283330402891567
[42] *Parsons v. Ryan*, 289 F.R.D. 513, 517 (D. Ariz. 2013) (identifying these deficiencies in all ten prisons)

▪ Also in 2012, Arizona disciplined Wexford for, among other things, failing to timely report one of its nurses who exposed 103 prisoners to hepatitis C through contaminated insulin injections as a result of improperly mixed vials. Wexford did not notify health officials of these prisoners' hepatitis C exposure until eight days later. According to the state, "Wexford failed to follow nursing protocols, mismanaged documents, and did not adequately notify authorities of the contamination." Moving forward, the state directed Wexford to "properly distribute and document medication for prisoners, show some urgency, and communicate better when problems arise." Shortly thereafter, Arizona and Wexford "abruptly decided to cancel the company's contract." According to the legal director of the ACLU of Arizona at the time, there was "no question that over the past year
Wexford [had] been providing abysmal care to Arizona prisoners with serious medical and mental health needs."[43]

**ANSWER:**    **NMCD Defendants deny the allegations contained in this paragraph.**

80. Likewise, in Mr. Jimenez's case, Wexford failed to provide adequate medical documentation and failed to communicate important changes in Mr. Jimenez's medical condition to providers who had the ability to appropriately treat his condition.

**ANSWER:**    **NMCD Defendants deny the allegations contained in this paragraph.**

81. The preceding articles and cases, among other reports, establish that Wexford and NMCD were on notice of these widespread unconstitutional practices prior to Mr. Jimenez's injuries and thereby knew that additional safeguards should have been put in place to address the inadequate medical documentation and communication of changes in patient conditions.

**ANSWER:**    **NMCD Defendants deny the allegations contained in this paragraph.**

82. Accordingly, it can be readily inferred that Wexford intentionally failed to adequately document patient conditions and failed to adequately communicate changes in those conditions despite the known and obvious risk to patient safety.

**ANSWER:**    **NMCD Defendants deny the allegations contained in this paragraph.**

---

[43] https://www.prisonlegalnews.org/news/2014/oct/2/arizona-fines-wexford-10000-neglect-hepatitis-c-exposure/

83. Wexford's widespread practice of failing to provide adequate medical documentation and communicate changes in patient conditions shares a close factual relationship with the events in Mr. Jimenez's case, and accordingly, the widespread practice was the moving force behind his injuries.

**ANSWER:     NMCD Defendants deny the allegations contained in this paragraph.**

84. Because Wexford personnel did not adequately document or otherwise communicate Mr. Jimenez's rapidly deteriorating medical condition to the appropriate personnel, he was not provided with the medical treatment that he clearly needed, which caused him to sustain life-threatening injuries and pass away.

**ANSWER:     NMCD Defendants deny the allegations contained in this paragraph.**

85. Accordingly, Wexford's policy and practice of providing inadequate medical documentation and failing to communicate changes in patient conditions to appropriate personnel caused Mr. Jimenez's injuries.

**ANSWER:     NMCD Defendants deny the allegations contained in this paragraph.**

86. NMCD intentionally failed to provide proper supervision and oversight of these practices despite the risk known to it. In fact, NMCD was complicit in failing to keep adequate prisoner medical records. In NMCD's contract with its prior medical provider from June 2016, it stated:

> "In order to provide constitutionally adequate medical care to patient-inmates and to help determine the strategy for completing NMCD's Clinical Data Repository (CDR) and pharmacy systems, a review of electronic health record options has determined that the best strategy moving forward is to procure an Electronic Health Record (EHR) software solution."

**ANSWER:     NMCD Defendants deny the allegations contained in this paragraph.**

87. Yet—over seven years later—NMCD has still not implemented an EHR system despite its continuing recognition that an EHR system is necessary for constitutionally adequate healthcare, as reaffirmed in the PSC, which states: "In order to provide constitutionally adequate medical care to inmates, NMCD has determined that it must procure an electronic health record (EHR) software

solution." Upon information and belief, no efforts are underway to identify and implement an EHR system.

**ANSWER:      NMCD Defendants deny the allegations contained in this paragraph.**

88. An EHR system would significantly curtail medical recordkeeping abuses and deficiencies, including the destruction, loss, and alteration of medical records. An EHR system would also create greater accountability for both NMCD and its medical contractors, including Wexford. Many medical record files provided by NMCD have missing medical records, oftentimes at critical periods just prior to a prisoner's hospitalization. Additionally, notes and signatures of non-electric notes are often illegible, and medical staff neglect to put notes in charts. Even Wexford managerial level medical personnel are unable to read the notes and signatures in prisoner medical records. For example, Wexford's former regional medical director for New Mexico, Dr. Murray Young, testified in another case to his inability to read numerous medical notes and signatures. Yet, Dr. Young took no corrective action to address this issue.

**ANSWER:      NMCD Defendants deny the allegations contained in this paragraph.**

89. NMCD has been on notice of the medical recordkeeping abuses and inadequacies in its facilities for years, and it has chosen not to implement an EHR system to curb those abuses and deficiencies. Therefore, NMCD has also demonstrated its own persistent pattern and practice of providing constitutionally deficient medical documentation, which was another moving force behind Mr. Jimenez's injuries.

> D. Wexford failed to adequately hire, retain, train, and supervise its personnel despite knowing that such practices were necessary to protect patient health, and this failure was a moving force behind Mr. Jimenez's injuries.

**ANSWER:      NMCD Defendants deny the allegations contained in this paragraph.**

90. Wexford's extensive and decades-long patterns of understaffing, delaying off-site medical treatment, poorly documenting prisoner medical appointments, failing to communicate important

changes in patients' medical conditions, and generally choosing cost-cutting measures over patients' well-being evinces Wexford's utter failure to properly hire, retain, train and supervise its employees and agents.

**ANSWER:     NMCD Defendants deny the allegations contained in this paragraph.**

91. The following information, outlined in various news articles and cases, has publicly documented Wexford's widespread practice of inadequately hiring, retaining, training, and supervising its staff, along with the dire consequences of these failures to properly hire, retain train, and supervise:

▪ In 2006, a former Wexford nurse from New Mexico reported that "[i]nmates were hoarding doses [of medication] and using them as currency because nursing staff were not adequately controlling medication dosage." According to this nurse, "[t]he nurses who did this were exceeding the scope of their licenses, breaking the law and jeopardizing patient safety." Wexford supervisors did nothing to stop this practice.[44]

▪ Around 2007, Washington, Mississippi, and New Mexico all reported issues with Wexford's "lack of training and oversight for medical employees, and promotion of workers into positions where they were not properly licensed." In Mississippi, medical care was provided to prisoners by Wexford employees without proper credentials. And in New Mexico, "mental health counselors were operating without state licenses."[45]

▪ In 2014, federal court-appointed medical experts published a report of their findings that Wexford "hired 'underqualified' physicians and failed to provide appropriate supervision and oversight," which "resulted in at least 36 deaths between January 2013 and June 2014 and two deaths in 2010 that the team deemed 'problematic.'"[46]

▪ In 2017, another federal court-appointed panel of medical experts found that Wexford still "failed to hire properly credentialed physicians, which increased the risk of harm to patients and led to nearly a dozen preventable deaths from 2016 to 2017." Alarmingly, two of the doctors found to provide inadequate care remained on Wexford's staff after these experts' findings had been circulated.[47]

▪ Also in 2017, the Mississippi Attorney General filed a RICO lawsuit against Wexford and others, claiming that Mississippi had been "defrauded through a pattern of bribery, kickbacks, misrepresentations, fraud, concealment, money laundering and other wrongful conduct," through which Wexford and others "benefited by stealing from taxpayers." [48]

▪ In 2020, a court-appointed monitor in Illinois found that "three Wexford doctors without proper credentials, including two whose licenses [were] on probation, have such serious issues

---

[44] https://www.sfreporter.com/news/coverstories/2006/08/09/hard-cell/
[45] https://www.acluaz.org/sites/default/files/documents/Wexford One-Pager_1.pdf
[46] https://theappeal.org/why-prisoners-get-the-doctors-no-one-else-wants/
[47] *Id.*
[48] https://www.clarionledger.com/story/news/politics/2017/02/08/epps-bribery-civil-lawsuit/97645586/

with qualifications and bad care that they should not be employed in prisons." Wexford did not inform the state about these disciplinary histories, and according to the monitor, the problematic doctors were not being adequately monitored. When asked, prison authorities would not disclose whether these doctors were still retained as Wexford employees after the findings were published. [49]

▪ The 2020 court-appointed monitor in Illinois also found that Wexford retained and did not discipline or document one doctor's neglectful medical care even though he had been recommended for termination and had repeatedly failed to spot signs of heart trouble and would not send such patients to off-site hospitals. Rather, Wexford gave this doctor high marks and praise in his review. [50]

▪ In 2021, a prisoner committed suicide a few days after he was wrongfully taken off suicide watch and after four recent prior attempts, and the lawsuit filed by his family noted that Wexford's failure to adequately supervise and train its staff resulted in a marked increase in prison suicide rates since Wexford began providing care in Iowa prisons in 2017. [51]

**ANSWER:   NMCD Defendants deny the allegations contained in this paragraph.**

92. Similarly, the extensive violations of proper protocol in Mr. Jimenez's case provide compelling evidence that Wexford had a continuing, widespread pattern and practice of failing to adequately hire, retain, train, and supervise its personnel.

**ANSWER:   NMCD Defendants deny the allegations contained in this paragraph.**

93. As such, Wexford's widespread failures to adequately hire, retain, train, and supervise its personnel were a primary cause of the constitutional violations suffered by Mr. Jimenez. Each of Wexford's failures to conduct necessary examinations deprived Mr. Jimenez of the opportunity to be evaluated, diagnosed, and to be prioritized in receiving the medical treatment that he so desperately needed. Because medical personnel were not adequately trained or supervised to ensure that the proper medical procedures were followed, Mr. Jimenez never received the opportunity to obtain additional medical services until his medical condition had become life threatening. Consequently, he sustained the injuries that resulted in his death.

---

[49] https://www.illinoistimes.com/springfield/prison-health-care-still-bad/Content?oid=12787400
[50] *Id.*
[51] https://www.indystar.com/story/news/investigations/2021/11/30/lawsuit-mentally-ill-man-should-not-have-diedindiana-prison/8797782002/

**ANSWER:** **NMCD Defendants deny the allegations contained in this paragraph.**

94. Training and supervision regarding proper medical treatment protocol and documentation was required because, as Wexford knew to a moral certainty, Wexford's personnel would commonly confront situations where they would need to assess the severity and emergency nature of patients' medical conditions. This is among the primary tasks that these personnel were hired to do.

**ANSWER:** **NMCD Defendants deny the allegations contained in this paragraph.**

95. Additionally, documenting and assessing the next steps in a patient's medical treatment is precisely the type of complex and important decision that requires training and supervision.

**ANSWER:** **NMCD Defendants deny the allegations contained in this paragraph.**

96. As evinced by Mr. Jimenez's situation and the others cited in this section of the Complaint, Wexford's widespread pattern of deficient hiring, retention, training, and supervision presents an obvious potential to violate patients' constitutional rights, because there has been a growing history where prisoners are denied serious medical care to which they are entitled, and they suffer from long-term disability or death as a result.

**ANSWER:** **NMCD Defendants deny the allegations contained in this paragraph.**

97. Wexford and NMCD were alerted to an obvious deficiency in Wexford's hiring, retention, training, and supervision through the many prior lawsuits against it alleging unconstitutional medical care. Wexford and NMCD were also put on notice of these deficiencies through the many news articles, cases, and reports from government agencies, court monitors, and former employees informing Wexford of the many ways that it fell short of providing constitutionally adequate medical care.

**ANSWER:** **NMCD Defendants deny the allegations contained in this paragraph.**

98. One of the best examples illustrating each of the abovementioned patterns and practices, and Wexford's awareness of each of these practices, is the voluminous discovery conducted in *Sharon*

36

*Bost v. Wexford et al.*, No. 15-CV-03278 (D. Md.), concerning the same patterns and practices as occurred in Mr. Jimenez's case, which was filed on October 27, 2015 (ECF 1) and for which Wexford moved for summary judgment on September 8, 2021 (ECF 536). In her motion opposing summary judgment (ECF 543-1), Bost cited extensively from, and exhibited, 147 discovery documents, some of which are sealed, but which include: at least 11 expert reports (ECF 544, Nos. 48-50, 52-54, 107-108, 116-118), at least 33 deposition transcripts (ECF 544, Nos. 14-15, 17, 19-32, 34-39, 74, 98, 104, 119, 132, 134, 137, 140-42), at least 17 Continuous Quality Improvement ("CQI") reports (ECF 544, Nos. 6-7, 58, 61-70, 78, 143-45), and at least six Wexford Corrective Action Plans ("CAPs") (ECF 544, Nos. 8-13). All of the information discussed in the motion practice was obtained well before the events at issue in this case.

**ANSWER:**   NMCD Defendants deny the allegations contained in this paragraph.

99. Additionally, the discovery and reports produced in *Lippert et al. v. Ghosh et al.*, No. 10-CV-04603 (N.D. Ill.), put Wexford on notice of its widespread constitutional violations in providing prison medical care. Most significantly, the 45-page report published by a panel of court appointed experts in December 2014 (ECF 339) outlined in detail how Illinois' healthcare program under Wexford was "unable to meet minimal constitutional standards" due to issues like: (1) unfilled and inadequate leadership positions, (2) the hiring of underqualified clinicians, (3) severe understaffing, (4) inadequate clinic space, sanitation, and equipment, (5) insufficient supervision and facility oversight, (6) substantial delays in medically processing patients through the reception process, (7) disorganized, improper, and untimely medical records, (8) insufficient diagnosing and monitoring of patients' conditions, (9) arbitrary cancelation of prisoners' sick call requests, (10) a "cookie cutter" approach to chronic disease management, (11) "excessive" delays in off-site medical appointments, and (12) an "incomprehensible" failure to identify and respond to serious medical conditions, among other issues.

**ANSWER:**   NMCD Defendants deny the allegations contained in this paragraph.

100. Moreover, Dr. Murray Young admitted in a deposition for a similar matter that the nurses working within NMCD facilities, including CNMCF, would not be able to identify endocarditis, yet they were, by Wexford's policy and practice, the gatekeepers who prevented prisoners like Mr. Jimenez from receiving treatment for endocarditis. In his deposition, Dr. Young stated:

> Nurses aren't built to make a diagnosis like that. So that's not what—you know, the nurses aren't trained to make those diagnoses, which I think is what you're after. I'm not gonna throw my nurses under the bus. They do a good job. But they're not going to know, you can't possibly train a nurse to ferret out osteomyelitis and endocarditis when a patient has these issues. It's just not gonna happen.

**ANSWER:    NMCD Defendants deny the allegations contained in this paragraph.**

101. Wexford nurses in NMCD facilities lack the training and skills to identify possible endocarditis, yet, in accordance with Wexford's own policy and practice, they remain unsupervised by medical doctors to ensure that proper and timely diagnoses are made before prisoners' conditions become life-threatening. Rather, as in Mr. Jimenez's case, the nurses simply repeatedly take vitals, declare the prisoners suitably healthy, state that nothing more can be done (other than possibly providing basic, over-the-counter pain medications and antibiotics), and send the prisoners back to their cells.

**ANSWER:    NMCD Defendants deny the allegations contained in this paragraph.**

102. Given the testimony of Dr. Young, it is not surprising that Wexford failed to report, diagnose, and treat emergent endocarditis and sepsis, as the nurses, who work without proper supervision by medical doctors, are not trained nor "built to" identify these life-threatening conditions.

**ANSWER:    NMCD Defendants deny the allegations contained in this paragraph.**

103. By the time that Mr. Jimenez suffered at the hands of NMCD and Wexford, Wexford and NMCD were both well aware of each of the above unconstitutional patterns and practices, including Wexford's dire need to implement better hiring, retention, training, and supervision policies to prevent these rampant constitutional violations from continuing to occur.

**ANSWER:     NMCD Defendants deny the allegations contained in this paragraph.**

104. Wexford's extensive and longtime failures to provide adequate care are further evidence of its deliberate indifference to the constitutional violations caused by its widespread deficiencies in hiring, retention, training, and supervising. Likewise, NMCD evinced its deliberate indifference to these unconstitutional practices through its refusal to provide proper supervision and oversight of these practices despite the risk known to it.

**ANSWER:     NMCD Defendants deny the allegations contained in this paragraph.**

**IV. THE INDIVIDUAL WEXFORD AND NMCD DEFENDANTS HAD OVERSIGHT AUTHORITY OF WEXFORD'S MEDICAL SERVICES IN CNMCF BUT ACTED WITH DELIBERATE INDIFFERENCE IN FAILING TO PERFORM ANY OVERSIGHT, THUS ALLOWING WEXFORD'S UNCONSTITUTIONAL PATTERNS AND PRACTICES TO CONTINUE AND CAUSING MR. JIMENEZ'S INJURIES AND RESULTING DEATH.**

**RESPONSE:     NMCD Defendants deny the allegations contained in this headnote.**

105. Upon information and belief, each of the Wexford and NMCD individual Defendants—Alisha Tafoya Lucero, Wence Asonganyi, Orion Stradford, Michael Hildenbrandt, Joseph Montoya, Dr. Keshab Paudel, Kathy Armijo, Rajesh Sharma, Sarah Cartwright, David Whipple, Denise Jones, Lynnsey Vigil, and Heather Garza—knew that there were a high number of endocarditis cases in NMCD prisons and did nothing to protect prisoners from worsening endocarditis, including Mr. Jimenez.

**ANSWER:     NMCD Defendants deny the allegations contained in this paragraph as to NMCD Defendants.**

106. Upon information and belief, each of the Wexford and NMCD individual Defendants also knew of Mr. Jimenez's persistent expressions of worsening pain, blurry vision, debilitated physical appearance, and his eventual inability to walk. Likewise, each of the Wexford and NMCD individual Defendants knew that these symptoms posed a substantial risk of harm to Mr. Jimenez, yet they did

nothing to attempt to ameliorate that impending substantial harm, despite each having the authority and obligation to act to ameliorate that harm.

**ANSWER:     NMCD Defendants deny the allegations contained in this paragraph as to NMCD Defendants.**

107. These individual Defendants became aware of the above information through prior internal and legislative reports, news coverage, weekly and quarterly meetings/calls amongst each other and with other Wexford medical staff, quarterly tracking documents, quality assurance program reports, monthly continuous quality improvement meetings, statistical reports submitted to the Health Services Bureau, training materials, continuous quality improvement audits, American Correctional Association audits, National Commission on Correctional Healthcare audits, performance improvement reports, corrective action plans, prisoner grievances, health services request forms, and individual inmate files, including Mr. Jimenez's file—a sampling of which is cited in Section III of this Complaint, *supra.*

**ANSWER:     NMCD Defendants deny the allegations contained in this paragraph.**

108. Any of the Wexford and NMCD individual Defendants could have interceded on behalf of Wexford and/or NMCD if any independent medical contractor did not appropriately care for any NMCD prisoner. Yet, none of the Wexford and NMCD individual Defendants interceded to protect Mr. Jimenez from the deliberate indifference of Wexford medical staff.

**ANSWER:     NMCD Defendants deny the allegations contained in this paragraph.**

109. As the New Mexico Secretary for the Department of Corrections, Defendant Alisha Tafoya Lucero is and was responsible for managing "all operations of the department and . . . administer[ing] and enforce[ing] the laws with which [s]he or the department is charged." N.M. Stat. Ann. § 9-3-5(A). Defendant Lucero was also required to exercise general supervisory power over all department employees and take administrative action by issuing orders to assure compliance with the

law. *See id.* §§ 9-3-5(B)(1), (5); *see also Anchondo v. Corr. Dep't*, 100 N.M. 108, 109 (N.M. 1983) (describing the statutory duties of the secretary of corrections). Additionally, Defendant Lucero was required to "provide courses of instruction and practical training for employees of the department." N.M. Stat. Ann. § 9-3-5(B)(7). Defendant Lucero failed to exercise any of these powers to end the inadequate training of identifying emergent infections and thereby maintained a policy or custom of inadequate medical care by relying on insufficiently trained medical staff who inadequately refer prisoners for outside care.

**ANSWER:    The allegations in this paragraph contain legal conclusions for which no response is required. If a response is required, NMCD Defendants deny the allegations contained in this paragraph.**

110. According to NMCD's own website, as the NMCD Health Services Administrator, Defendant Wence Asonganyi is and was responsible for ensuring that the health care in NMCD prisons "meets correctional healthcare standards and constitutional mandates." Defendant Asonganyi failed to exercise these powers to end the inadequate training of identifying emergent infections and thereby maintained a policy or custom of inadequate medical care by relying on insufficiently trained medical staff who inadequately refer prisoners for outside care.

**ANSWER:    NMCD Defendants deny the allegations contained in this paragraph.**

111. According to NMCD's website, as the NMCD Bureau Chief, Orion Stradford is and was "responsible for providing clear, concise executive direction while monitoring and auditing," with a focus on "private prison contract compliance, American Correctional Association compliance, quality assurance and conditions of confinement for the incarcerated." He and his Bureau are "also responsible for NMCD policy revisions and other compliance efforts related to the prevention of major prison litigation." Defendant Stradford failed to exercise these powers to end the inadequate training of identifying emergent infections and thereby maintained a policy or custom of inadequate

medical care by relying on insufficiently trained medical staff who inadequately refer prisoners for outside care.

**ANSWER:     NMCD Defendants deny the allegations contained in this paragraph.**

112. As Wexford's Director of Operations, Defendant Michael Hildenbrandt was responsible for ensuring that Wexford was meeting the terms of the PSC, which required compliance with constitutional medical standards. Defendant Hildenbrandt failed to exercise these powers to end the inadequate training of identifying emergent infections and thereby maintained a policy or custom of inadequate medical care by relying on insufficiently trained medical staff who inadequately refer prisoners for outside care.

**ANSWER:     NMCD Defendants deny the allegations contained in this paragraph.**

113. According to Wexford's own human resources documents, as Wexford's Health Services Administrator for CNMCF, Defendant Joseph Montoya was "responsible for effectively and efficiently managing the institution's overall health care delivery system and monitoring all health service contract activities," including supervising scheduling patients for outside appointments, reviewing hospital specialty referrals, and monitoring overall performance. Defendant Montoya failed to exercise these powers to end the inadequate training of identifying emergent infections and thereby maintained a policy or custom of inadequate medical care by relying on insufficiently trained medical staff who inadequately refer prisoners for outside care.

**ANSWER:     NMCD Defendants deny the allegations contained in this paragraph.**

114. According to Wexford's human resources documents, as Wexford's Regional Medical Director, Defendant Dr. Keshab Paudel was responsible for "clinical supervision." Defendant Paudel failed to exercise these powers to end the inadequate training of identifying emergent infections and

thereby maintained a policy or custom of inadequate medical care by relying on insufficiently trained medical staff who inadequately refer prisoners for outside care.

**ANSWER:** **NMCD Defendants deny the allegations contained in this paragraph.**

115. According to Wexford's human resources documents, as Wexford's Regional Manager of CNMCF, Defendant Kathy Armijo was responsible for supervising Defendant Montoya, Wexford's HSA, to ensure that he was adequately performing his job responsibilities. Defendant Armijo failed to exercise these powers to end the inadequate training of identifying emergent infections and thereby maintained a policy or custom of inadequate medical care by relying on insufficiently trained medical staff who inadequately refer prisoners for outside care.

**ANSWER:** **NMCD Defendants deny the allegations contained in this paragraph.**

116. According to Wexford's human resources documents, as Wexford's Medical Director of CNMCF, Defendant Rajesh Sharma was responsible for reviewing hospital specialty referrals, ensuring that hospital specialty referrals were appropriately made, and overseeing interactions with medical specialists. Additionally, Defendant Sharma was tasked with providing clinical supervision at CNMCF. Defendant Sharma failed to exercise these powers to end the inadequate training of identifying emergent infections and thereby maintained a policy or custom of inadequate medical care by relying on insufficiently trained medical staff who inadequately refer prisoners for outside care.

**ANSWER:** **NMCD Defendants deny the allegations contained in this paragraph.**

117. According to Wexford's human resources documents, as Wexford's Directors of Nursing, Defendants Sarah Cartwright, David Whipple, and Denise Jones were responsible for clinical supervision of nurses at CNMCF and oversight of "the nursing process of assessment, planning, implementation, and evaluation." Defendants Cartwright, Whipple, and Jones were also responsible for reviewing and monitoring all prisoners receiving medications and "mak[ing] referrals to the appropriate health care provider in a timely manner based on diagnostic tests, labs, and nursing

diagnosis." Defendants Cartwright, Whipple, and Jones failed to exercise these powers to end the inadequate training of identifying emergent infections and thereby maintained a policy or custom of inadequate medical care by relying on insufficiently trained medical staff who inadequately refer prisoners for outside care.

  **ANSWER:**  **NMCD Defendants deny the allegations contained in this paragraph.**

  118. As Wexford's Utilization Management Coordinator Nurses, Defendants Lynnsey Vigil and Heather Garza were responsible for ensuring an effective and constitutionally adequate process by which referrals to outside medical providers were made and approved. Defendants Vigil and Garza failed to exercise these powers to end the inadequate training of identifying emergent infections and thereby maintained a policy or custom of inadequate medical care by relying on insufficiently trained medical staff who inadequately refer prisoners for outside care.

  **ANSWER:**  **NMCD Defendants deny the allegations contained in this paragraph.**

  119. Although their supervisory roles empowered them to do so, none of the Wexford or NMCD individual Defendants provided training to correctional staff or medical staff on the symptoms of endocarditis or sepsis. None of the Wexford or NMCD individual Defendants established reporting requirements for staff when deadly infections such as endocarditis and sepsis are apparent. And none of the Wexford or NMCD individual Defendants took any step to revise the policies or practices by which inadequately trained medical staff were responsible for diagnosing prisoners and acted as gatekeepers, effectively causing CNMCF prisoners to be denied all medical care for endocarditis, sepsis, and similar infections such as osteomyelitis.

  **ANSWER:**  **NMCD Defendants deny the allegations contained in this paragraph.**

  120. The Wexford medical staff at CNMCF referenced above were clearly inadequately trained, and each of the Wexford and NMCD individual Defendants were responsible for ensuring that these staff were adequately trained to prevent the type of injuries and constitutional violations

suffered by Mr. Jimenez. Specifically, each of the Wexford and NMCD individual Defendants were responsible for ensuring that Wexford did not perpetuate a policy or practice where prisoners were forced to resort to describing their medical problems to staff who were unqualified to diagnose illnesses like endocarditis or to identify such conditions and make the appropriate referrals.

**ANSWER:     NMCD Defendants deny the allegations contained in this paragraph.**

121. The Wexford and NMCD individual Defendants knowingly endorsed and perpetuated a policy where prisoners at CNMCF were unable to make their medical problems known to staff, because the Wexford medical staff were not competent to diagnose illnesses to then refer prisoner patients to proper medical providers to treat those conditions. In this way, CNMCF prisoners were denied access to appropriately qualified health care personnel for serious, life-threatening conditions—and this knowing denial evinces the deliberate indifference of the Wexford and NMCD individual Defendants.

**ANSWER:     NMCD Defendants deny the allegations contained in this paragraph.**

122. Consequently, each of the individual Defendants is liable according to claims of direct supervisory liability.

**ANSWER:     The allegations contained in this paragraph contain legal conclusions for which no response is required. If a response is required, NMCD Defendants deny the allegations contained in this paragraph.**

123. The Wexford medical staff referenced above were each subordinates of the individual Wexford and NMCD Defendants named in the Complaint, as these staff members were agents of both Wexford and NMCD, and the individual Defendants each have supervisory authority over them. As such, the constitutional violations of Wexford medical staff properly serve as the basis for each of the Wexford and NMCD Defendants' supervisory liability.

**ANSWER:** The allegations contained in this paragraph contain legal conclusions for which no response is required. If a response is required, NMCD Defendants deny the allegations contained in this paragraph.

124. Through their failures to act despite having the duty and authority to do so, each of the Wexford and NMCD individual defendants personally implemented, utilized, and promulgated Wexford's unconstitutional practices and policies, as further outlined in Section III of this Complaint, *supra.*

**ANSWER:** NMCD Defendants deny the allegations contained in this paragraph.

125. Overall, each of the Wexford and NMCD individual Defendants maintained policies or customs of (a) failing to medically train prison employees responsible for diagnosing and treating prisoners, (b) delaying medical care, and (c) keeping poor records. As a result, Mr. Jimenez's infection was allowed to become uncontrollable until he suffered from severe sepsis, endocarditis, and heart failure, which caused his death.

**ANSWER:** NMCD Defendants deny the allegations contained in this paragraph.

126. The harm to Mr. Jimenez could have been avoided if he had received a simple referral and had supervisory Defendants approved the referral to an outside specialist for proper diagnosis and treatment. Additionally, the harm to Mr. Jimenez could have been avoided with proper reporting by NMCD and/or Wexford personnel when it was clear that he was not receiving proper medical care and thus deteriorating rapidly.

**ANSWER:** NMCD Defendants deny the allegations contained in this paragraph.

V.   **DAMAGES SOUGHT**

127. As a direct result of Defendants' unlawful conduct, Mr. Jimenez endured tremendous pain, injuries, anguish, suffering, and ultimately, death, which entitles Plaintiff to general and special compensatory damages by way of survival.

**ANSWER:**     **NMCD Defendants deny the allegations contained in this paragraph.**

128. Further, Plaintiff is entitled to attorney's fees and costs pursuant to 42 U.S.C. § 1988, in addition to pre-judgment interest and costs as allowed by federal law.

**ANSWER:**     **NMCD Defendants deny the allegations contained in this paragraph.**

129. Plaintiff is also entitled to punitive damages against each of the Defendants, as their actions were done with malice or, minimally, with reckless indifference to Mr. Jimenez's federally protected rights.

**ANSWER:**     **NMCD Defendants deny the allegations contained in this paragraph.**

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF:
**8th and 14th Amendments to the U.S. Constitution**
**Deliberate Indifference to Serious Medical Need (42 U.S.C. § 1983)**
**(against Wexford, Alisha Tafoya Lucero, Wence Asonganyi, Orion Stradford, Michael Hildenbrandt, Joseph Montoya, Dr. Keshab Paudel, Kathy Armijo, Rajesh Sharma, Sarah Cartwright, David Whipple, Denise Jones, Lynnsey Vigil, and Heather Garza in their individual capacities)**

130. Each paragraph of this Complaint is incorporated as if fully restated herein.

**ANSWER:   NMCD Defendants reassert their answers and defenses as stated in paragraphs 1-129.**

131. The abovenamed Defendants each possessed responsibility for the decisions that resulted in the violation of Mr. Jimenez's constitutional right to be free from cruel and unusual punishment regarding the deliberate indifference to his serious medical needs while in NMCD custody, as described more fully above.

**ANSWER:**     **NMCD Defendants deny the allegations contained in this paragraph.**

132. These Defendants were aware of and deliberately disregarded the substantial risk of harm to Mr. Jimenez that would ensue because of their failures to provide him with constitutionally adequate medical care, as described more fully above.

**ANSWER:**   **NMCD Defendants deny the allegations contained in this paragraph.**

133. Notably, each of the abovenamed Defendants was aware of Mr. Jimenez's severe and escalating pain, blurry vision, and inability to walk, yet took essentially no action to address this anguish, which constitutes deliberate indifference to his pain and deteriorating medical condition.

**ANSWER:**   **NMCD Defendants deny the allegations contained in this paragraph.**

134. The deliberate indifference of the abovenamed Defendants caused Mr. Jimenez to experience worsening severe, prolonged and unnecessary pain (first harm), to develop severe sepsis and endocarditis (second harm), and to suffer from a delayed diagnosis of severe sepsis and endocarditis (third harm), which ultimately caused his heart failure and death (fourth harm).

**ANSWER:**   **NMCD Defendants deny the allegations contained in this paragraph.**

135. Mr. Jimenez's harms were sufficiently serious injuries that a reasonable doctor or patient would find them important and worthy of immediate treatment. Without treatment, Mr. Jimenez's worsening severe pain and infection caused him to lose the ability to take care of his most basic needs, like eating, drinking, and walking, and restricted him to a wheelchair at times. Ultimately, Mr. Jimenez's severe sepsis and endocarditis caused his heart failure and resulting death.

**ANSWER:**   **NMCD Defendants deny the allegations contained in this paragraph.**

136. Moreover, Mr. Jimenez's severe pain, sepsis, and endocarditis significantly affected his daily activities, as he lost the ability to care for even his most basic needs and struggled through pain while completing basic tasks like standing up, lying down, and attempting to eat, drink, and walk.

**ANSWER:**   **NMCD Defendants deny the allegations contained in this paragraph.**

137. The above named Defendants are not shielded by qualified immunity for their deliberate indifference to Mr. Jimenez's serious medical needs because of the well-documented 10th Circuit precedent notifying medical and prison personnel that the Eighth Amendment is violated when such personnel fail to take reasonable measures to provide a patient with access to medical attention and/or

deny medical care to a patient with serious medical needs, as occurred in Mr. Jimenez's case with each of the Defendants named herein.

**ANSWER:** **NMCD Defendants deny the allegations contained in this paragraph.**

### SECOND CLAIM FOR RELIEF:
**8th and 14th Amendments to the U.S. Constitution**
**Policy & Practice of Denial of Medical Care (42 U.S.C. § 1983)**
**(against Wexford)**

138. Each paragraph of this Complaint is incorporated as if fully restated herein.

**ANSWER:** **NMCD Defendants reassert their answers and defenses as stated in paragraphs 1-137.**

139. As a private corporation acting pursuant to its agreement with NMCD to provide medical services to New Mexico State prisoners, Wexford was at all times relevant to the events described in this Complaint acting under color of law and, as the provider of healthcare services to prisoners incarcerated at CNMCF, was responsible for the creation, implementation, oversight, and supervision of all policies and procedures followed by employees and agents of Wexford and CNMCF/NMCD.

**ANSWER:** **The allegations contained in this paragraph contain legal conclusions for which no response is required. If a response is required, NMCD Defendants deny the allegations contained in this paragraph.**

140. Mr. Jimenez's injuries were proximately caused by Wexford's policies and practices.

**ANSWER:** **NMCD Defendants deny the allegations contained in this paragraph.**

141. Wexford maintains a policy, practice, and custom of under-reporting the severity of medical and mental health emergencies and denying appropriate medical and mental health care to prisoners. On information and belief, Wexford medical staff working in NMCD facilities lack the necessary medical backgrounds to provide adequate care and are trained to ignore or underreport symptoms of medical and mental health emergencies, which amounts to deliberate indifference to the serious medical needs of prisoners presenting symptoms of such emergencies, including Mr. Jimenez.

**ANSWER:**     **NMCD Defendants deny the allegations contained in this paragraph.**

142. On information and belief, Wexford supervises its employees to ignore or underreport symptoms of medical and mental health emergencies, which amounts to deliberate indifference to the serious medical needs of prisoners presenting symptoms of such emergencies, including Mr. Jimenez.

**ANSWER:**     **NMCD Defendants deny the allegations contained in this paragraph.**

143. On information and belief, Wexford ratifies the conduct of its employees and agents who ignore or under-report symptoms of medical and mental health emergencies through review and approval of these employees' and agents' performance, and through the decision to continue the employment of such individuals who ignore and under-report medical and mental health emergencies of NMCD prisoners, which amounts to deliberate indifference to the serious medical needs of prisoners presenting symptoms of such emergencies, including Mr. Jimenez.

**ANSWER:**     **NMCD Defendants deny the allegations contained in this paragraph.**

144. At all times relevant to this Complaint, Wexford and NMCD had notice of a widespread practice by their employees and agents at CNMCF and other NMCD facilities under which prisoners with serious medical conditions, including Mr. Jimenez, were routinely denied access to proper or sufficient medication and medical attention. Upon information and belief, it was common to observe prisoners of CNMCF and NMCD with clear symptoms of serious medical and/or mental concerns whose requests for medical care were routinely denied or completely ignored. Upon information and belief, a significant portion of these denials of medical and mental health care resulted in substantial injury or death.

**ANSWER:**     **NMCD Defendants deny the allegations contained in this paragraph.**

145. More specifically, there was a widespread practice under which employees and agents of Wexford and NMCD, including correctional officers and medical personnel, failed or refused to: (1) report, diagnose, and properly examine, monitor, and treat prisoners with serious medical and/or

mental health conditions, including failing to provide proper medications to prisoners with serious medical and/or mental health conditions; (2) respond to prisoners who requested medical and/or mental health services; (3) respond to prisoners who exhibited clear signs of medical and/or mental health need or illness; (4) adequately document and communicate the medical and mental health needs of prisoners to the appropriate correctional officers and/or medical or mental health staff; or (5) timely refer prisoners for emergency or other offsite medical services.

**ANSWER:** **NMCD Defendants deny the allegations contained in this paragraph.**

146. Additionally, there was a widespread practice under which Wexford personnel severely understaffed its medical and mental health facilities and failed adequately to train and supervise its personnel on necessary medical and mental health procedures.

**ANSWER:** **NMCD Defendants deny the allegations contained in this paragraph.**

147. These widespread practices were allowed to proliferate because Wexford and NMCD directly encouraged, and were the moving forces behind, the specific misconduct at issue. Wexford and NMCD also failed to adequately hire, retain, train, supervise, and control correctional officers and medical personnel by failing to adequately punish and discipline prior instances of similar misconduct, thereby directly encouraging future abuses like those which harmed Mr. Jimenez.

**ANSWER:** **NMCD Defendants deny the allegations contained in this paragraph.**

148. Wexford and NMCD knew of the substantial risk of serious or fatal consequences that could be caused by their unconstitutional policies, practices, customs, failures to train, and failures to supervise, hire, and retain appropriately credentialed staff, as occurred in Mr. Jimenez's case. However, they intentionally continued to perpetuate these unconstitutional policies and practices despite the known risks.

**ANSWER:** **NMCD Defendants deny the allegations contained in this paragraph.**

149. These policies and conduct were the moving force behind the violations of Mr. Jimenez's constitutional rights and his injuries. Mr. Jimenez's injuries were caused by employees and contractors of NMCD and Wexford, including but not limited to the individually-named Defendants, who acted pursuant to the unconstitutional policies and practices of NMCD and Wexford while engaging in the misconduct described in this Complaint.

**ANSWER:** **NMCD Defendants deny the allegations contained in this paragraph.**

150. Upon information and belief, Wexford maintained these policies and practices in order to maximize profit and without regard to its constitutional and medical obligations to NMCD prisoners who were entrusted to Wexford's care.

**ANSWER:** **NMCD Defendants deny the allegations contained in this paragraph.**

151. Wexford and the Wexford individual Defendants are not shielded by qualified immunity for their unconstitutional policies and practices, because private companies and their private employees are never entitled to qualified immunity, even when employed doing correctional work. *See, e.g., Phillips v. Tiona*, 508 Fed. Appx. 737, 751-52 (10th Cir. 2013).

**ANSWER:** **NMCD Defendants deny the allegations contained in this paragraph.**

## JURY DEMAND

NMCD Defendants demand a twelve jury on all issues so triable.

## AFFIRMATIVE DEFENSES

1.      Some or all of the allegations contained in the Complaint fail to state a claim upon which relief can be granted.

2.      Plaintiff's claims are barred by Plaintiff's failure to exhaust administrative remedies, including those required by NMSA § 33-2-ll(B). Plaintiff's claims are subject to all terms, conditions and limitations set forth in the Prison Litigation Reform Act.

3.      NMCD Defendants asserts all applicable limitations on damages and liability, including, without limitation, the New Mexico Medical Malpractice Act NMSA §41-5-1 et seq. at the time of the events that form the basis of this suit, which limits Plaintiff's claims and recovery of damages, if any.

4.      Plaintiff has not suffered any injuries or damages because of any act or omission of NMCD Defendants. NMCD Defendants' alleged acts or omissions were not the proximate cause of any alleged damages or injuries to Plaintiff.

5.      NMCD Defendants sued in their individual capacities invoke the defense of qualified immunity.

6.      NMCD Defendants did not breach any duty owed to Plaintiff, if any such duty was owed.

7.      Plaintiff's alleged injuries and damages, if any, were caused, in whole or in part, from a pre-existing condition and/or unavoidable medical complication for which NMCD Defendants are not responsible.

8.      Plaintiff's alleged injuries or damages were the result of an independent intervening cause or causes, thereby barring recovery by Plaintiff.

9.      Plaintiff's alleged injuries or damages were the result of an independent and superseding cause or causes, thereby barring recovery by Plaintiff against NMCD.

10.     Other parties, including persons not parties to this suit as well as Plaintiff, may have been negligent and caused or contributed to Plaintiff's alleged damages, thereby barring or limiting Plaintiff's recovery, if any, against NMCD Defendants.

11.     Plaintiff has failed to mitigate his alleged injuries and damages.

12. Plaintiff fails to state a claim for punitive damages. Alternatively, Plaintiff's claims for punitive damages are barred, either in whole or in part, as a result of the protections provided by the 5th and 14th Amendments to the United States Constitution and the New Mexico Constitution.

13. Pleading in the alternative, NMCD Defendants' conduct was reasonable and prudent, and was undertaken in good faith and without any culpable mental state, and therefore, Plaintiffs' claim and request for punitive damages should be dismissed.

14. NMCD possessed and applied the knowledge and used the skill and care ordinarily used by reasonably operated medical facilities, given due consideration to the locality involved.

15. NMCD Defendants expressly deny that any other defendant or third party engaging in acts alleged by Plaintiff was acting as NMCD's respective agent, representative, employee, or servant, at the instruction of NMCD, or within the control of NMCD. To the extent that Plaintiff seeks recovery from NMCD Defendants for the acts or omissions of such third parties, Plaintiff's claims are barred in whole or in part as a matter of law.

16. NMCD reserves the right to amend this answer and add additional affirmative defenses and more information becomes available through discovery or otherwise.

**WHEREFORE** NMCD Defendants request that the Court enter judgment in its favor on all of Plaintiff's claims and causes of action, dismissing them with prejudice, awarding NMCD Defendants their costs, including attorneys' fees, and requests such other and further relief to which NMCD Defendants may be justly entitled.

Respectfully Submitted,

LAW OFFICES OF MARY T. TORRES

By: _/s/   Mary T. Torres, Attorney at Law_
Mary T. Torres
*Attorneys for NMCD Defendants*
201 Third Street N.W., Suite 1950
Albuquerque, New Mexico 87102
(505) 944-9030 (t)
(505) 944-9091 (f)
mtt@marytorreslaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2024, I electronically filed the foregoing document with the clerk of the court for the District of New Mexico, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of E-Filing" to the attorneys of record in this case.

_/s/ Mary T. Torres_
Mary T. Torres