# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

THE ESTATE OF AARON JIMENEZ, Deceased, by
and through EUGENIO S. MATHIS, personal
representative,

       Plaintiff,

    v.                                   Civ. No. 24-316 SCY/JMR

WEXFORD HEALTH SOURCES, INC.; ALISHA
TAFOYA LUCERO, NM SECRETARY FOR
DEPARTMENT OF CORRECTIONS, in her
individual capacity; WENCE ASONGANYI, NMCD
HEALTH SERVICES ADMINISTRATOR, in his
individual capacity; ORION STRADFORD, NMCD
BUREAU CHIEF, in his individual capacity;
MICHAEL HILDENBRANDT, WEXFORD
DIRECTOR OF OPERATIONS, in his individual
capacity; JOSEPH MONTOYA, WEXFORD HEALTH
SERVICES ADMINISTRATOR OF CNMCF, in his
individual capacity; DR. KESHAB PAUDEL,
WEXFORD REGIONAL MEDICAL DIRECTOR, in
his individual capacity; RAUL NOCHES, WEXFORD
REGIONAL MANAGER OF CNMCF, in his
individual capacity; RAJESH SHARMA, WEXFORD
MEDICAL DIRECTOR OF CNMCF, in his individual
capacity; SARAH CARTWRIGHT, WEXFORD
REGIONAL DIRECTOR OF NURSING, in her
individual capacity; DAVID WHIPPLE, WEXFORD
DIRECTOR OF NURSING OF CNMCF, in his
individual capacity; DENISE JONES, WEXFORD
DIRECTOR OF NURSING OF CNMCF, in her
individual capacity; LYNNSEY VIGIL, WEXFORD
UTILIZATION MANAGEMENT COORDINATOR,
in their individual capacity; and HEATHER GARZA,
WEXFORD UTILIZATION MANAGEMENT
COORDINATOR, in her individual capacity,

       Defendants.

**MEMORANDUM OPINION AND ORDER**
**DENYING MOTION FOR QUALIFIED IMMUNITY**

Plaintiff, The Estate Of Aaron Jimenez, brings suit against N.M. Department of Corrections ("NMDC") officials following a twelve-day period in which Mr. Jimenez presented to contracted medical staff in prison with symptoms of endocarditis and the medical staff allegedly failed to treat his condition or refer him to outside care. By the time he was transported to the hospital, his condition was so serious that he passed away a day later. Plaintiff brings suit against NMDC officials arguing that: (1) they knew of the seriousness of Mr. Jimenez's medical condition and yet failed to do anything to ensure that he received appropriate medical treatment, and (2) in general, they knew the contractor provided inadequate medical care to prisoners and yet failed to do anything to remedy this issue.

The NMCD officials move for qualified immunity, arguing that the allegations that they knew of Mr. Jimenez's condition are conclusory and that they have no duty to second-guess medical care provided by medical staff. The Court agrees that the allegations in the complaint relating to prison officials' knowledge of Mr. Jimenez's condition are conclusory. Nonetheless, it denies the motion for qualified immunity because clearly established law holds prison officials liable for dangerous conditions in the prison of which they are aware, such as a pattern and practice of contracted medical staff denying proper medical treatment.

**BACKGROUND**

Plaintiff filed this complaint in federal court on April 18, 2023. Doc. 1 ("Compl."). The complaint brings claims against two groups of defendants: N.M. Department of Corrections ("NMDC") officials and private healthcare provider Wexford Health Sources, Inc. and its employees. Because this matter is before the Court on a motion to dismiss by NMDC defendants, the Court focuses on the allegations against that group of defendants and will use the general

term "Defendants" to refer only to the NMCD defendants who bring this motion. Plaintiff sues

NMDC Defendants Alisha Tafoya Lucero, Wence Asonganyi, and Orion Stradford in their

individual capacities, asserting violations of the 8th and 14th Amendments to the U.S.

Constitution under the theory of deliberate indifference to a serious medical need pursuant to 42

U.S.C. § 1983. Compl. at 42. At relevant times, Alisha Tafoya was the Secretary of Corrections,

*id*. ¶ 11, Wence Asonganyi was the Health Services Administrator, *id*. ¶ 12, and Orion Stradford

was NMCD Bureau Chief. *Id.* ¶ 13.

    This Background section does not address each specific allegation Plaintiff makes in its

forty-eight-page complaint. Instead, the Court uses this Background section to provide a general

summary of Plaintiff's allegations. After setting forth the relevant law, the Court then addresses

Plaintiff's specific factual allegations in more detail in its Analysis section. Similarly, the Court

waits until the Analysis section to separate Plaintiff's legal conclusions and statements from

Plaintiff's factual allegations in the complaint.[1]

    A.    <u>Plaintiff's medical condition and treatment allegations</u>

    Aaron Jimenez was incarcerated by NMCD at Central New Mexico Correctional Facility

("CNMCF") in Los Lunas, New Mexico. *Id.* ¶ 8. He had "a history of intravenous drug abuse

that made him susceptible to infections, including endocarditis, and this history was known to

Wexford and NMCD staff, including the individual Defendants, through Mr. Jimenez's prison

---

[1] The Court accepts Plaintiff's well-pleaded, non-conclusory allegations as fact. However, as further described in the Court's analysis, even drawing all inferences in Plaintiff's favor, in some instances Plaintiff's allegations are too conclusory to be considered fact. *See Hackford v. Babbitt*, 14 F.3d 1457, 1465 (10th Cir. 1994) ("On considering the legal sufficiency of the complaint, the burden remains with the plaintiff to assert facts sufficient to support the claim, but the court accepts as true all well-pleaded facts and construes all reasonable allegations in the light most favorable to the plaintiff. Nevertheless, we are not bound by conclusory allegations, unwarranted inferences, or legal conclusions." (internal citations omitted)).

file and regular conversations amongst Wexford medical staff and the individual Defendants."
*Id.* ¶ 25. On March 22, 2021, Mr. Jimenez reported to Wexford medical staff complaining of
dizziness, blurred vision, dehydration, hoarseness, double vision, numbness in his face, and
vomiting. *Id.* ¶ 26. Wexford medical staff gave him Tylenol and discharged him back to his cell.
*Id.* ¶ 27. Three hours later, Mr. Jimenez returned to inform Wexford medical staff that he could
not eat or drink because he was vomiting everything he consumed. *Id.* ¶ 28. Wexford medical
staff noted that his skin was warm and dry and that he looked pale. *Id.* Wexford medical staff
provided him with no medical care and sent him back to his cell. *Id.* That evening, Mr. Jimenez
submitted a written medical request, writing: "I think I got a ear infection cause the right side of
my head has been throbing painfully for 2 days. I'm walking like I'm drunk. The pain is from my
lower right ear to my jaw and behind my ear to the whole right side of my head. Please help me."
*Id.* ¶ 29 [sic]. Wexford medical staff did not respond or take any action to address this complaint.
*Id.* ¶ 30.

    Two days later, on March 24, Mr. Jimenez complained to Wexford medical staff of an
earache in his right ear. *Id.* ¶ 31. Wexford medical staff noted that his right ear was swollen and
gave him ear drops used to treat infection and irritation, Keflex (an antibiotic), and Rocephin
(another antibiotic). *Id.* On March 26, Mr. Jimenez returned to Wexford medical staff for ear
pain and blurry vision. *Id.* ¶ 32. He reported that his ear pain had lessened but that his blurry
vision persisted. *Id.* Wexford medical staff wrote that he needed an eye examination, but he was
not provided with one. *Id.* Instead, Wexford medical staff took his vitals and prescribed
Gatorade. *Id.* ¶ 33. On March 31, Mr. Jimenez reported that he still had blurry vision that was not
improving. *Id.* ¶ 34. Wexford medical staff again did nothing but provide him Gatorade. *Id.* On
April 2, Wexford medical staff took his vitals but made no attempt to diagnose or treat his

complaints of persistent blurry vision. *Id.* ¶ 35.

On April 3, Wexford medical staff saw Mr. Jimenez again due to complaints of weakness and the inability to stand. *Id.* ¶ 36. Wexford medical staff noted that he had labored breathing, pale lips, and an increased respiratory rate. *Id.* He complained of heart pain, shortness of breath, vomiting, and severe right upper quadrant pain. *Id.* Wexford medical staff gave him oxygen, and more Gatorade. *Id.* During the entire time Mr. Jimenez was complaining of blurry vision and the inability to eat or drink without vomiting, he was never seen by a doctor or any other medical provider at the correctional facility capable of competently evaluating, diagnosing, or treating his symptoms and conditions. *Id.* ¶ 39.

Sometime on April 3, Wexford medical staff decided to refer Mr. Jimenez to emergency medical services. *Id.* ¶ 37. Mr. Jimenez told emergency medical staff that he could feel a lump on his side and was still suffering from blurry vision and growing, severe body pain. *Id.* Immediately upon learning of his symptoms, outside emergency medical staff knew that he was likely suffering from sepsis, and transported him to the UNMH trauma unit. *Id.* ¶ 38. However, "the referral of Mr. Jimenez for emergency care was not made until it was too late to prevent his death." *Id.* ¶ 44. As a result of sepsis, endocarditis, and heart failure, Mr. Jimenez died the next day. *Id.* ¶¶ 38, 50-51, 56-57.

B.    <u>Wexford's pattern and practice allegations</u>

According to the complaint, Wexford had a pattern and practice of failing to report, diagnose, and treat the warning signs of serious conditions for other patients in circumstances similar to Mr. Jimenez's. Compl. ¶ 62. The complaint alleges that "on-site Wexford medical providers are unable to refer prisoner patients for off-site diagnostic testing and services. Instead, Wexford's 'utilization review' process requires Wexford corporate approval of prisoners' off-site services." *Id.* ¶ 66. "Wexford has a pattern and practice of routinely denying off-site medical

referrals for prisoners and, in doing[] so, frequently overrides the clinical advice of its on-site medical providers." *Id.*

The complaint cites eight non-exhaustive examples of illustrative cases filed between 2015 and 2022 bringing what Plaintiff asserts to be similar allegations. *Id.* ¶ 62. The complaint also recites various news articles and investigations publicly documenting Wexford's allegedly widespread practices of improper reporting, diagnosing, monitoring, examining, treating, and referring prisoner patients for off-site services across the country, including in New Mexico, from 2004 to 2021. *Id.* ¶ 65. As a result, the complaint alleges that NMCD was on notice of these widespread unconstitutional practices prior to Mr. Jimenez's injuries and knew that additional safeguards should have been put in place to address signs of serious health conditions. *Id.* ¶ 67. NMCD failed to provide proper supervision and oversight of these practices despite the knowledge that they existed. *Id.* ¶ 68.

The complaint alleges that "Wexford's widespread failure to refer prisoners for off-site medical care was, in large part, financially motivated." *Id.* ¶ 64. This is because "Wexford was contractually relieved from paying for the hospital costs of any prisoner who was hospitalized for more than 24 hours. Evidently, this fee structure incentivized Wexford to refrain from referring prisoners for off-site care unless and until their injuries were so severe that they would likely require hospitalization lasting more than 24 hours." *Id.* ¶ 64. In addition, Wexford has chronically understaffed its medical positions, including in New Mexico, and this has been continually publicized, investigated, reported nationwide, and otherwise made known to NMCD as early as the late 1990s. *Id.* ¶¶ 72-73. In this case, Mr. Jimenez "received little to no healthcare services largely because there were very few healthcare providers working in NMCD prisons in the months leading up to his injuries." *Id.* ¶ 75.

The complaint further alleges that it was widely known—publicized and investigated by governmental agencies across the country, with examples given from 2004 to 2012—that Wexford had a pattern and practice of failing to provide adequate medical documentation; failing to communicate changes in patient conditions; and failing to adequately hire, retain, train, and supervise its personnel despite knowing that such practices were necessary to protect patient health. *Id.* ¶¶ 78-79, 90-91. The complaint alleges that NMCD was aware of Wexford's documented shortcomings. *Id.* ¶¶ 86, 97. It further alleges that NMCD was complicit in some of these shortcomings; for instance, in 2016, NMCD determined that it needed an electronic health records system. *Id.* ¶ 86. Yet, by the time of Mr. Jimenez's death, it still had not implemented any such thing. *Id.* ¶ 87.

This pattern and practice of "failing to report, diagnose, and treat the warning signs of serious medical and mental health conditions," *id.* ¶ 69; "failing to provide adequate medical documentation and communicate changes in patient conditions shares, *id.* ¶ 83; and "widespread failures to adequately hire, retain, train, and supervise its personnel," *id.* ¶ 93, all "share[] close factual relationship with the events" in this case that led to Mr. Jimenez's death. *Id.* ¶¶ 69, 83, 93. Wexford's former regional medical director for New Mexico, Dr. Murray Young, testified in another case that nurses working within NMCD facilities, including CNMCF, would not be able to identify endocarditis, yet they were, by Wexford's policy and practice, the gatekeepers who prevented prisoners like Mr. Jimenez from receiving treatment for endocarditis. *Id.* ¶ 100.

The complaint alleges that the NMCD Defendants "knew that there were a high number of endocarditis cases in NMCD prisons and did nothing to protect prisoners from worsening endocarditis." *Id.* ¶ 105. "[E]ach of the Wexford and NMCD individual Defendants also knew of Mr. Jimenez's persistent expressions of worsening pain, blurry vision, debilitated physical

appearance, and his eventual inability to walk. Likewise, each of the Wexford and NMCD individual Defendants knew that these symptoms posed a substantial risk of harm to Mr. Jimenez, yet they did nothing to attempt to ameliorate that impending substantial harm." *Id.* ¶ 106. "These individual Defendants became aware of the above information through prior internal and legislative reports, news coverage, weekly and quarterly meetings/calls amongst each other and with other Wexford medical staff, quarterly tracking documents, quality assurance, program reports, monthly continuous quality improvement meetings, statistical reports submitted to the Health Services Bureau, training materials, continuous quality improvement audits, American Correctional Association audits, National Commission on Correctional Healthcare audits, performance improvement reports, corrective action plans, prisoner grievances, health services request forms, and individual inmate files, including Mr. Jimenez's file." *Id.* ¶ 107.

## **LEGAL STANDARD**

### A.   Motion to dismiss standard

Rule 8 requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In turn, Rule 12(b)(6) allows a court to dismiss a complaint for failure to state a claim upon which the court can grant relief. "[T]o withstand a Rule 12(b)(6) motion to dismiss, a complaint must contain enough allegations of fact, taken as true, to state a claim to relief that is plausible on its face." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (internal quotation marks omitted). While Rule 8(a)(2) does not require detailed factual allegations, it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The court is not required to accept conclusions of law or the asserted application of law to the alleged facts. *See Hackford v.*

*Babbitt*, 14 F.3d 1457, 1465 (10th Cir. 1994). Nor is the court required to accept as true legal conclusions that are masquerading as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A court considering a challenge under Rule 12(b)(6) may proceed according to a "two-pronged approach." *Iqbal*, 556 U.S. at 679. First, a court "can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*

For purposes of this second prong, the Court "accept[s] the well-pled factual allegations in the complaint as true, resolve[s] all reasonable inferences in the plaintiff's favor, and ask[s] whether it is plausible that the plaintiff is entitled to relief." *Diversey v. Schmidly*, 738 F.3d 1196, 1199 (10th Cir. 2013) (internal citations and quotation marks omitted); *see also Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1280 (10th Cir. 2013) (the court must view a plaintiff's allegations in the light most favorable to him or her). "Plausible" does not mean "likely to be true." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Quintana v. Santa Fe Cnty. Bd. of Commissioners*, 973 F.3d 1022, 1034 (10th Cir. 2020) (quoting *Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009)). "Rather, 'plausibility' in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs have not nudged their claims across the line from conceivable to

plausible." *Robbins*, 519 F.3d at 1247 (internal quotation marks omitted). In other words, "[a] claim is facially plausible when the allegations give rise to a reasonable inference that the defendant is liable." *Mayfield v. Bethards*, 826 F.3d 1252, 1255 (10th Cir. 2016).

Even under *Twombly* and *Iqbal*, however, the Rule 8 standard is notice pleading, *Khalik*, 671 F.3d at 1191-92, which is a "low bar," *Quintana*, 973 F.3d at 1034. "Thus, as the Court held in *Erickson v. Pardus,* 551 U.S. 89, 93 (2007), which it decided a few weeks after *Twombly,* under Rule 8, 'specific facts are not necessary; the statement need only give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Khalik*, 671 F.3d at 1192 (alterations omitted). "While the 12(b)(6) standard does not require that Plaintiff establish a prima facie case in her complaint, the elements of each alleged cause of action help to determine whether Plaintiff has set forth a plausible claim." *Id.* (quoting with approval the Ninth Circuit's holding that "*Twombly* and *Iqbal* do not require that the complaint include all facts necessary to carry the plaintiff's burden" (citing *al-Kidd v. Ashcroft*, 580 F.3d 949, 977 (9th Cir. 2009), *rev'd on other grounds*, 563 U.S. 731 (2011))).

B.    Qualified immunity standard

Qualified immunity protects public officials from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). When an individual defendant raises the qualified immunity defense on summary judgment, the burden shifts to the plaintiff to meet a strict two-part test. *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). The plaintiff must show that 1) the officer violated a constitutional or statutory right and 2) the right was clearly established when the alleged violation occurred. *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002); *Martinez*, 563 F.3d at 1088. A court may address these prongs in either order, *Pearson*,

555 U.S. at 236, but a plaintiff must satisfy both to avoid qualified immunity, *Olsen*, 312 F.3d at 1304.

A right is clearly established if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The action at issue need not have been previously declared unlawful, but its unlawfulness must be evident in light of preexisting law. *Beedle v. Wilson*, 422 F.3d 1059, 1069 (10th Cir. 2005). Except for egregious circumstances in which every reasonable official would understand the conduct at issue to be unreasonable, unlawfulness is generally demonstrated "when there is controlling authority on point or when the clearly established weight of authority from other courts supports plaintiff's interpretation of the law." *Id.* at 1069-70 (internal quotation marks omitted). "A prior case need not have identical facts," *Patel v. Hall*, 849 F.3d 970, 980 (10th Cir. 2017), but the precedent must make it clear "to every reasonable officer . . . that what he is doing violates that right," *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation marks omitted); *see also Sturdivant v. Fine*, 22 F.4th 930, 937 (10th Cir. 2022) ("[A] case directly on point is not required so long as existing precedent [has] placed the . . . constitutional question beyond debate.") (internal quotation marks and citations omitted).

The plaintiff bears the burden of identifying "a controlling case or robust consensus of cases" where an official acting "under similar circumstances" to those faced by the defendants was found to have acted unlawfully. *D.C. v. Wesby*, 538 U.S. 48, 65 (2018); *Quinn v. Young*, 780 F.3d 998, 1013 (10th Cir. 2015). Furthermore, the cases so cited must clearly establish that "the scope of the right encompasses the facts presented." *Quinn*, 780 F.3d at 1012 (internal quotation marks omitted; emphasis removed).

The Supreme Court "has issued a number of opinions reversing federal courts in qualified immunity cases." *White v. Pauly*, 80 U.S. 73, 79 (2017). "The Court has found this necessary both because qualified immunity is important to society as a whole, and because as an immunity from suit, qualified immunity is effectively lost if a case is erroneously permitted to go to trial." *Id.* (internal quotation marks and citations omitted). "[T]he defense of qualified immunity gives public officials the benefit of legal doubts." *Donovan v. City of Milwaukee*, 17 F.3d 944, 951 (7th Cir. 1994) (internal quotation marks omitted). Thus, qualified immunity provides "ample room for mistaken judgments" and protects all but "the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 314, 343 (1986).

On a motion to dismiss raising the defense of qualified immunity, "plaintiffs must allege facts sufficient to show (assuming they are true) that the defendants plausibly violated their constitutional rights, and that those rights were clearly established at the time. This requires enough allegations to give the defendants notice of the theory under which their claim is made." *Robbins*, 519 F.3d at 1249. "This does not mean that complaints in cases subject to qualified immunity defenses must include all the factual allegations necessary to sustain a conclusion that defendant violated clearly established law." *Id.* (internal quotation marks omitted). "Fair notice under Rule 8(a)(2) depends on the type of case." *Id.* (internal quotation marks omitted). "In § 1983 cases, defendants often include the government agency and a number of government actors sued in their individual capacities." *Id.* at 1249-50. Therefore, "it is particularly important in such circumstances that the complaint make clear exactly *who* is alleged to have done *what* to *whom,* to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state." *Id.* at 1250.

**DISCUSSION**

I.    **Constitutional violation**

"The Eighth Amendment's prohibition of cruel and unusual punishment imposes a duty on prison officials to provide humane conditions of confinement, including adequate food, clothing, shelter, sanitation, medical care, and reasonable safety from serious bodily harm." *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008). "[P]rison officials violate the Eighth Amendment if their deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain." *Kikumura v. Osagie*, 461 F.3d 1269, 1291 (10th Cir. 2006) (internal quotation marks omitted). "'Deliberate indifference' involves both an objective and a subjective component. The objective component is met if the deprivation is sufficiently serious. A medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000) (some internal quotation marks and citations omitted). Here, Plaintiff alleges that the deprivation of medical care caused Mr. Jimenez's death. This allegation is sufficient to satisfy the objective component and Defendants do not argue otherwise. Thus, resolution of the present motion to dismiss turns on the subjective component.

 "The subjective component is met if a prison official knows of and disregards an excessive risk to inmate health or safety." *Id.*; *Tafoya*, 516 F.3d at 921 (prison supervisors are liable if they "kn[o]w of the dangerous conditions at the jail and deliberately elect[] not to remedy them"). Deliberate indifference is met "when prison officials prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment." *Sealock*, 218 F.3d at 1211. "The standard is subjective, requiring that the official actually be aware of facts from which the inference could be drawn that a substantial risk of

serious harm exists, and he must also draw the inference." *Tafoya*, 516 F.3d at 916. But "a jury is permitted to infer that a prison official had actual knowledge of the constitutionally infirm condition based solely on circumstantial evidence, such as the obviousness of the condition." *Id.* In other words, deliberate indifference can be established when a supervisor "deliberately or consciously fails to act when presented with an obvious risk of constitutional harm which will almost inevitably result in constitutional injury of the type experienced by the plaintiff." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013) (internal quotation marks omitted).

Plaintiff argues that Defendants acted with deliberate indifference in two separate ways. First, Plaintiff argues that the individual Defendants knew about Mr. Jimenez's illness and complaints and knew that these symptoms posed a substantial risk of harm to Mr. Jimenez, but were deliberately indifferent to this risk. Compl. ¶¶ 106, 133. Defendants, in their motion to dismiss, argue that Plaintiff's factual allegations, taken as true, do not plausibly indicate that the individual Defendants knew about Mr. Jimenez's symptoms and Wexford's treatment of them. The Court agrees with Defendants that the complaint lacks facts plausibly showing how any individual Defendant was on notice about Mr. Jimenez's symptoms and Wexford's treatment of them.

Second, Plaintiff argues that, even if the individual Defendants did not know about Mr. Jimenez's medical condition, they did know that about Wexford's alleged pattern and practice of failing to timely provide appropriate medical treatment to inmates with serious conditions, such as those experiencing symptoms of endocarditis, and that this failure created a substantial risk, including the risk of death, to such inmates. *Id.* ¶¶ 105, 120-21. Nonetheless, Plaintiff argues, the individual Defendants did nothing to address this risk to which they were substantially

indifferent. *Id.* ¶¶ 121, 124. The Court agrees that under a series of published Tenth Circuit decisions on similar topics, Plaintiff has stated a claim of deliberate indifference.

    A.    <u>Plaintiff fails to plausibly allege that Defendants knew of Mr. Jimenez's health condition.</u>

In deciding whether Plaintiff plausibly alleged that Defendants knew of Mr. Jimenez's health condition, the Court first parses out Plaintiff's conclusory allegations. In *Iqbal*, the Supreme Court applied the two-step process it set forth in *Twombly* and began its "analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. It then identified the plaintiff's allegation that the defendants, including individual defendants such as the attorney general of the United States, "'knew of, condoned, and willfully and maliciously agreed to subject [him]' to harsh conditions of confinement 'as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest.'" *Id.* (quoting the plaintiff's complaint). It described these allegations as "bare assertions [that] . . . amount to nothing more than a formulaic recitation of the elements of a constitutional discrimination claim, namely, that petitioners adopted a policy 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group . . . . As such, the allegations are conclusory and not entitled to be assumed true." *Id.* at 681 (internal quotation marks and citations omitted).

Similarly, as Defendants correctly argue, Plaintiff's allegations about Defendants' knowledge, standing alone, are not entitled to the presumption of truth. *See* Doc. 14 at 8 ("other than conclusory allegations that NMCD Defendants knew about Mr. Jimenez's medical condition and failed to take steps to address it, there is no basis to infer from the Complaint that they knew about a risk of harm to Mr. Jimenez"). In its complaint, Plaintiff alleges:

    Upon information and belief, each of the Wexford and NMCD individual
    Defendants also knew of Mr. Jimenez's persistent expressions of worsening pain,

blurry vision, debilitated physical appearance, and his eventual inability to walk. Likewise, each of the Wexford and NMCD individual Defendants knew that these symptoms posed a substantial risk of harm to Mr. Jimenez, yet they did nothing to attempt to ameliorate that impending substantial harm, despite each having the authority and obligation to act to ameliorate that harm.

These individual Defendants became aware of the above information through prior internal and legislative reports, news coverage, weekly and quarterly meetings/calls amongst each other and with other Wexford medical staff, quarterly tracking documents, quality assurance program reports, monthly continuous quality improvement meetings, statistical reports submitted to the Health Services Bureau, training materials, continuous quality improvement audits, American Correctional Association audits, National Commission on Correctional Healthcare audits, performance improvement reports, corrective action plans, prisoner grievances, health services request forms, and individual inmate files, including Mr. Jimenez's file—a sampling of which is cited in Section III of this Complaint, supra.

Compl. ¶¶ 106-07.

Paragraph 106 of the complaint, standing alone, is similar to the allegations the Supreme Court held to be conclusory in *Iqbal*. Such allegations, however, cannot be read in isolation. At the motion to dismiss stage, all reasonable inferences must be drawn in a plaintiff's favor. *Diversey v. Schmidly*, 738 F.3d 1196, 1199 (10th Cir. 2013) (on a motion to dismiss, the court "resolve[s] all reasonable inferences in the plaintiff's favor" and then "ask[s] whether it is plausible that the plaintiff is entitled to relief" (internal quotation marks omitted)). If responsibilities attendant to a defendant's employment make it plausible that the defendant would be aware of a particular situation, factual allegations related to a defendant's job responsibilities may suffice.

Plaintiff alleges that Defendant Alisha Tafoya Lucero served as the New Mexico Secretary for the Department of Corrections, overseeing prison operations, including NMCD's duty to provide a safe environment at its facilities and to ensure that prisoners have access to adequate health care. *Id*. ¶ 11. Defendant Lucero was also required to exercise general supervisory power over all department employees and take administrative action by issuing

orders to assure compliance with the law. *Id.* ¶ 109. She was required to provide courses of instruction and practical training for employees of the department. *Id.*

Defendant Wence Asonganyi served as the Health Services Administrator ("HSA") for NMCD and maintained direct clinical oversight over independent medical contractors, and was responsible for ensuring that NMCD contractors provided adequate care to NMCD prisoners. *Id.* ¶ 12. Defendant Asonganyi was responsible for ensuring that the health care in NMCD prisons meets correctional healthcare standards and constitutional mandates. *Id.* ¶ 110.

Defendant Orion Stradford served as the NMCD Bureau Chief and was responsible for monitoring the work of independent contractors, including Wexford. *Id.* ¶ 13. He was responsible for providing clear, concise executive direction while monitoring and auditing, with a focus on private prison contract compliance, American Correctional Association compliance, quality assurance and conditions of confinement for the incarcerated. *Id.* ¶ 111.

Thus, each individual Defendant had a general duty to ensure that inmates in NMCD facilities received appropriate medical treatment. This general duty, however, does not translate to detailed, real-time knowledge of each inmate's medical condition at NMCD facilities. Plaintiff's factual allegations regarding the duties of each individual Defendant do not indicate that any Defendant oversaw individual care Wexford provided.[2] In short, Plaintiff's allegations about Defendants' job duties do not make it plausible that any Defendant would be aware of Mr. Jimenez's symptoms or complaints.

---

[2] Defendants note, unlike the Wexford employees who provided treatment to Mr. Jimenez, none of the individual NMCD Defendants were nurses or doctors. Doc. 14 at 7. Because the Court holds that Plaintiff has failed to state a claim under its first theory of liability—that Defendants knew of, but failed to address, Mr. Jimenez's specific medical condition—the Court need not address the extent to which Mr. Jimenez's medical condition would be obvious to a layperson.

Plaintiff asserts in paragraph 107 of the complaint that Defendants became aware of the "above" information through various sources Plaintiff then lists. *Id.* ¶ 107. Defendants argue that this type of conclusory, "collective knowledge" allegation lacks sufficient plausibility and specificity to establish liability in a qualified immunity case. Doc. 14 at 8-9. Defendants argue that the Court cannot credit the allegation that they, collectively, "knew" of Mr. Jimenez's condition based on the litany of non-specific sources of knowledge, most of which were highly unlikely to contain information about a single prisoner's medical case in a twelve-day period in one prison. Doc. 21 at 6-7.

To the extent the "above" information refers to "symptoms [that] posed a substantial risk of harm to Mr. Jimenez," it is not plausible that sources such as legislative reports and statistical reports submitted to the Health Services Bureau provided Defendants notice about Mr. Jimenez's specific symptoms. Further, Plaintiff has not alleged that other sources such as news reports or grievances specifically referred to Mr. Jimenez's symptoms. And, without more specific allegations about content, it is not plausible that audits, news coverage, and statistical reports covered any one prisoner's medical symptoms in any detail during this particular twelve-day period. The Court in its present analysis cannot speculate that they did. *See Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) ("The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief."); *id.* at 1250 (the court "need not speculate, because the burden rests on the plaintiffs to provide fair notice of the grounds for the claims made against each of the defendants"). Finally, there are no facts establishing it is plausible that any individual Defendant read Mr. Jimenez's file during this time; for example, there is no description of job duties entailing regular review of inmate files.

In sum, it is not plausible from the general, conclusory allegations in the complaint that any individual NMCD Defendant was on notice about Mr. Jimenez's symptoms and Wexford's treatment of them.

B.    Drawing all reasonable inferences in Plaintiff's favor, Plaintiff alleges Defendants' knowledge of a substantial risk of inadequate medical care.

The rejection of Plaintiff's theory of direct knowledge does not resolve this motion to dismiss. Defendants contend that "[b]ecause Plaintiff's allegations fail to identify each of the NMCD Defendants' personal involvement in the alleged inadequate medical care, [Plaintiff] cannot meet the first prong to establish supervisory liability." Doc. 14 at 10-11; *see also id.* at 11 ("Plaintiff's complaint fails to detail how NMCD Defendants supposedly knew about Mr. Jimenez's medical condition, like when or how they learned about it. Therefore, Plaintiff cannot establish a tie between NMCD Defendants' challenged conduct and Mr. Jimenez's injury."). The Court disagrees. The Tenth Circuit does not require Plaintiff to establish that each defendant knew of a risk of harm to Mr. Jimenez specifically.

Prison-condition claims may be based on a known risk of harm to the general prison population. *Tafoya*, 516 F.3d at 916 ("The official's knowledge of the risk need not be knowledge of a substantial risk to a *particular* inmate, or knowledge of the particular manner in which injury might occur."); *Farmer v. Brennan*, 511 U.S. 825, 843 (1994) (finding deliberate indifference may be established even though the prison official "did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault"). "The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial risk of serious damage to his future health, and it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack

for reasons personal to him or because all prisoners in his situation face such a risk." *Farmer*,
511 U.S. at 843 (internal quotation marks and citation omitted).

In *Tafoya*, a 2008 case, the Tenth Circuit considered the liability of county sheriff John
Salazar, who was responsible for the management and supervision of the Huerfano County Jail
from 1995 to 2003. 516 F.3d at 914. "In 1998, two independent incidents of sexual assault
occurred in the jail, both perpetrated by male detention officers against female inmates." *Id.* Both
detention officers were convicted and imprisoned for the offenses. *Id.* at 915. Although the Tenth
Circuit did not specify when the convictions occurred, the Tenth Circuit's reliance on the
convictions indicates they occurred before the plaintiff in that case, Michelle Tafoya, was
assaulted. *Id.* In 2005, in *Gonzales v. Martinez*, a civil case stemming from the assaults, the
Tenth Circuit "found evidence that these assaults were the product of unconstitutional jail
conditions maintained through the deliberate indifference of Sheriff Salazar." *Id.* at 914 (citing
*Gonzales v. Martinez*, 403 F.3d 1179 (10th Cir. 2005)).

In December 2001, detention officer Alan Ruiz assaulted Ms. Tafoya. *Id.* Reversing the
district court's grant of summary judgment in favor of the sheriff, the Tenth Circuit held that the
evidence was sufficient to show that "Sheriff Salazar was aware of prison conditions that were
substantially likely to result in the sexual assault of a female inmate," and concluded "that a jury
might infer that the assaults on Ms. Tafoya were caused by these dangerous conditions." *Id.* at
915. The Tenth Circuit held that "[a]lthough deliberate indifference is a subjective inquiry, a jury
is permitted to infer that a prison official had actual knowledge of the constitutionally infirm
condition based solely on circumstantial evidence, such as the obviousness of the condition." *Id.*
at 916. "If a risk is obvious, so that a reasonable man would realize it, we might well infer that
the prison official did in fact realize it." *Id.* (quoting *Garrett v. Stratman*, 254 F.3d 946, 950

(10th Cir. 2001)) (internal alterations omitted); *see also Farmer*, 511 U.S. at 842 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." (citation omitted)).

The Tenth Circuit held that a jury could find that the sheriff was on notice of prison conditions due to the 1998 assaults. *Tafoya*, 516 F.3d at 917. The Tenth Circuit summarized the aspects of the sheriff's conduct that led to those 1998 assaults identified in the *Gonzales* opinion: his "failure to adequately address inmate complaints, conduct employee reviews and background checks, be physically present at the jail, and discipline the inappropriate conduct of detention officers." *Id.* Although the Tenth Circuit's *Gonzales* opinion issued in 2005—well after Ms. Tafoya's 2001 assault—the Tenth Circuit observed that "Sheriff Salazar must have been informed of deficiencies in his jail administration leading to sexual assaults on female inmates by jail personnel through the process of discovery," because discovery concluded in one of the cases in May 2001. *Id.* at 921 & n.6. The Tenth Circuit examined the remedial measures the sheriff took after 1998, and found a dispute of fact as to whether they were sufficient to address the problems identified in the *Gonzales* opinion, concluding that a jury could find deliberate indifference because of this insufficiency. *Id.* at 918-21.

In 2019 and 2020, a little over a decade after issuing its decision in *Tafoya*, the Tenth Circuit issued a pair of decisions reaffirming its holding that Eighth Amendment violation claims can be based on deliberate indifference to general conditions that create a substantial risk of injury to *some* inmate, even if the defendant did not know of the risk to a *particular* inmate. In the first of these decisions, *Burke v. Regalado*, the court considered the 2011 death of Elliott

Williams at the Tulsa County Jail. 935 F.3d 960 (10th Cir. 2019). Shortly after his booking,

Williams "severely injured his neck, causing lower body paralysis." *Id.* at 980. "No one treated

his injury. Despite his frequent complaints of pain and paralysis, no one transported him to a

hospital. He remained immobile for five days, lying on his back in various cells at the jail, and

died of complications from the neck injury." *Id.* At the district court level, a jury found that Tulsa

County Sheriff Stanley Glanz, who ran the jail, was liable in his individual supervisory capacity

and in his official capacity. *Id.* The sheriff appealed, arguing among other things that the

evidence was insufficient to sustain this verdict. *Id.* at 980-81.

The Tenth Circuit rejected the sheriff's arguments, holding that "[t]he trial evidence

supported the jury's verdict that Sheriff Glanz maintained a policy or custom of insufficient

medical resources and training, chronic delays in care, and indifference toward medical needs at

the jail, and that he did so knowing of an urgent need for reform." *Id.* at 999. The Tenth Circuit

identified numerous prior findings about conditions at the jail that "would permit a reasonable

jury to find [the sheriff] was deliberately indifferent to the risk that poor care would result in Mr.

Williams's constitutional injury" (*id.* at 1000):

- In 2007, the National Commission on Correctional Health Care ("NCCHC")
  conducted an on-site audit of the jail's health services. *Id.* at 986. The NCCHC audit
  revealed that health needs identified during receiving screening were not addressed in
  a timely manner. *Id.* at 999.

- In 2009, the American Correctional Association ("ACA") conducted a "mock audit"
  of the jail. *Id.* at 986. Based on the ACA's findings, the jail sought advice from
  Elizabeth Gondles, a correctional consultant. *Id.* "The jail asked Ms. Gondles to help
  address a failure to provide timely health appraisals to inmates." *Id.* at 999. The
  Gondles Report identified understaffing as an issue and recommended increased
  staffing, and stated that the lack of well-qualified nurses required better pay. *Id.*

- In November 2010, the NCCHC conducted another audit and placed the jail on
  probation. *Id.* at 987-88. Among other issues, it found that "training for custody staff
  regarding suicidal inmates had been limited." *Id.* at 999 (alterations omitted). The
  probation was based in part on the finding that "diagnostic tests and specialty

22

consultations are not completed in a timely manner and are not ordered by the physician." *Id.*

- In December 2010, an inmate died after the jail failed to follow up on his required medications. *Id.* at 1000.

- In 2011, the U.S. Department of Homeland Security's Office of Civil Rights and Civil Liberties ("CRCL") inspected the jail's medical system. *Id.* at 988. The CRCL inspection found a lack of training had resulted in the perforation of an inmate's appendix. *Id.* at 999. Additionally, it "[f]ound two ICE detainees with clear mental/medical problems that have not seen a doctor." *Id.* at 999-1000. These findings regarding "[d]elays in follow-up care were communicated to Sheriff Glanz one month before Mr. Williams's death" of October 27, 2011. *Id.* at 999.

These deficiencies, the Tenth Circuit concluded, supported the finding that there was a policy or custom of deficient medical care at the jail. *Id.* at 999. Turning to causation, the Tenth Circuit concluded: "A reasonable jury could find these deficiencies resulted in Mr. Williams's death." *Id.* at 1000. "A reasonable jury could infer that understaffing, inadequate training, or poor follow-up—or a combination of all three—explained why jail personnel left Mr. Williams in holding cell #10 for ten hours, took three days to send a physician to examine him, and declined for more than a day to enter his cell to examine him." *Id.* "Likewise, a reasonable jury could find one or more of these deficiencies, especially lack of training, contributed to (1) Nurse Luca's failure to act on Mr. Williams's complaints of pain and paralysis, (2) Nurse Hughes's incorrect conclusion that Mr. Williams was not injured solely based on an external physical examination, and (3) Officers Smith's and Rich's refusal to allow Nurse Hughes to enter Mr. Williams's cell upon request." *Id.* Finally, the Tenth Circuit held that the sheriff's knowledge of these administrative reports and audits, combined with the failure to address the deficiencies identified, sufficiently supported the jury's finding of deliberate indifference. *Id.* at 1000-01.

A year later, in 2020, the Tenth Circuit considered the issue of deliberate indifference in in the context of an Eighth Amendment *Monell* claim.[3] In *Quintana v. Santa Fe County Board of Commissioners*, Ricardo Jose Ortiz, an inmate at the Sante Fe Adult Detention Facility, died of heroin withdrawal symptoms on January 7, 2016, three days after his booking. 973 F.3d 1022, 1027 (10th Cir. 2020). The Tenth Circuit found the complaint stated a claim against one detention officer who had observed Mr. Ortiz vomiting and throwing up blood the day of his booking but took no action. *Id.* at 1030, 1032-33. The Tenth Circuit then considered whether the district court should have permitted an amendment to add a *Monell* claim against Santa Fe County for its allegedly deficient medical intake protocol. *Id.* at 1033. In finding the proposed amended complaint plausibly pled that the county was "on notice" of the problems at the detention center, the Tenth Circuit considered:

- Mr. Ortiz's particular case, i.e., the failure to administer proper treatment for heroin withdrawal upon his booking;

- The allegation that three other inmates at the same jail recently experienced withdrawal-related deaths;

- A 2003 Department of Justice study, which put Santa Fe County on notice about deficiencies in the jail's intake medical screening, assessment, and referral process; and

- The allegation that the jail previously provided Ortiz with deficient intakes over the course of eight separate incidents of incarceration at the jail.

*Id.* at 1034. "Altogether, the allegations of intake failures preceding Ortiz's death and past process failures sufficiently state a *Monell* claim at this early stage in the proceedings." *Id.* "So

---

[3] Although personal supervisory liability for officials and *Monell* claims differ in some aspects, "the elements for supervisory and municipal liability are the same" where supervisory liability is predicated on the official's maintaining a policy or custom that resulted in deficient medical care in a jail. *Burke*, 935 F.3d at 998-99. Here, because both personal supervisory liability and *Monell* claims require notice of a substantial risk of deficient medical care, the Court draws on both types of cases for its analysis.

[the Tenth Circuit] conclude[d]—given the low threshold for amendment and low bar for surviving a motion to dismiss—the plaintiffs alleged enough to explore their *Monell* claim in the discovery process." *Id.*

Turning to the present case, Plaintiff's complaint alleges that Wexford's pattern and practice of failing to timely refer prisoners experiencing serious emergent medical conditions, to include symptoms of endocarditis, to outside medical care put prisoners like Mr. Jimenez in serious medical danger, and that Defendants knew this was true as a general aspect of the provision of medical services by Wexford in prisons including NMCF. Compl. ¶¶ 62-68, 69, 83, 93, 105. The complaint specifies that Wexford "maintained various widespread patterns and practices" which caused Mr. Jimenez's death in the following ways: (A) "failing to report, diagnose, and treat warning signs of serious medical and mental health conditions, and of delaying or denying patients access to critical off-site medical services" (*id*. at 15-22); (B) "severely understaffing its medical and mental health facilities" (*id*. at 22-25); (C) "failing to provide adequate medical documentation and failing to communicate changes in patient conditions" (*id*. at 25-29); and (D) "fail[ing] to adequately hire, retain, train, and supervise its personnel" (*id*. at 29-35).

As set forth above, to state a claim against the individual NMDC Defendants, Plaintiff must allege facts that make it plausible they knew about Wexford's practices and that these practices created a substantial risk that an inmate would suffer a serious harm. Plaintiff, to support the allegation that Defendants knew of, but were deliberately indifferent to, Wexford's practices, lists numerous sources of information it argues put Defendants on notice of Wexford's constitutionally deficient care. *See* Compl., Section III. Considering each theory in turn, the

Court examines whether Plaintiff plausibly pleads NMCD's knowledge of Wexford's practices in New Mexico prisons, such as CNMCF.

                1.    <u>Information from outside New Mexico</u>

Many of the sources of information Plaintiff alleges put Defendants on notice about deficiencies in Wexford's medical care relate to out-of-state lawsuits, news reports, and assertions from various other sources. The complaint makes no effort to link these out-of-state sources' findings to conditions in New Mexico prisons, let alone CNMCF. The Court agrees with Plaintiff that, for purpose of a motion to dismiss, evidence that Defendants knew Wexford failed to provide inmates timely care for serious medical conditions in other facilities might put Defendants on notice that they should check into whether the same deficiencies exist in facilities they control. Allegations about conditions at out-of-state facilities, however, do much less to plausibly establish Defendants' knowledge than do allegations about New Mexico facilities.

Further, Plaintiff does not allege how Defendants would know about every lawsuit and news report against Wexford in other states. That is, Plaintiff makes no allegation that such reports aired in, or were published in, New Mexico. This raises the issue of whether Plaintiff's allegations create a reasonable inference that Defendants plausibly knew about out-of-state sources of information. Although the Supreme Court has indicated a plaintiff can state a claim by identifying "a substantial risk" that was "longstanding, pervasive, [or] well-documented," the Court also required a showing that "the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk." *Farmer*, 511 U.S. at 842.

If Plaintiff's allegations about *New Mexico sources of information* that relate to *New Mexico facilities* are sufficient to state a claim, however, the Court need not consider how much, if at all, Plaintiff's allegations about out-of-state sources and out-of-state facilities move the plausibility needle. Because the Court concludes that Plaintiff's allegations that New Mexico

sources of information provided Defendants sufficient notice about New Mexico facilities, the Court does not address Plaintiff's allegations about out-of-state sources of information and out-of-state facilities. Thus, the Court considers only information sources in New Mexico which add to the plausibility of Plaintiff's Eight Amendment claim against Defendants.

2.   Failure to diagnose and refer serious medical conditions

*Financial structure.* In this section, the complaint alleges that "Wexford's widespread failure to refer prisoners for off-site medical care was, in large part, financially motivated." Compl. ¶ 64. This is because "Wexford was contractually relieved from paying for the hospital costs of any prisoner who was hospitalized for more than 24 hours. Evidently, this fee structure incentivized Wexford to refrain from referring prisoners for off-site care unless and until their injuries were so severe that they would likely require hospitalization lasting more than 24 hours." *Id.* The Court draws a reasonable inference in Plaintiff's favor that NMCD, as the agency contracting with Wexford to perform these medical services at its prisons, would know how Wexford is being compensated for them. Thus, Plaintiff plausibly pleads Defendants' knowledge of Wexford's financial incentives to delay sending inmates for hospital care.

*Recent similar state court lawsuits.* The next sources of support Plaintiff lists are recently filed lawsuits in New Mexico state court. As set forth above, the Tenth Circuit has recognized that previous lawsuits can provide a party notice of a condition that creates a substantial risk of harm to inmates. For instance, one issue before the Tenth Circuit in *Tafoya* was whether evidence existed through which "a reasonable jury could infer that Sheriff Salazar knew of the dangerous conditions at the jail and deliberately elected not to remedy them." 516 F.3d at 921. The Tenth Circuit determined that "the timing of discovery in [a previous lawsuit] against Mr. Martinez and Sheriff Salazar and the content of that evidence as we discussed in our opinion in [the previous lawsuit], reveals that Sheriff Salazar must have been informed of deficiencies in his

jail administration leading to sexual assaults on female inmates by jail personnel through the process of discovery." *Id*. Importantly, the Tenth Circuit noted that the discovery in the previous lawsuit was completed months before Ms. Tafoya's assault. *Id*. at 921 n.6.

In the present complaint, Plaintiff asserts that the first two state lawsuits involved situations where "Wexford failed to diagnose and treat a patient's emergent infection and failed to refer the patient to an outside provider in a timely manner," which caused the inmates at issue serious harm. Compl. ¶ 62. In the first case, NMCD was a defendant and so clearly knew about the lawsuit. The case number for the lawsuit, however, indicates that the lawsuit was not filed until 2022. Thus, the discovery process for the first case Plaintiff lists did not begin until after Mr. Jimenez's death. Therefore, neither the lawsuit Plaintiff identifies nor the discovery provided in that lawsuit could have provided Defendants notice about inadequate medical care. Even so, it is possible that the underlying events were serious enough to support notice on their own, even prior to the litigation. *E.g.*, *Quintana*, 973 F.3d at 1034 (highlighting an allegation that three other inmates at the same jail recently experienced withdrawal-related deaths); *Burke*, 935 F.3d at 1000 (a year before the plaintiff's death, an inmate died after the jail failed to follow up on his required medications). But Plaintiff does not indicate when events that gave rise to this 2022 lawsuit occurred, and the Court cannot assume those events occurred before Mr. Jimenez obtained the infection that caused his death.

Although Plaintiff does not indicate that NMCD was a party in the next case it identifies, Compl. ¶ 62 at p. 16, it can be inferred for purposes of a motion to dismiss that each Defendant had knowledge of this lawsuit because it is a New Mexico case in which Wexford was a defendant. Again, however, Plaintiff does not indicate when the events that gave rise to this lawsuit occurred, when discovery in the lawsuit took place, or when the lawsuit was filed.

Although the lawsuit's case number indicates the lawsuit was filed in 2021, Plaintiff does not indicate whether it was filed before or after Mr. Jimenez's infection in March 2021 or whether the other plaintiff was infected before or after March 2021. Thus, like the first case, this second case does not provide a reason to infer that Defendants had notice of the conditions at CNMCF.

The third New Mexico case Plaintiff cites is a 2020 case where Plaintiff asserts that "Wexford refused to timely report, diagnose, and treat signs of Hepatitis-C, which caused the patient substantial pain for over a year and put his life in jeopardy." *id*. ¶ 62 at p. 16. Although Plaintiff does not indicate whether these allegations were ever substantiated, that a lawsuit was filed alleging that Wexford failed to timely treat a medical condition that put an inmate's life at risk does provide Defendants some notice.

*News reports and audits.* The complaint then turns to news reports and audits. It cites news sources quoting former Wexford employees and covering alleged deficiencies in care as a cost-cutting method at Wexford in 2006, including failing to send sick inmates off-site to hospitals expeditiously. *Id*. ¶ 65 at pp. 17-18. These news reports and some of Plaintiff's allegations both involve Wexford, for cost-saving reasons, failing to timely send sick inmates off-site to hospitals. The extent to which news reports in local papers and online sources such as www.acluaz.org, thirteen years prior to the events of this case, plausibly put Defendants on notice of the conditions at CNMCF during the time of Mr. Jimenez's incarceration is debatable. *E.g.*, *id*. ¶ 65 at pp. 17-18 nn.1-5. In addition, the age of these reports diminishes their value. But the Court will accept these allegations as cumulatively providing some notice along with other factors.

The 2007 New Mexico Legislative Finance Committee audit regarding Wexford's care for diabetic patients also came out more than ten years before Mr. Jimenez's death. *Id*. ¶ 65 at p.

18. An audit, however, is a more probative source of deficient prison conditions than news reports allegedly quoting former employees. In *Quintana*, a 2003 Department of Justice study served as a basis for the Tenth Circuit's conclusion that the plaintiff's complaint stated an Eighth Amendment claim based on deliberate indifference to a jail's deficiencies in its intake medical screening, assessment, and referral process as of 2016. 973 F.3d at 1034. This Tenth Circuit precedent indicates that a 2007 audit from New Mexico's Legislative Finance Committee that found "gaping holes" in Wexford's delivery of healthcare, to include not providing diabetic patients drugs needed to fight off infections, does enhance the plausibility of Plaintiff's present claim.

3.    Severe understaffing

With respect to its understaffing theory, Plaintiff alleges that "[i]n 2005, the NMCD Corrections Secretary at the time confirmed that Wexford proposed paying New Mexico approximately $35,000 'to address state concerns about a shortage of hours worked by Wexford personnel.'" Compl. ¶ 73 at p. 22. Although it seems that this report indicates Wexford employees might not have worked all of the hours New Mexico paid those employees to work, Plaintiff's allegations about this report do not indicate the report found that Wexford provided inadequate medical care due to understaffing. As a result, Defendants' knowledge of this 2005 report does not add to the plausibility of Plaintiff's claim that Defendants were deliberately indifferent to deficient medical care in 2021.

Plaintiff also attempts to support the allegations that Defendants had notice about Wexford's understaffing through news reports from 2006 that quoted former Wexford employees' criticisms about staffing shortages and long waits for dental care. *Id*. ¶ 74 at pp. 22-23. Diminishing the value of such a news report is that the crux of Plaintiff's claim does not relate to understaffing, as Plaintiff does not allege that understaffing issues prevented any

medical personnel from seeing Mr. Jimenez. To the contrary, Plaintiff asserts that Wexford medical staff saw Mr. Jimenez numerous times over the twelve days at issue in this case. *Id.* ¶¶ 27, 28, 31-36. Plaintiff does not allege that Mr. Jimenez did not see a doctor because doctors were unavailable. Instead, Plaintiff asserts Mr. Jimenez did not see a doctor because nurses who were not qualified to diagnose Mr. Jimenez's condition and who acted as gatekeepers prevented Mr. Jimenez from timely seeing a doctor. *Id.* ¶¶ 42-44; *see also id.* ¶ 100 ("the nurses working within NMCD facilities, including CNMCF, would not be able to identify endocarditis, yet they were, by Wexford's policy and practice, the gatekeepers who prevented prisoners like Mr. Jimenez from receiving treatment for endocarditis").

Nonetheless, Tenth Circuit precedent indicates that, even where an inmate is repeatedly seen by nurses and doctors, previous findings of understaffing have some relevance. In *Burke v. Regalado*, the Tenth Circuit described numerous visits to the inmate, Mr. Williams from nurses, mental health counselors, a psychiatrist, and a family medicine doctor over a five-day period. 935 F.3d 960, 982-85 (10th Cir. 2019). Yet, in its analysis, the Tenth Circuit stated the delay in administering *appropriate* medical care could be explained by understaffing: "A reasonable jury could infer that understaffing . . . explained why jail personnel left Mr. Williams in holding cell #10 for ten hours, took three days to send a physician to examine him, and declined for more than a day to enter his cell to examine him." *Id.* at 1000. Here, too, Plaintiff is alleging a delay in appropriate medical care from providers qualified to treat Mr. Jimenez's condition.

In addition to news reports, Plaintiff cites to a 2007 New Mexico Legislative Finance Committee ("LFC") audit finding that Wexford was very understaffed "to save money." Compl. ¶ 73 at p. 23. Unlike the news reports that do not attribute a reason for Wexford's understaffing (such understaffing could be due to a shortage of health care professionals in the area), the LFC

audit findings attribute Wexford's understaffing to a cost-saving motive. As such, this report would tend to place Defendants on notice that Wexford was willing to take shortcuts in patient care to save money. It further relates to Plaintiff's allegation that the delay in Mr. Jimenez's transfer to a hospital was caused in part by Wexford's cost-saving practice of delaying inmate transfers to a hospital until their condition became so severe that they would likely need to stay at the hospital for at least 24 hours, which meant Wexford would not have to pay for the hospital visit. *Id.* ¶¶ 38, 44-45, 64. Finally, as set forth above, although the LFC audit issued its findings thirteen years before Mr. Jimenez contracted the infection that led to his death, the gap between the DOJ study the Tenth Circuit found relevant in *Quintana* and the events that gave rise to that lawsuit was also thirteen years. Accordingly, although Plaintiff's understaffing allegations, standing alone, are insufficient to nudge Plaintiff's claim across the plausibility line, they do serve to push its claim in that direction.

> 4.      Failing to provide adequate medical documentation and failing to communicate changes in patient conditions

The complaint cites news reports from 2005, 2006, and 2007 pertaining to Wexford and NMCD's failures to adequately maintain inmate medical records. According to a 2005 report, Wexford's regional medical director for New Mexico's prisons found that Wexford nurses repeatedly failed to accurately document test results or to communicate those results. Compl. ¶ 79 at p. 26. The news reports also contain complaints and reports from former employees about altering inmates' medical records to hide mistakes, desultory recordkeeping making it difficult to keep track of which inmate was getting which medicine, "glaring errors" resulting in prisoners receiving the wrong medicine and wrong dosage, and failure to issue timely reports on 14 prisoner deaths in New Mexico correctional facilities. *Id.* The complaint also alleges that, in June 2016, NMCD itself recognized the need for an electronic health record software system in order

to render constitutionally adequate prison healthcare, but no such system was ever implemented. *Id.* ¶¶ 86-89.

The complaint alleges that "Wexford failed to provide adequate medical documentation and failed to communicate important changes in Mr. Jimenez's medical condition to providers who had the ability to appropriately treat his condition." *Id.* ¶ 80. The complaint, however, does not include any facts supporting the allegation that poor recordkeeping resulted in a failure to provide Mr. Jimenez adequate medication or a referral to a doctor. *Cf. id.* ¶¶ 26-41. Again, the crux of Plaintiff's argument is that the nurses who saw Mr. Jimenez did not alert doctors to Mr. Jimenez's condition because they were not qualified to recognize the severity of his condition and that Wexford's practice was to keep inmates inhouse until their conditions become so severe that they would likely need to stay in the hospital for at least 24 hours.

Nonetheless, at the motion to dismiss stage, the Court recognizes that a jury could possibly infer that deficiencies in a recordkeeping system may have contributed to a failure to communicate Mr. Jimenez's condition to doctors. These allegations therefore slightly nudge Plaintiff's claims forward.

5.    Failing to adequately hire, retain, train, and supervise medical personnel

The complaint alleges that "[t]he following information, outlined in various news articles and cases, has publicly documented Wexford's widespread practice of inadequately hiring, retaining, training, and supervising its staff, along with the dire consequences of these failures to properly hire, retain, train, and supervise." Compl. ¶ 91 at pp. 29-30. The complaint then asserts that "[i]n 2006, a former Wexford nurse from New Mexico reported that nurses were not adequately controlling medication, and inmates were using medication as currency as a result. *Id.* ¶ 91 at p. 30. The complaint also cites a news report in 2007 that "New Mexico . . . reported issues with Wexford's lack of training and oversight for medical employees, and promotion of

workers into positions where they were not properly licensed. . . . [I]n New Mexico, mental health counselors were operating without state licenses." *Id.* (internal quotation marks omitted). Plaintiff's failure to allege who in New Mexico reported these issues, and to whom, makes it more difficult to evaluate the probative value of this information. Similarly, the allegation concerning mental health counselors does not seem to pertain to Plaintiff's injuries in this case.

In contrast to the minimal relevance of such non-specific allegations, the deposition testimony of Wexford's former regional medical director for New Mexico, Dr. Murray Young, provides information specifically related to diagnoses of endocarditis in New Mexico prisons. Plaintiff alleges Dr. Young "admitted in a deposition for a similar matter that the nurses working within NMCD facilities, including CNMCF, would not be able to identify endocarditis, yet they were, by Wexford's policy and practice, the gatekeepers who prevented prisoners like Mr. Jimenez from receiving treatment for endocarditis." *Id.* ¶¶ 100-01. If Defendants knew of this alleged testimony before Mr. Jimenez became infected with endocarditis, it would significantly advance the plausibility of Plaintiff's claim that Defendants were deliberately indifferent to a constitutionally deficient medical condition that created a substantial risk to prisoners like Mr. Jimenez. The complaint, however, fails to link Dr. Young's testimony to NMCD correctional officials. It does not say what lawsuit the deposition took place within. It does not say whether NMCD was a defendant or took part in any briefing or other discovery on the issue. It does not even say whether the deposition took place before Mr. Jimenez's infection.

To be sure, Dr. Young's deposition does not provide the only means through which Defendants could learn about the deficient medical condition Plaintiff alleges. If it were obvious to any reasonable prison official that Wexford was not treating endocarditis in NMCD facilities due to this gatekeeping system—possibly because of a high number of untreated cases or

resulting deaths prior to Mr. Jimenez's—a jury could find the condition obvious enough to infer the officials had notice of it. Without more information about the context of Dr. Murray's deposition, such as when it was taken, however, the deposition does not support such an allegation.

    6. <u>Conclusion</u>

  Thus, where Plaintiff fails to indicate that certain information was produced before Mr. Jimenez's infection, allegations about such information do not plausibly provide Defendants notice of constitutionally deficient medical conditions at NMCD facilities. Focusing on Plaintiff's remaining allegations, they include:

- News reports from 2005 and 2006 stating that Wexford's regional medical director for New Mexico's prisons, along with five other former employees, accused Wexford nurses of repeatedly failing to accurately document test results or to communicate those results; altering inmates' medical records to hide mistakes; desultory recordkeeping making it difficult to keep track of which inmate was getting which medicine; and "glaring errors" resulting in prisoners receiving the wrong medicine and wrong dosage;

- News sources from 2006 quoting former employees regarding alleged deficiencies in care as a cost-cutting method at Wexford, including failing to send sick inmates off-site to hospitals expeditiously;

- News reports from 2006 quoting former Wexford employees about staffing shortages and long waits for dental care;

- News reports in 2006 quoting former Wexford employees alleging that nurses were not adequately controlling medication, and inmates were using medication as currency as a result;

- A 2007 news report about Wexford failing to issue timely reports on 14 prisoner deaths in New Mexico correctional facilities;

- A 2007 audit finding from New Mexico's Legislative Finance Committee identifying "gaping holes" in Wexford's delivery of healthcare, to include not providing diabetic patients drugs needed to fight of infections, and that Wexford was very understaffed "to save money";

- A news report in 2007 that New Mexico reported issues with Wexford's lack of training and oversight for medical employees, and promotion of workers into positions for which they were not properly licensed;

- NMCD's acknowledgement in June 2016 of the need for an electronic health record software system in order to render constitutionally adequate prison healthcare, while no such system was ever implemented;

- A 2020 case involving New Mexico prisons where Wexford failed to timely report, diagnose, and treat signs of Hepatitis-C, which caused the patient substantial pain for over a year and put his life in jeopardy;

- Wexford's financial incentives to refrain from referring prisoners for off-site care unless and until their injuries were so severe that they would likely require hospitalization lasting more than 24 hours; and

- The deficiencies in medical care and the failure to refer that led Mr. Jimenez's death in this case.

These sources include very old allegations and allegations that, as explained above, are only minimally connected to Mr. Jimenez's case. Taken together, however, if true they demonstrate that Wexford's care has had serious deficiencies starting in 2006 and 2007. Although the complaint does not cite recent reports or findings, at this stage, given the allegations of Mr. Jimenez's deficient care, the Court must draw the inference in Plaintiff's favor that these conditions have not improved.

As the Tenth Circuit said in *Quintana*, an inmate dying of untreated heroin withdrawal symptoms (combined with at least minimal indications that this problem existed beforehand) is probative of whether a pattern and practice of failing to treat these conditions existed at this prison. 973 F.3d at 1034 ("[G]iven the low threshold for amendment and low bar for surviving a motion to dismiss[,] the plaintiffs alleged enough to explore their *Monell* claim in the discovery process."). And as the Tenth Circuit said in *Tafoya*, the obviousness (or severity) of a deficiency permits an inference of deliberate indifference to that condition. 516 F.3d at 922 ("[T]he requirement of deliberate indifference imposes a burden on the plaintiff to [allege facts] from

which a jury might reasonably infer that the prison official was actually aware of a constitutionally infirm condition. . . . [A] plaintiff may satisfy this burden by offering circumstantial evidence of the prison official's knowledge, because a jury is permitted to infer deliberate indifference based solely on the obviousness of the threat posed to inmates."). Aspects of Mr. Jimenez's treatment could be indicative of a pattern or practice of treatment about which Defendants more likely would be aware.

Taken together, based on the Tenth Circuit's decisions in *Tafoya*, *Quintana*, and *Burke*, and the low bar for surviving a motion to dismiss, the Court finds that the allegations nudge Plaintiff's claims "across the line from conceivable to plausible." *Robbins*, 519 F.3d at 1247 (internal quotation marks omitted).

C.    Collective allegations

Defendants further argue that collective allegations against "all defendants" do not suffice; the complaint must make it clear how each defendant individually is liable to the plaintiff. Doc. 14 at 10-11. The Court finds the complaint sufficiently sets forth facts explaining how each individual Defendant had a responsibility for ensuring Wexford did not create dangerous conditions for prisoners in need of medical treatment. The complaint sufficiently puts each Defendant on notice of the grounds for the claim against them—that is, the aspect of each of their job responsibilities that entailed overseeing medical care at CNMCF. Compl. ¶ 11 (Defendant Alisha Tafoya Lucero oversaw all prison operations in New Mexico); *id.* ¶ 12 (Defendant Wence Asonganyi served as the Health Services Administrator for NMCD and was responsible for clinical oversight of independent medical contractors including Wexford); *id.* ¶ 13 (Defendant Orion Stradford served as the NMCD Bureau Chief and was responsible for monitoring the work of independent contractors, including Wexford).

II.    **Clearly established law**

Defendants argue that "[t]here is no clearly established law imposing . . . on jail administrators like NMCD Defendants" the duty "to second guess the medical professionals providing [Mr. Jimenez] care and determine that the care was not just negligent, but reckless." Doc. 14 at 14. Defendants argue that the complaint alleges that Wexford's medical care was, at most, negligent rather than constitutionally inadequate. Doc. 14 at 13-14 ("The challenged medical care spanned less than two-weeks. During this period, Mr. Jimenez was seen and treated. Therefore, this is not a case in which Wexford medical staff failed to provide any care; rather, it is a case of alleged inadequate medical care."); Doc. 21 at 3 ("Plaintiff has not set forth any allegations to demonstrate why or how medical staff were unqualified to diagnose or treat Mr. Jimenez's complaints of blurry vision or an ear infection. When he sought treatment for troubling symptoms, including labored breathing, medical staff immediately transferred him to the hospital where he could receive a higher level of treatment. These allegations do not suggest that medical staff were unqualified.").

Defendants' argument is directed to whether the medical care provided to this specific prisoner amounted to a clearly established violation of the Eighth Amendment. The Court agrees the complaint pleads no facts plausibly demonstrating that these Defendants were aware of Mr. Jimenez's symptoms and Wexford's actions in treating him, so it does not consider whether the law was clearly established in this respect.

Rather, the Court finds that the complaint plausibly pleads deliberate indifference against Defendants based on notice of the substantial risk posed by Wexford's provision of health care in New Mexico. As outlined above, in *Tafoya*, *Quintana*, and *Burke*—opinions published prior to March 2021—the Tenth Circuit clearly established prison officials' liability for failing to remedy dangerous prison conditions of which they knew and/or their responsibility for a pattern or

practice of deficient medical care. *Supra*, pp. 20-24. These cases provide notice under the second prong of a qualified immunity analysis.

## **CONCLUSION**

NMCD Defendants' Motion To Dismiss And For Qualified Immunity And Supporting Memorandum, Doc. 14, is DENIED.

_____
STEVEN C. YARBROUGH
UNITED STATES MAGISTRATE JUDGE