**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

THE ESTATE OF AARON JIMENEZ, deceased, by
and through EUGENIO S. MATHIS, personal
representative of the estate,

      Plaintiff,

      v.                                     Civ. No. 24-316 SCY/JMR

WEXFORD HEALTH SOURCES, INC.; ALISHA
TAFOYA LUCERO, NM SECRETARY FOR
DEPARTMENT OF CORRECTIONS, in her
individual capacity; WENCE ASONGANYI, NMCD
HEALTH SERVICES ADMINISTRATOR, in his
individual capacity; ORION STRADFORD, NMCD
BUREAU CHIEF, in his individual capacity;
MICHAEL HILDENBRANDT, WEXFORD
DIRECTOR OF OPERATIONS, in his individual
capacity; JOSEPH MONTOYA, WEXFORD HEALTH
SERVICES ADMINISTRATOR OF CNMCF, in his
individual capacity; DR. KESHAB PAUDEL,
WEXFORD REGIONAL MEDICAL DIRECTOR, in
his individual capacity; RAUL NOCHES, WEXFORD
REGIONAL MANAGER OF CNMCF, in his
individual capacity; RAJESH SHARMA, WEXFORD
MEDICAL DIRECTOR OF CNMCF, in his individual
capacity; SARAH CARTWRIGHT, WEXFORD
REGIONAL DIRECTOR OF NURSING, in her
individual capacity; DAVID WHIPPLE, WEXFORD
DIRECTOR OF NURSING OF CNMCF, in his
individual capacity; DENISE JONES, WEXFORD
DIRECTOR OF NURSING OF CNMCF, in her
individual capacity; LYNNSEY VIGIL, WEXFORD
UTILIZATION MANAGEMENT COORDINATOR,
in their individual capacity; and HEATHER GARZA,
WEXFORD UTILIZATION MANAGEMENT
COORDINATOR, in her individual capacity,

      Defendants.

**<u>MEMORANDUM OPINION AND ORDER
ON PENDING <em>DAUBERT</em> MOTIONS</u>**

Plaintiff, The Estate Of Aaron Jimenez, brings suit against N.M. Department of

Corrections officials ("NMDC Defendants") and contracted health care providers ("Wexford Defendants") following a twelve-day period in which Mr. Jimenez developed endocarditis, a life-threatening inflammation of the inner lining of the heart's chambers and valves. Doc. 1 (Compl.) ¶ 1. Prison medical staff allegedly failed to treat his condition appropriately or timely refer him to outside care. Compl. ¶¶ 1-2. By the time he was transported to the hospital, his condition was so serious that he passed away a day later. Compl. ¶¶ 47-59.

Currently before the Court are three motions to exclude medical experts or portions of expert opinions: Wexford Defendants move to exclude Plaintiff's medical expert, Dr. Ryan Herrington (Doc. 63); NMCD Defendants move to exclude opinions Dr. Herrington provided for the first time in his deposition and request an order that he not be allowed to mention NMDC at all (Doc. 66); and Plaintiff moves to exclude NMCD Defendants' medical expert, Dr. Dean Rieger (Doc. 70). The Court denies Wexford Defendants' motion to exclude Dr. Herrington's testimony, grants NMCD Defendants' motion to exclude opinions Dr. Herrington provided for the first time in his deposition but denies NMCD Defendants' request to bar Dr. Herrington from even mentioning NMCD, and grants in part and denies in part Plaintiff's motion to exclude Dr. Rieger's testimony.

## I.    Legal Standard

Both motions argue that the Court should exclude testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).[1] Rule of Evidence 702 assigns to the district judge a gatekeeping role to ensure that scientific testimony is both reliable and relevant. The gatekeeping function involves a two-step analysis. "First, the court had to determine whether . . .

---

[1] No party requests an evidentiary *Daubert* hearing, and the Court finds one is unnecessary because the motions present legal issues. *See United States v. Nichols*, 169 F.3d 1255, 1263 (10th Cir. 1999) (discussing when a *Daubert* hearing is necessary).

the expert was qualified by 'knowledge, skill, experience, training, or education' to render an

opinion. Second, if [the expert] was so qualified, the court had to determine whether her opinions

were 'reliable' under the principles set forth under *Daubert*." *Ralston v. Smith & Nephew*

*Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001) (citing Fed. R. Evid. 702). The *Daubert*

factors that guide the Court in determining reliability are: whether the theory or technique in

question can be and has been tested, whether it has been subjected to peer review and

publication, whether it has a known or potential error rate, the existence and maintenance of

standards controlling its operation, and whether it has attracted widespread acceptance within a

relevant scientific community. 509 U.S. at 593-94. Nonetheless, expert evidence need not

conform to all factors listed in *Daubert*, which are "meant to be helpful, not definitive." *Kumho*

*Tire Co. v. Carmichael*, 526 U.S. 137, 151 (1999). "[T]he reliability criteria enunciated in

*Daubert* are not to be applied woodenly in all circumstances." *United States v. Garza*, 566 F.3d

1194, 1199 (10th Cir. 2009).

## II.      Wexford Motion to Exclude Dr. Herrington

Wexford Defendants move to strike Plaintiff's retained expert, Ryan Herrington MD.

Doc. 63. Dr. Herrington indicates he will testify about the medical care provided to decedent

Aaron Jimenez while he was incarcerated at the Central New Mexico Correctional Facility. *Id*. at

1. NMCD Defendants filed a notice of joinder in the motion. Doc. 65.

Dr. Herrington is a correctional medicine physician expert with a medical degree and a

master's degree in public health. Doc. 75-1. He is licensed to practice medicine and is dual board

certified in public health and preventative medicine and addiction medicine. *Id*. His experience

includes over 7 years working in correctional healthcare settings and 27 years as a physician. *Id.*

He has overseen, managed, and supervised medical services and providers in correctional

facilities, including serving as a facility medical director, where he was responsible for

3

supervision of prison medical staff and management of off-site specialist consultations, among other duties. *Id.* As Chief Medical Officer at an Ohio prison his duties included direct patient care, management of outpatient referrals, and supervision of mid-level practitioners. *Id.*

In forming his opinions in this case, Dr. Herrington reviewed Mr. Jimenez's medical records and opined that his symptoms were potentially life threatening when he first presented to Wexford personnel on March 22, 2021 and therefore required an immediate referral to the hospital. Doc. 62-2 at 9. Failure to do so, he opines, was an "extreme" departure from the standard of care. *Id.* As to causation, Dr. Herrington opined that a hospital referral would have "in all reasonable likelihood" identified endocarditis and appropriate treatment for this condition would have made it "unlikely" that he died of his symptoms on April 4. *Id.* at 20.

In moving to exclude Dr. Herrington's opinions, Wexford Defendants argue that (1) his methodology is unreliable and his opinions are speculative;[2] and (2) he did not consider contradictory evidence. For the reasons below, the Court rejects Wexford Defendants' arguments.

### A.    Methodology and Speculation

Wexford Defendants first attack Dr. Herrington's methodology because it is "outcome driven." Doc. 63 at 5, 11. That is, they claim Dr. Herrington testified that he reached a conclusion of medical negligence based solely on the fact that Mr. Jimenez died. In support of this argument, they rely on this passage from his deposition:

> The first thing I did was I looked at the autopsy report so that I know—I knew what the end outcome was. And then I went through the records and developed a timeline of what took place. And then I, after doing that and learning what happened and looking for evidence that standard of care was met, I didn't find

---

[2] Wexford Defendants incorporate "speculation" arguments in both the methodology section and the causation section of their motion. Doc. 63 at 7, 12-14. Because the Wexford Defendants intermingle these arguments in their brief, the Court considers them together.

evidence that standard of care was met. And so the—sort of the alternative conclusion, which is that standard of care was not met, was accordingly substantiated.

Doc. 63-1 at 2.

The Court agrees that an expert who begins his analysis with a conclusion the expert would like to reach and then works backwards to find facts in support of that conclusion utilizes an improper methodology. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."). No indication exists, however, that Dr. Herrington employed such a methodology to reach his conclusion.

True, Dr. Herrington started his analysis by looking at the outcome—Mr. Jimenez's death and the autopsy report that identified the cause of death. Notably, however, neither Mr. Jimenez's death nor the cause of his death are in dispute. Thus, there is no risk that Dr. Herrington started with a disputed outcome and then searched for data to justify a pre-determined conclusion related to the cause of Mr. Jimenez's death. The focus of Dr. Herrington's testimony is on Mr. Jimenez's prognosis while he was alive.

It is also true that the scientific method's order of operations places the formation of a hypothesis in front of analysis and reaching a conclusion. *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 783 (10th Cir. 1999) ("Scientific method today is based on generating hypotheses and testing them to see if they can be falsified . . . [t]he district court found that Drs. Van Veldhuizen and Milner reached their ultimate conclusions before studying the available literature. This type of action turns scientific analysis on its head. Instead of reasoning known facts to reach a conclusion, the experts here reasoned from an end result in order to hypothesize what needed to be known but what was not." (internal quotations and citations omitted)). It is not true, however, that knowing an outcome before determining the cause of that outcome precludes an expert from

5

analyzing available data, forming an opinion about the cause of an outcome, and then testifying about that opinion. Such a rule would require the exclusion of nearly all expert testimony from pathologists, who, of course, are aware of the outcome—a person's death—before analyzing data and forming an opinion about the cause of that outcome. Similarly, if a bridge collapsed, an engineer would not be able to study available data, reach a conclusion as to why the bridge collapsed and then testify about that conclusion. And an accident reconstructionist, aware of the results of an accident, could not begin her analysis by visiting the scene of the accident.

The Court does acknowledge that whether an expert was aware of the final result before analyzing data and forming an opinion about the cause of that result is relevant. But it is not determinative as to admissibility. What matters more than where an expert starts an analysis is that the expert is qualified to consider and reach a conclusion based on the available data, and that consideration of the available data provides a reliable methodology of arriving at the opinion reached.

Here, Dr. Herrington did not state that he reached his conclusions because of the fact that Mr. Jimenez died. He stated that he reviewed the autopsy report first. It is plausible that information from an autopsy report can provide evidence of a decedent's condition while alive and chance of survival had the decedent timely obtained certain medical treatment. Indeed, Wexford Defendants do not argue that the autopsy report is unreliable evidence that Dr. Herrington should not have reviewed. Dr. Herrington's choice to begin with the autopsy report is analogous to the starting point choices of the above-referenced pathologist, engineer, and accident reconstructionist. In short, that Dr. Herrington reviewed the evidence in the record is more important than the order in which he reviewed that evidence. Accordingly, the Court rejects

6

Wexford Defendants' argument that the order in which Dr. Herrington reviewed the evidence amounts to a confession of outcome-driven reasoning.

Wexford Defendants next argue that Dr. Herrington admitted he did not rely on peer-reviewed methodology. Wexford Defendants, however, make no persuasive argument as to why a correctional medicine expert must cite a peer-reviewed source establishing a particular methodology in order to give an opinion about correctional medical care. Dr. Herrington testified that he relied on his own professional experience to develop his methodology. Doc. 63-1 at 2. Indisputably, Dr. Herrington has experience in the relevant specialty of correctional healthcare, having held positions as medical director and chief medical officer of correctional institutes, with responsibility for managing a medical system to provide medical care for prison populations. Doc. 75-1. Dr. Herrington's extensive correctional and medical expertise, education, and experience appropriately inform his methodology. Dr. Herrington reviewed the medical records, opined as to the standard of care, and explained why the standard of care was not met. This testimony from a doctor with education, experience, and credentials in the appropriate fields need not necessarily rely on scientific-knowledge-based evidence such as peer review. *See Kumho*, 526 U.S. at 151 (not every *Daubert* factor applies in every case); *Spray v. Bd. of Cnty. Comm'rs of Okla. Cnty.*, No. 20cv1252, 2023 WL 5432507, at *2 (W.D. Okla. Aug. 23, 2023) (medical opinions admissible where they "are supported by an adequate factual basis and are sufficiently grounded in Dr. Lawrence's experience as a medical doctor"); Fed. R. Evid. 702, advisory committee notes to 2000 amendment ("Nothing in this amendment is intended to suggest that experience alone—or experience in conjunction with other knowledge, skill, training or education—may not provide a sufficient foundation for expert testimony."); *see also Church Mut. Ins. Co., S.I. v. Chabad of New Mexico*, No. 1:24-CV-00090-MIS-SCY, 2026 WL 370150,

at *5 (D.N.M. Feb. 10, 2026) (collecting cases where "knowledge, skill, experience, training, and/or education" was sufficient to render an opinion reliable under *Daubert*). The Court concludes that Dr. Herrington's reliance on his professional experience, education, and training provides a sufficient methodology for him to testify about the medical care provided in the present case without resorting to speculation.

Of course, unlike the standard of medical care for a general population—which can be readily known through experience and training—a medical opinion about the prognosis of a specific individual requires consideration of evidence related to that specific individual. In providing a prognosis of what might have been, Dr. Herrington stated that "each day of earlier intervention 'is going to afford Mr. Jimenez some kind of increased probability of not dying on the 4th.'" Doc. 63 at 6-7. Further, as Wexford Defendants note, when asked what probability Dr. Herrington would assign if Mr. Jimenez had been hospitalized on March 22 rather than April 3, he testified that it "would be more than 50 percent" but could not say whether that means the percentage would be 55, 72, or 98. *See* Doc. 63 at 13; Doc. 63-1 at 6. Wexford Defendants argue that "[w]ithout quantification, statistical support, or peer-reviewed literature, Dr. Herrington's assertion is no more than speculation." Doc. 63 at 7. Wexford Defendants further argue, "Dr. Herrington did not identify what specific treatment Mr. Jimenez would have received on March 22 that was unavailable on April 3, or provide any opinions that any treatment on March 22 would have altered the outcome. Without naming the intervention—whether antibiotics, valve surgery, or other measures—and without quantifying its likelihood of success, the opinion is purely speculative." Doc. 63 at 14.

As an initial matter, the Court observes that an attempt by Dr. Herrington to fix a precise percentage to Mr. Jimenez's chance of survival had he been taken to the hospital earlier would

require a statistical analysis and additional methodology. Plaintiff's cause of action, however, does not require such precision. An Eighth Amendment claim requires a plaintiff to show "that [the] medical need was objectively sufficiently serious, and that defendants' delay in meeting that need caused [the inmate] substantial harm." *Mata v. Saiz*, 427 F.3d 745, 752 (10th Cir. 2005). "The relevant question is whether the delay worsened [the inmate]'s condition, not caused it." *Kellum v. Mares*, 657 F. App'x 763, 771 (10th Cir. 2016).[3] Wexford Defendants contend that Dr. Herrington engaged in speculation because he agreed in his deposition that "we will never know" what exactly would have happened with earlier intervention and that he is "not clairvoyant." Doc. 63 at 6-7; Doc. 63-1 at 4. But again, under the relevant legal standard, Wexford Defendants demand too much. Expert testimony need only establish that a delay worsened the inmate's condition and/or caused unnecessary pain and suffering. *Kellum*, 657 F. App'x at 771-72. It does not require certainty as to what would have happened in the absence of the delay.

Of course, this does not mean that an expert's opinion that a delay caused harm is admissible in the absence of some foundation. Here, however, Dr. Herrington did provide a foundation for his opinions. He provided the medical evidence on which he relied (Mr. Jimenez's symptoms of necrotizing infective endocarditis of his aortic valve) and explained why a hospital admission would have discovered it (this condition must have developed many days prior to his death). Doc. 63-2 at 19-20. Dr. Herrington also explained that "abnormal blood clotting, the visual changes, pupillary findings and elevated respiratory rate" reported on March 22 presented sufficient cause for a hospital referral due to potentially being COVID positive, and because

---

[3] The Court cites unpublished Tenth Circuit cases for their persuasive value. *See* 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").

these are signs of potentially life-threatening conditions such as stroke and pulmonary embolism. Doc. 63-2 at 9. Wexford Defendants are free to present a competing theory, based on their own medical expert testimony, to the jury at trial. But such a disagreement is not a basis for excluding expert opinions.

Finally, Wexford Defendants argue that Dr. Herrington did not opine on what treatment the hospital could have provided to prevent Mr. Jimenez's death from endocarditis. Doc. 63 at 14-15. As set forth above, Dr. Herrington did not testify that the hospital would certainly have prevented his death, but that Wexford's failure to refer him to the hospital resulted in a loss of chance for timely treatment. Doc. 63-2 at 19-20. Again, if Dr. Herrington had failed to establish a foundation for this opinion, the Court might agree that his conclusion is speculative. However, Dr. Herrington's report incorporates and cross-references the treatment the hospital did provide. *E.g.*, Doc. 63-2 at 15 (hospital discharge summary including description of treatment administered); *id.* at 10 (hospital progress notes describing assessment/treatment plan). Dr. Herrington concludes his report by saying: "Had Wexford referred Mr. Jimenez to the hospital on 3/22/21 . . ., treatment would have been instituted at that time making it unlikely that he expires on 4/04/21." *Id.* at 20. The Court reads his opinion as concluding that the treatment the hospital did administer on April 3 and 4, had it been administered on March 22, would "likely" have saved his life by being administered before the necrotizing infection passed the point of successful intervention.

In other words, Dr. Herrington explained the foundation for his opinion. Any identification of logical or medical gaps in this opinion is classic fodder for an opposing expert to disagree, or for cross-examination at trial. It does not amount to a showing that his opinion is unreliable. *Daubert*, 509 U.S. at 596.

This conclusion is consistent with the Tenth Circuit's unpublished, but persuasive, opinion in *Kellum v. Mares*. There, the inmate presented to correctional staff signs indicating a need for urgent medical attention, but her condition was not diagnosed or treated until she was taken by ambulance to a hospital. 657 F. App'x at 764. At the hospital, she was diagnosed with endocarditis, pulmonary artery blockage, and a collapsed lung. *Id.* The inmate sued both a nurse who saw her three days before the hospital transport and a correctional officer who observed her condition five hours before the transport. *Id.* at 764-66. The Tenth Circuit did not discuss medical expert testimony regarding the nurse, but discussed it in the context of the five-hour-delay claim against the correctional officer. *Id.* at 766, 771-72.

> The district court cited medical testimony from Ms. Kellum's expert, Dr. Ross, that the staphylococcus aureus bacterium responsible for Ms. Kellum's heart infection doubles every twenty minutes, that the bacterium is very aggressive, and that a few days of delay could make a big difference in the patient's outcome. Dr. Ross also testified that seventy-five percent of patients with endocarditis caused by sepsis are treated successfully with antibiotics and without surgery when they receive timely emergency care at the first signs of sepsis. The district court concluded this evidence was sufficient to support the reasonable inference that the five hours Ms. Mares delayed medical treatment for Ms. Kellum worsened Ms. Kellum's condition because during that time the bacteria doubled fifteen times, or increased by a factor of 16,386. Further, the district court cited the evidence showing Ms. Kellum experienced substantial and debilitating pain and suffering during the five hours Ms. Mares delayed Ms. Kellum's receipt of medical treatment.

*Kellum*, 657 F. App'x at 766.

The defendant argued this testimony left an "evidentiary causation vacuum," because it was possible, given the aggressive bacteria-replication rate, that the inmate was already at the point of no return before the five-hour delay." *Id.* at 771. The Tenth Circuit disagreed: "We are satisfied that the expert medical opinion regarding the bacteria-replication rate is sufficient to meet Ms. Kellum's summary judgment burden on worsened-condition causation." *Id.* at 772.

Based on the standard for expert testimony articulated in *Kellum*, the testimony in this case that a nearly two-week delay caused harm satisfies the relevant causation standard.

Here, unlike the expert in *Kellum*, Dr. Herrington does not offer testimony about the speed at which the bacterium responsible for Mr. Jimenez's infection spread nor provide statistics related to the prognosis of patients with endocarditis who are treated at the first signs of sepsis. He did, however, reference the treatment Mr. Jimenez received and opine that, had Mr. Jimenez received that treatment earlier, Mr. Jimenez's chances of survival would have been greater. Such testimony is relevant and admissible under the standard the Tenth Circuit set forth in *Kellum*.

> B.     Ignoring Contrary Evidence

Next, Wexford Defendants argue that Mr. Jimenez did not display classic clinical findings of infective endocarditis on March 22, such as fever, cardiac murmur, or vascular phenomena. Doc. 63 at 9-10. Because Dr. Herrington did not account for the lack of these symptoms, they argue that his opinion is "based solely on his retrospective interpretation of limited data that he selected, without excluding other plausible causes such as anemia, chronic disease, medication effects, or non-cardiac respiratory changes." *Id.* at 11.

Dr. Herrington, however, did not opine in his report that Wexford providers should have diagnosed infective endocarditis on March 22—he testified simply that many symptoms of endocarditis were present on March 22. Doc. 75 at 15-16. More specifically, Dr. Herrington opined that the failure to meet the standard of care on March 22 was due to COVID concerns and potentially life-threatening conditions such as stroke and pulmonary embolism. Doc. 63-2 at 9.

Similarly, Dr. Herrington's causation opinion is not dependent on the proposition that Wexford providers should have diagnosed infective endocarditis on March 22. As set forth above, he opined that *hospital providers* would likely have diagnosed this condition and

12

administered treatment. Doc. 63-2 at 9, 20. An argument that Wexford providers could not have diagnosed infective endocarditis on March 22 is not a persuasive reason to exclude testimony that, "Based on the availability of advanced diagnostic testing in a hospital setting and the multisystem impact of Mr. Jimenez's endocarditis, it is likely that this condition would have been identified had he been sent to the hospital on 3/22/21 as required by standard of care." Doc. 63-2 at 20.

More importantly, assertions that experts failed to consider all available data or founded their opinions on unreliable data are common fodder for cross-examination and closing argument. But rarely are such arguments a basis to exclude the experts from testifying at all. "By its terms, the *Daubert* opinion applies only to the qualifications of an expert and the methodology or reasoning used to render an expert opinion. *Daubert* generally does not, however, regulate the underlying facts or data that an expert relies on when forming her opinion." *United States v. Lauder*, 409 F.3d 1254, 1264 (10th Cir. 2005) (citation omitted). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. The Court finds that Wexford Defendants' arguments go to the weight and not the admissibility of the opinion.

For these reasons, the Court denies Wexford Defendants' motion in full.

## III.    NMCD Defendants' Motion to Exclude Dr. Herrington

NMCD Defendants move to exclude Dr. Herrington from testifying about three categories of information. First, "NMCD Defendants request that this Court exclude any opinion concerning NMCD's role or Mr. Asonganyi's role regarding the decision to remove Mr. Jimenez from COVID quarantine." Doc. 66 at 6. Second, the NMCD Defendants argue "the Court should exclude Dr. Herrington from referencing utilization management or review as it pertains to

NMCD." *Id*. at 7. Third, the NMCD Defendants assert "the Court should exclude Dr. Herrington from even referencing NMCD or NMCD Defendants at trial . . . ." *Id*. The Court grants Defendants' first request because Dr. Herrington did not discuss the testimony the NMCD Defendants seek to exclude in his expert report and because Plaintiff has not established that his opinion is reliable. As to the NMCD's second request, Plaintiff clarified in its response that Dr. Herrington will not testify about utilization management as it relates to the NMCD Defendants. As such, the NMCD's second request is more akin to an unopposed motion in limine. Even if NMCD's second request were not unopposed, however, Dr. Herrington's report does not discuss utilization management as it relates to the NMCD Defendants and the Court would bar such testimony as being untimely disclosed. Finally, the Court denies as overly broad the NMCD Defendants' request to bar Dr. Herrington from uttering the words "NMCD" or "New Mexico Department of Corrections" during his testimony.

The Court begins its analysis with a timeliness discussion. In his report, Dr. Herrington offers no opinion regarding utilization management or that any NMCD Defendant was either directly or indirectly responsible for the decision to move Mr. Jimenez from quarantine status.[4] Under Rule 26, a retained expert must disclose a report containing "a complete statement of all opinions the witness will express and the basis and reasons for them," by the deadline set in the Court's scheduling order. Fed. R. Civ. P. 26(a)(2)(B). Under Rule 37, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not

---

[4] Dr. Herrington did invoke the phrase "utilization management" in the following sentence: "Entities responsible for the practice environment at a correctional facility, whether a budget driven public agency or a revenue driven private company, have the obligation to manage operations, design workflows and draft policies, including utilization management policies, that assure that delivered healthcare meets standard of care." Doc. 63-2 at 3. This statement about what duty entities responsible for the practice environment at a correctional facility have, however, is not equivalent to an opinion that any Defendant in this case breached such a duty.

14

allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). In this case, Plaintiff does not address whether the failure was substantially justified or harmless. *Cf.* Doc. 102 at 4-5. Thus, Plaintiff fails to meet its "burden of establishing substantial justification and harmlessness is upon the party who is claimed to have failed to make the required disclosure." *Nguyen v. IBP, Inc.*, 162 F.R.D. 675, 680 (D. Kan. 1995).

Regarding utilization management, Plaintiff does not even now seek testimony from Dr. Herrington against the NMDC Defendants on this subject. As Plaintiff acknowledged in response to the NMCD Defendants' motion, "Although NMCD Defendants seek to prevent Dr. Herrington from offering opinions about Wexford's use of utilization management as it pertains to NMCD, Dr. Herrington's report does not include direct opinions on utilization management. His deposition testimony makes no reference to NMCD in the context of utilization management. Thus, it would be improper to characterize Dr. Herrington as offering unreliable opinions on NMCD and utilization management, when he offered no such opinions." Doc. 102 at 8. Because Dr. Herrington has not offered an opinion on NMCD and utilization management and is not seeking leave to offer such an opinion, this issue in not ripe for analysis under *Daubert*.[5] To remove any ambiguity as to whether the Court would allow such testimony at trial, however, the Court notes that such testimony would be untimely and excluded under Rule 37.

---

[5] In his deposition, Dr. Herrington testified that Wexford "looks at hospital status" to "make sure that their central office knows about the hospitalization" in order to "make sure [they are] getting value for the money." Doc. 66-1 at 3 (Herrington dep. at 96:5-12). Dr. Herrington referred to this as "utilization management." *Id.* As Plaintiff points out, however, neither Dr. Herrington's testimony nor his report connects this "utilization management" to anything NMCD Defendants did or did not do. Doc. 102 at 8.

Although Plaintiff does not seek to have Dr. Herrington testify about utilization management as it pertains to the NMCD Defendants, it does seek to introduce testimony from Dr. Herrington that "the facility's medical director, Defendant Asonganyi, was responsible for ensuring a formal process was in place to remove Mr. Jimenez and others at CNMCF from quarantine." Doc. 102 at 7. In support, Plaintiff does not contend that Dr. Herrington offered such an opinion in his report. Nor does it seek leave for Dr. Herrington to supplement his report. *See* Doc. 102 at 5 (arguing the good cause and excusable neglect standards do not apply because "Plaintiff is not moving to modify deadlines. The report discloses the quarantine opinions, discloses the standard-of-care framework, and discloses the methodology used. (ECF No. 63-2 at 3, 7, 17–18, 21). Dr. Herrington offered an opinion at his deposition, before the close of discovery, when asked a question about NMCD policies."). It is true that Dr. Herrington repeatedly opines in his report that the standard of care was breached by moving Mr. Jimenez out of quarantine rather than moving him somewhere for more extensive medical care. Doc. 63-2 at 7, 9, 20-21. But Dr. Herrington never opines in his report that Mr. Asonganyi, or any other NMCD Defendant, was responsible for this alleged breach of the standard of care.

Rather than seeking to supplement Dr. Herrington's report or to extend discovery to add this information, Plaintiff appears to take the position that if the NMCD Defendants wanted to explore the opinion Dr. Herrington did not disclose until his deposition, it was up to Defendants to seek additional discovery on this topic. *See* Doc. 102 at 3-4 ("NMCD Defendants articulate no discernable reason why Dr. Herrington's opinion on the term 'medical director,' which was prompted by a question he was asked at his deposition, a term defined on a policy which NMCD Defendants disclosed to Plaintiff, would require more written discovery into the scope of Dr. Herrington's opinions or a supplemental deposition of Dr. Herrington."). Plaintiff implies that

16

Dr. Herrington need not have disclosed this opinion in a written report because "NMCD Defendants extensively questioned Dr. Herrington on this opinion." *Id*. at 4. Further attempting to shift the burden onto Defendants, Plaintiffs argue, "NMCD Defendants did not reserve the right to keep the deposition open or indicate whatsoever that further questioning was required." *Id*. Absent from Plaintiff's brief, however, is any legal support for the notion that a party may wait until its expert is deposed to disclose an opinion and then shift the burden to the opposing party to justify why more discovery related to this opinion might be necessary. As noted above, the burden of establishing substantial justification and harmlessness for a belatedly disclosed opinion is on the party who is claimed to have failed to make the required disclosure. *Nguyen v. IBP, Inc.*, 162 F.R.D. 675, 680 (D. Kan. 1995). Put simply, Plaintiff did not timely disclose the expert opinion it now seeks to introduce, did not attempt to justify its late disclosure, and did not seek to supplement its expert report to include this opinion. Therefore, Rule 37 bars Plaintiff from introducing this opinion.

Even if Dr. Herrington's opinion were timely, however, the Court would still exclude it. This is because Dr. Herrington's opinion is premised on an inference rather than on a fact he knows to be true. After reading NMCD Policy 170100, Dr. Herrington believed that the "medical director" who bears responsibility for directing a pandemic response and who would therefore have "indirect responsibility" for moving patients in and out of quarantine would be an NMCD employee. Doc. 66-1 at 4 (Herrington Dep. at 100:8-101:1). Dr. Herrington's belief that the medical director referenced in NMCD Policy 170100 would be an NMCD employee is understandable. NMCD Policy 170100 defines "medical director" as "[t]he Chief Medical Administrator *who is the Department official* and healthcare authority responsible for directing the provision of all medical and dental contract services." Doc. 102-1 at 2 (emphasis added). Dr.

Herrington, however, never stated that he knew an NMCD employee held the position of medical director; he testified only that he assumed from reading NMCD Policy 170100 that an NMCD employee held this position.[6] Doc. 66-1 at 4-5. Thus, Dr. Herrington's opinion that an NMCD employee was responsible for developing a process for moving patients out of quarantine (and therefore indirectly responsible for Mr. Jimenez being moved from quarantine to general population) is based on nothing more than an inference he made upon reading NMCD Policy 170100. Such an inference does not provide a reliable factual basis for Dr. Herrington's opinion. *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003) (under *Daubert*, expert opinions must be "based on facts sufficiently tied to the case"); Fed. R. Evid. 702(b) (expert testimony must be "based on sufficient facts or data"). Accordingly, the Court grants NMCD Defendants' request to "exclude any opinion concerning NMCD's role or Mr. Asonganyi's role regarding the decision to remove Mr. Jimenez from COVID quarantine." Doc. 66 at 6.

Further, the Court agrees with the NMCD Defendants that, although Dr. Herrington does assume from NMCD Policy 170100 that the medical director described in the policy is an NMCD employee, Dr. Herrington does not assume this employee is Mr. Asonganyi. As Defendant points out, Plaintiff—not Dr. Herrington—asserts that Mr. Asonganyi held the position of medical director. Doc. 113 at 6. Normally, an expert opinion that comes from a party rather than from a party's expert would warrant little discussion—an admissible expert opinion must obviously come from the expert rather than from the party who hired the expert.

Some discussion about Plaintiff's assumption is warranted because the NMCD Defendants spend a large portion of their Reply excoriating Plaintiff for labeling Mr. Asonganyi

---

[6] In reply, the NMCD Defendants assert the medical director was not an NMCD employee. Doc. 113 at 1-4.

as the medical director, to include stating that Plaintiff's doing so raises Rule 11 concerns. Doc. 113 at 1-4. For several reasons, the Court disagrees that Plaintiff's characterization of Mr. Asonganyi as the medical director raises such concerns. First, NMCD 170100 indicates that the medical director is an NMCD employee and, as the Health Services Administrator, Mr. Asonganyi appears to be the NMCD employee best positioned to fill that role. Second, during Mr. Asonganyi's deposition, in response to questions from counsel for NMCD Defendants, Dr. Herrington repeatedly referred to the "medical director" as "your director". Doc. 66-1 at 5 (Herrington dep. at 104:22-23). Counsel for NMCD Defendants also reasonably could have been interpreted as implying that the medical director was an NMCD employee when she asked during this deposition, in an attempt to draw a concession from Dr. Herrington, "So your testimony is that **NMCD's medical director** was not involved in the decision to remove him from quarantine." *Id*. (Herrington dep. at 105:1-2) (emphasis added). And, most significantly, the NMCD Defendants' motion reasonably can be read as identifying Mr. Asonganyi as being the medical director:

> Notwithstanding that Dr. Herrington opined that he has no evidence **that the medical director (NMCD Defendant Asonganyi)** played any role in Mr. Jimenez's removal from COVID quarantine on March 22, 2021 (*Id. at p8: 19-230,* nonetheless, Dr. Herrington testified in his deposition that NMCD's medical director bore responsibility for Mr. Jimenez's removal from COVID quarantine, *id.* at 99:23-101:16, despite not having reviewed NMCD's COVID protocols and despite not having even assessed whether NMCD was managing the outbreak of COVID correctly or incorrectly. *Id.* at 101:17-102:8.

Doc. 66 at 6 (emphasis in bold added; emphasis in italics in original). In sum, although not an actual opinion of Dr. Herrington and not a subject on which Dr. Herrington may opine, Plaintiff's assertion that Defendant Asonganyi filled the role of the medical director described in in NMCD Policy 107100 was not without some basis.

19

Finally, the Court addresses the NMCD Defendants' request to "exclude Dr. Herrington from even referencing NMCD or NMCD Defendants at trial." Doc. 66 at 7. Such a request goes beyond seeking to exclude Dr. Herrington from attempting to offer an opinion related to an NMCD Defendant. NMDC employees are parties in this case and Mr. Jimenez's confinement at an NMDC provides relevant factual context. The jury will be well aware that Mr. Jimenez was in custody at an NMDC facility and so a mere reference to NMDC by Dr. Herrington inflicts no prejudice on the NMDC Defendants. At this point, it is impossible to predict what questions Dr. Herrington will be asked. It is not difficult to imagine, however, a scenario in which a simple reference to NMDC could provide appropriate context to a response Dr. Herrington might provide. The Court thus denies the NMDC Defendants' request to prohibit Dr. Herrington from mentioning NMDC.

## IV.    Plaintiff's Motion to Exclude Dr. Rieger

Plaintiff, in turn, moves to exclude NMCD Defendants' medical expert, Dean Rieger, MD MPH. Doc. 70. In support of this motion, Plaintiff raises three arguments: (1) Dr. Rieger's opinion on ultimate legal questions should be excluded; (2) Dr. Rieger's opinion is unreliable under *Daubert*; and (3) any testimony speculating about possible drug use should be excluded. Doc. 70. The Court agrees with the first argument, rejects the second, and partially agrees with the third. Thus, the Court grants in part and denies in the part the motion.

### A.    Opinion on legal conclusions

In his report, Dr. Rieger opines that "no Wexford provider exhibited deliberate indifference" and that he "identified no circumstances in which Wexford personnel were indifferent to Mr. Jimenez's serious medical needs." Doc. 70-1 at 2, 16. Plaintiff argues this is a legal conclusion because the legal standard for its constitutional claims is "deliberate indifference." Doc. 70 at 5-6. In response, NMCD Defendants do not take the position that

20

medical experts may render opinions on ultimate legal conclusions. Instead, they argue that Dr. Rieger rendered medical opinions: that the care provided was adequate, with concern for Mr. Jimenez's medical needs, and medical staff consistently responded to Mr. Jimenez's complaints and provided care reflective of clinical attention and concern. Doc. 97 at 9-10.

The Court agrees that an expert should not testify about whether medical staff were "indifferent" to an inmate's medical needs. As the word is used in common English—as a lay jury would understand it—whether a nurse subjectively cared about or was indifferent to an inmate's complaints is not relevant to the issues in the complaint. And whether a provider was "deliberately indifferent" is a legal term of art outside the expert's purview. *See Christiansen v. City of Tulsa*, 332 F.3d 1270, 1283 (10th Cir. 2003) ("Whether defendants in this case acted 'recklessly' is a legal conclusion, and thus, the district court properly excluded that portion of Dr. Crass' affidavit."); *Sims v. Bd. of Cnty. Commissioners for Oklahoma Cnty.*, No. 23cv780, 2026 WL 281173, at *4 (W.D. Okla. Feb. 3, 2026) (collecting cases for the proposition that "expert testimony that a defendant acted with 'deliberate indifference' [is] an impermissible legal conclusion").

Therefore, the Court grants the motion in part to exclude Dr. Rieger's opinions about providers' "indifference" or "deliberate indifference" at trial. This, of course, does not prevent Dr. Rieger from testifying about the substantive medical issues identified in NMCD Defendants' brief—that is, "assess[ing] Mr. Jimenez's access to medical care and whether the care provided was adequate based on how Mr. Jimenez presented to the medical staff." Doc. 97 at 6.

B.    *Daubert* argument

Plaintiff next moves to exclude Dr. Rieger from testifying at all. In support, it makes arguments similar to those the Wexford Defendants raised in their attempt to exclude the

21

testimony of Dr. Herrington. For the same reasons the Court rejected the Wexford Defendants' arguments, the Court rejects Plaintiff's arguments.

Dr. Rieger is a physician and has been board certified in Preventive Medicine and Public Health since 1984. Dr. Rieger's career in correctional medicine began in 1977 and lasted until 2016, including stints as the facility medical director for correctional institutions. Doc. 75-1. As with Wexford Defendants' challenge to Dr. Herrington, Plaintiff does not challenge Dr. Rieger's knowledge, training, or experience in the relevant specialized fields. Rather, under *Daubert*, Plaintiff argues that (1) his methodology is not reliable because it lacks support from peer-reviewed studies; and (2) the expert did not consider all the relevant evidence. These arguments are unavailing.

The Court first addresses Plaintiff's argument that Dr. Rieger "cites no peer-reviewed publications, aside from a general reference to American Correctional Association standards and offers no explanation of the methodology he used to evaluate the medical records." Doc. 70 at 6. For the reasons explained above with respect to Dr. Herrington, the Court finds that a lack of peer-reviewed methodology does not prevent Dr. Rieger from rendering an opinion under the facts of this case based on his training and experience in the field of correctional medicine.

Second, Plaintiff argues that Dr. Rieger ignores evidence contrary to his position. Plaintiff asserts that Dr. Rieger omits discussion of a March 26, 2021 encounter, wherein Mr. Jimenez presented with low oxygen saturation and a Wexford practitioner failed to address a March 25 laboratory report showing a significantly low hemoglobin level, confirming anemia. Doc. 70 at 6-7. Instead, Dr. Rieger characterizes the medical record from March 24 through March 30 as "silent." Doc. 70-1 at 8. As explained above, assertions that experts failed to consider all available data or founded their opinions on unreliable data amount to fodder for

22

cross-examination. *United States v. Lauder*, 409 F.3d 1254, 1264 (10th Cir. 2005). They are

seldom a basis for wholesale exclusion of an opinion. The Court finds that any disputes over the

March 26 encounter go to the weight of this testimony rather than its admissibility. Accordingly,

the Court rejects Plaintiff's motion to exclude Dr. Rieger from testifying at all.

> C.    <u>Opinion on drug use</u>

Turning its focus to a specific portion of Dr. Reiger's proposed testimony, Plaintiff next

moves to exclude Dr. Reiger from testifying about possible drug use. When discussing a March

22 appointment with a Wexford nurse, Dr. Riegel wrote:

> The immediate concern was dehydration. Vital signs suggested that dehydration
> was not present as did the moist membranes in his mouth. Objective evidence of
> dehydration or its absence could then have been confirmed by a simple urinalysis,
> which Mr. Jimenez was offered but refused. It appears that the provider contact
> was terminated when he refused the simple urine test.
>
> (Illicit drug use was a real concern at this time. Stimulant drug abuse can cause
> fixed, dilated, and nonresponsive pupils, and "jittery eyes," which can include
> nystagmus and double vision. Although we will never know precisely what
> caused these eye findings, we know from brain imaging in the emergency
> department at the New Mexico University Hospitals that there were no obvious
> brain lesions when the hospital received him and from the autopsy (which
> included gross assessment and histological examination of the brain) that there
> were no lesions at the time of Mr. Jimenez's death. Again, we can never know
> why Mr. Jimenez refused to provide urine, but it is possible he was concerned
> about a possible test for illicit drugs.)

Doc. 70-1 at 6-7.

Plaintiff argues that this opinion is unreliable under *Daubert* because it engages in

speculation as to the reason Mr. Jimenez refused a urine test. Doc. 70 at 7-8. NMCD Defendants

disagree with this characterization of the passage. They argue that it is not speculation as to why

Mr. Jimenez refused a urine test, but that it is an opinion as to whether medical staff

appropriately considered that "illicit drug use was a possible cause of the symptoms." Doc. 97 at

9. In reply, Plaintiff disagrees again: "Dr. Rieger does not opine that Mr. Jimenez's fixed, dilated, and non-responsive pupils were likely caused by stimulant drug use." Doc. 99 at 5.

This passage from Dr. Riegel's report is somewhat ambiguous. Both parties offer reasonable interpretations of its meaning. The Court need not resolve the dispute over what Dr. Riegel meant when he wrote this passage, however, because even accepting Plaintiff's interpretation, NMCD Defendants do not contend that Dr. Riegel should be permitted to engage in speculation at trial about why Mr. Jimenez refused a urine test.

The Court therefore grants the motion in this narrow aspect: at trial, Dr. Riegel will be precluded from engaging in speculation about why Mr. Jimenez refused a urine test on March 22. Because other apparent explanations for Mr. Jimenez's symptoms are relevant, however, Rule 702 does not bar Dr. Riegel from testifying about the symptoms illicit drug use may cause.

## CONCLUSION

The Court DENIES Wexford Defendants' Motion To Exclude Testimony Of Ryan Herrington, MD (Doc. 63).

The Court GRANTS IN PART and DENIES IN PART NMCD Defendants' Daubert Motion To Exclude Testimony Of Ryan Herrington, M.D. (Doc. 66) as follows:

1. At trial, Dr. Herrington shall not reference utilization management or review as it pertains to NMCD;

2. At trial, Dr. Herrington shall not provide an opinion about NMCD's role or Defendant Asonganyi's role regarding the decision to remove Mr. Jimenez from COVID quarantine; and

3. At trial, Dr. Herrington shall not provide an opinion related to the NMCD Defendants but is not prohibited from mentioning NMCD at all.

24

The Court GRANTS IN PART and DENIES IN PART Plaintiff's Motion To Exclude Testimony Of Dean Rieger, MD MPH (Doc. 70) as follows:

1.    At trial, Dr. Rieger shall not provide an opinion about whether the medical providers exhibited "indifference" or "deliberate indifference" with respect to Mr. Jimenez;

2.    At trial, Dr Rieger shall not engage in speculation about why Mr. Jimenez refused a urine test on March 22; and

3.    The motion is denied in all remaining aspects.

SO ORDERED.

_____
STEVEN C. YARBROUGH
UNITED STATES MAGISTRATE JUDGE
Presiding by consent